Roger Flynn (CO Bar # 21078) *(Applicant Pro Hac Vice)*
Jeffrey C. Parsons (CO Bar # 30210) *(Applicant Pro Hac Vice)*
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO 80540
Phone: 303-823-5738
Email: wmap@igc.org

Marc D. Fink (MN Bar # 343407) (Applicant *Pro Hac Vice*)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org

Allison N. Melton (CO Bar # 45088) (Applicant *Pro Hac Vice*)
Center for Biological Diversity
128 Cascadilla St./#3024
Crested Butte, CO  81224
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | | |
|---|---|---|
| Save the Scenic Santa Ritas; | ) | |
| Center for Biological Diversity; | ) | Case No. |
| Arizona Mining Reform Coalition; | ) | |
| Sierra Club Grand Canyon Chapter; | ) | COMPLAINT FOR |
| | ) | VACATUR, AND |
| Plaintiffs, | ) | EQUITABLE, |
| v. | ) | DECLARATORY, AND |
| | ) | INJUNCTIVE RELIEF |
| U.S. Army Corps of Engineers; | ) | |
| D. Peter Helmlinger, Brigadier General, U.S. | ) | |
| Army, in his official capacity; | ) | |
| | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.      This case challenges the decisions of the U.S. Army Corps of Engineers ("Corps") to issue a permit that authorizes the construction and operation of the Rosemont Copper Project ("Rosemont Project" or "Mine"), a large-scale open pit copper mine in the heart of the Santa Rita Mountains south of Tucson, Arizona.  D. Peter Helmlinger, Brigadier General of the Corps, issued the Corps' Record of Decision ("ROD") and Permit under Section 404 of the federal Clean Water Act on March 8, 2019 ("404 Permit").

2.      The 404 Permit authorizes Rosemont Copper Company and its parent company, Hudbay Minerals, Inc. based in Toronto, Canada ("Hudbay") to discharge "dredged or fill material" into "Waters of the United States" ("WOUS") at the Mine site, which without the Mine could not be constructed or operated as Rosemont proposed.

3.      The 404 Permit enables Rosemont to construct and operate a mining project that will dump well over a billion tons of mine waste and rock into the waters and adjacent lands of Barrel and Wasp Canyons, permanently eliminating these waters and their surrounding riparian areas.

4.      In addition to their nationally-recognized environmental, wildlife, and cultural values, the lands and waters at the Mine site and surrounding areas are noted for their stunning beauty:



Plaintiff SSSR photo of proposed Rosemont Mine site, October 2017.

5.      This suit challenges the Corps' failure to comply with mandatory procedural and substantive requirements governing the Corps' approval of Section 404 permits under the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the implementing regulations and policies of these laws.

6.      Because the Mine would be located on federal public land administered by the U.S. Forest Service ("USFS") (except for a portion of the mine pit and tailings waste

facility, which would be located on Rosemont's private lands), the USFS prepared a Final Environmental Impact Statement ("FEIS") in 2013 and issued a Record of Decision authorizing the Project in June of 2017.  The Corps was a "cooperating agency" with USFS in preparing the FEIS, and the Corps relies upon the 2013 FEIS in issuing the 404 Permit.

7.      The USFS' decisions, and the related "Biological Opinion" issued by the United States Fish and Wildlife Service ("FWS"), have been challenged in three pending and consolidated lawsuits filed in this court.  *See* Center for Biological Diversity v. U.S. Fish and Wildlife Service, No. 4:17-cv-00475-TUC-JAS (Lead); Save the Scenic Santa Ritas v. U.S. Forest Service, No. 4:17-cv-00576-TUC-JAS; Tohono O'odham Nation v. U.S. Forest Service, No. 4:18-cv-00189-TUC-JAS.

8.      In order to construct and operate the mine, Rosemont needs both final authorization from the USFS as well as the 404 Permit from the Corps.  Because the issuance of the 404 Permit by the Corps is a necessary prerequisite for construction and operation of the Mine, the USFS stated that it would not approve the revised and final Mining Plan of Operations ("MPO") for the Mine, nor allow Rosemont to disturb public land, until the Corps issued the 404 Permit.  "[T]he Coronado [National Forest] will approve the MPO, contingent upon Rosemont Copper's receiving the [sic] all local, State, and Federal permits. . . .  If required permits are not received, actions cannot commence on NFS lands."  FEIS at 60.

9.      After the Corps issued the 404 Permit, the USFS approved the revised MPO on

March 20, 2019, authorizing the construction and operation of the Mine.

10.     At the beginning of the permitting process for the 404 Permit and in order to delineate the WOUS that will be directly affected by the discharges authorized by the 404 Permit, the Corps determined that "potentially jurisdictional WOUS" are present within the Mine site, thus requiring the 404 Permit prior to any discharge into these waters.  FEIS Appendix 5 at 4-5.

11.     "The proposed action involves the permanent and temporary discharge of dredged or fill material into 39.00 acres of waters of the United States on the proposed mine site." ROD at 1.

12.     In addition, the ROD and 404 Permit authorize "the permanent discharge of fill material into 9.48 acres of waters of the U.S. for the proposed compensatory mitigation under Section 404 of the CWA."  Id.  Of this total, 8.9 acres of fill discharge will occur in Sonoita Creek, which lies in a different watershed over 10 air miles from the Mine site.  The remaining fill discharges associated with the new mitigation plan will occur at four stock tanks at the Mine site.  404 Permit at 2.

13.     The two discharge locations are shown in this figure from the 404 Permit:





404 Permit "Project Setting" Figure attachment.

14.      The WOUS in this case are found throughout the Mine site, including in the

proposed locations of the mine pit, waste rock dump, and tailings (mine waste) facility.



ROD at 9, Figure 2, showing discharge locations in WOUS throughout Project footprint.

15.     The mine pit would be located in the WOUS sites in Wasp Canyon and its

tributaries and the waste rock dump and tailings waste facility would be located in the

WOUS sites in Barrel Canyon and its tributaries:



FEIS Appendix 5, "CWA Section 404(b)(1) Alternatives Analysis," Figure 9.

16.    "The proponent [Rosemont] must have an issued [404] permit in order to conduct project activities within the boundaries of WUS [WOUS] that have been determined to be jurisdictional under CWA."  USFS Record of Decision at 96.

17.    The 404 Permit authorizes discharges of fill material associated with the construction of the waste rock dump and tailings facility and operation of the mine.

These facilities, including the mine pit, are "project activities within the boundaries of [WOUS]." Id. As such, these facilities could not be constructed without being authorized via the 404 Permit.

18.     According to the initial, and only, Public Notice for Rosemont's Application for Permit, issued in December, 2011, the Corps described the proposed activities requiring the 404 Permit:

> **Activity**
> To discharge fill material into Barrel Canyon and associated tributaries including Wasp Canyon, McCleary Canyon, Trail Canyon, and other unnamed ephemeral washes for construction of the proposed Rosemont Copper Project open pit mine.

Corps Public Notice, Dec. 6, 2011, at 1.

19.     According to the Public Notice, the Rosemont Project will require the disposal of 19,941 cubic feet of waste rock into 8.24 acres of currently jurisdictional waters. Corps Public Notice 12/6/2011, Table 2. The Project will also require the disposal of 66,792 cubic feet of mine tailings into an additional 20.70 acres of jurisdictional waters. Id.

20.     The description of this fill/discharge in the 2011 Public Notice and reviewed in the FEIS stated that the discharges from the "Project Feature[s]" of the Waste Rock and Dry Stack Tailings would only include "Excavated Waste Rock," or "ROM [Run-of-Mine] Rock." Public Notice at 11, Table 2.

> The waste rock storage area will receive pit-run, or run-of-mine (ROM), waste rock consisting largely of limestone and skarn rock types, with some andesite, quartz monzonite porphyry, and arkose. . . . Site preparation of the waste rock storage areas will involve clearing and grubbing the existing topsoil in preparation of construction of the perimeter buttress. Impacts to potential WUS within the waste rock storage area will result from the placement of ROM waste rock.

2011 Public Notice at 4.

21.     In 2017, Rosemont likewise stated that the fill to be discharged into the WOUS and subject to Corps regulation was "fill of waste rock and tailings material."  No mention was made that the fill in these WOUS would be "native material" from the clearing/grubbing/grading.  As Rosemont stated in its final mitigation plan submitted in September 2017, and now relied upon by the Corps to purportedly comply with the mitigation requirements in the CWA regulations: "[t]he Rosemont Project will directly impact approximately 40.4 acres of ephemeral washes (Figure 4).  Approximately half (19.2 acres) of **these direct impacts results from fill of waste rock and tailings material in Barrel and Wasp canyon** . . .."  Final Habitat Mitigation and Monitoring Plan, Rosemont Copper Project ("HMMP"), at 6 (emphasis added).

22.     Yet in the 2019 404 Permit, the Corps reversed position and now asserts for the first time that only "native material" fill used in the initial "clearing, grubbing, and grading activities" at the waste rock and tailings sites fall within its regulatory authority under the CWA.  404 Permit at 1; ROD at 19, Table 2.

23.     This rationale and/or new discharge alternative was never mentioned in the Public Notice or analyzed in the FEIS.  The Corps now asserts that because the disposal of waste rock and mine tailings will occur after the streams have already been filled with "native material," it need not consider the adverse downstream and secondary effects to the aquatic ecosystem from the mining operations.  This is a transparent, last-minute attempt to avoid the statutory and regulatory obligation to consider the secondary

consequences of authorizing the use of waters of the United States for the purposes of

constructing and operating the mining project.

24.     This is despite the fact that the Mine could not be constructed without the 404

Permit and these initial activities, despite the fact that the tailings, waste rock, and mine

pit would be located in the WOUS sites detailed in the above figures, and despite the fact

that the Corps informed the public that the discharge of fill was for the "construction of

the proposed Rosemont Copper Project."  Public Notice at 1.

25.     The Corps now claims it did not have to consider the impacts from the

operation of the Mine in determining whether to issue the 404 Permit because it now

considers the only "discharge of fill material" to be from the initial

"clearing/grubbing/grading" in the WOUS:

> The discharge of fill material within the mine pit area and the waste rock/tailing
> disposal area would occur through using typical earth moving construction
> equipment to spread fill material throughout the disposal site.  No material from
> the excavated mine pit would be discharged into waters of the U.S. as the
> placement of excavated material from the mine pit would occur only after the
> waters of the U.S. have been filled with native material.  Following the placement
> of fill material into the ephemeral washes and three springs (note a total of five
> springs are proposed to be filled, but only three are considered potential waters of
> the U.S. See Section VIII.a.4), and prior to the excavation of the mine pit, no
> waters of the U.S. will exist within the proposed mine pit area.  No waters of the
> U.S. would be filled for excavation activities associated with operation of the mine
> pit (e.g. excavation to 2,900 feet below existing ground surface).  For this reason,
> the operation of the mine is not within the Corps' jurisdiction.

ROD at 13.

26.     Thus, contrary to its own previous and consistent position dating back to at

least 2011, and the position of Rosemont in the 2017 mitigation plan, because the

initial clearing/grubbing/grading will quickly bury all of the WOUS at the Mine site, the Corps unilaterally divested itself of any responsibility under the CWA to consider the direct, indirect, cumulative, and secondary impacts from the operation of the Mine, even though that is the entire purpose for which Rosemont applied for this 404 Permit.  Id.

27.     The Corps has thereby ignored and refused to consider the direct impacts to Wasp and Barrel Canyons and downstream Davidson Canyon from the contaminated runoff and seepage from the waste rock and tailings facilities, and failed to consider or protect against the indirect, cumulative, and/or secondary impacts to environmental, wildlife, and cultural resources that will be severely impacted, if not destroyed or eliminated altogether, by construction and operation of the Mine, made possible by the issuance of the 404 Permit.

28.     These permanent indirect/secondary effects resulting from the issuance of the 404 Permit include the most long-lasting and devastating impacts to the aquatic ecosystems in the Santa Rita Mountains resulting from the Mine: (1) the predicted elimination and/or reduction of water flows in the adjacent Las Cienegas National Conservation Area ("LCNCA"), including federal reserved water rights, caused by the Mine's dewatering of the regional aquifer; (2) creation of a permanent mine pit lake whose waters the FEIS predicts will be very harmful to wildlife; and (3) elimination of habitat, including designated critical habitat, within the LCNCA for species protected by the Endangered Species Act ("ESA").

29.     In addition to the indirect/secondary impacts from the Mine, the direct impacts to

the environment and WOUS at and downstream from the Mine site caused by the discharges and polluted runoff/seepage are also severe and permanent, including (1) violation of state and federal water quality standards for affected waters; (2) significant degradation of WOUS affected by the discharges, including the "Outstanding Arizona Waters" in Davidson Canyon and Cienega Creek; and (3) elimination of wildlife habitat, springs and waters at the site.

30.     Because of these severe impacts, the Los Angeles District of the Corps, which had reviewed the 404 Permit application since it was submitted in 2011, determined in July 2016 that the 404 Permit should be denied due to multiple violations of the CWA and implementing regulations promulgated by the Corps and U.S. Environmental Protection Agency ("EPA").  In a December 28, 2016 letter to Rosemont/Hudbay, General (then Colonel) Helmlinger, Commander of the Corps' South Pacific Division, informed the company of the various reasons why the Permit should be denied:

> The key CWA 404(b)(1) factors identified by the District that support a permit denial are determinations that **the proposed Rosemont Mine will cause or contribute to violations of state water quality standards and significant degradation of waters of the United States, including shortfalls in the proposed compensatory mitigation**. . . .  In this case, the District concluded that implementation of the proposed project would cause or contribute to violations of state water quality standards, and that minimization and mitigation measures, along with proposed monitoring were inadequate to ensure that degradation did not occur.  The District further concluded that implementation of the proposed project would result in significant degradation of waters of the United States, as a result of a substantial reduction of functions and services and that the project would contribute to the degradation of Outstanding Arizona Waters.  The District concluded that implementation of the proposed project would, among other things, adversely affect sediment delivery, hydrological functions, surface water quality, and use by humans and wildlife, including listed species.

> The District also concluded that mitigation proposed to offset project impacts would be inadequate.

December 28, 2016 letter at 1-2 (emphasis added).

31.     As shown in more detail below, in November, 2017, the EPA reiterated its similar and longstanding position that the 404 Permit would violate the CWA and numerous Corps and EPA CWA regulations and thus should not be issued.

32.     Despite General Helmlinger's stated acknowledgment of these various reasons "that support a permit denial," he nevertheless issued the Permit in 2019.

33.     Notably, the construction and operation of the waste rock dump, tailings waste facility, and mine pit – the Mine facilities associated with the authorized discharges – have not materially changed since then-Colonel Helmlinger notified Rosemont/Hudbay that the Project would violate the CWA and thus the Permit should be denied.

34.     The Corps' decision to issue the 404 Permit, despite overwhelming evidence, and its own previous findings, as well as findings from the EPA and other agencies showing that the Project and its discharges violate the CWA, is arbitrary and capricious, contrary to law, and must be vacated and remanded to the agency.

35.     In addition to authorizing the new fill discharges of "native material" into the WOUS, the 404 Permit authorizes new discharges also not mentioned in the only Public Notice issued by the Corps, allowing Rosemont: (1) "[t]o permanently discharge fill material into 8.9 acres of waters of the U.S. . . . on the Sonoita Creek/Rail X Ranch sites"; (2)  [t]o permanently discharge fill material into 0.25 acre of ephemeral drainages for the removal of the Gunsight Pass stock tank"; and (3) "[t]o temporarily discharge fill

material into 0.33 acre of ephemeral drainages for the removal of the Barrel Canyon East stock tank (0.13 acre), McCleary Canyon stock tank (0.16 acre), and Rosemont Crest stock tank (0.05 acre)."  404 Permit at 2.  None of these new discharges were included in any Public Notice as required by the Corps' regulations, or subject to any public review under NEPA.  As such, the new authorizations are likewise arbitrary and capricious, contrary to law, and must be vacated and remanded to the agency.

## JURISDICTION AND VENUE

36.     Plaintiffs bring this action pursuant to the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706.  This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question), and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706.  There is a present an actual controversy between the parties.  Plaintiffs ask this court to set aside and vacate the Corps decisions, and seek a declaratory judgment and injunctive relief to remedy the violations complained of herein.  Plaintiffs also seek an award of costs and expenses, including attorneys' fees, costs, and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412.

37.     Venue lies in the District of Arizona (Tucson Division) because Plaintiffs reside and have offices in Tucson; the lands at issue in this suit are located approximately 30 miles south of Tucson in Pima County, Arizona; and a substantial part of the events giving rise to Plaintiffs' legal claims occurred in the Tucson Division of the District of Arizona.  28 U.S.C. § 1391(e)(1).

# PARTIES

38.     Save the Scenic Santa Ritas ("SSSR") is a non-profit corporation based in Tucson, dedicated to the protection of the Santa Rita Mountains and other nearby lands and waters.  SSSR has worked since its inception to protect these lands and waters from the adverse impacts from mining and related operations.  Its members include conservationists, business owners, ranchers, wildlife enthusiasts, and others committed to ensuring that the Rosemont Mine, and its review and approval by federal, state, and local agencies, complies with all applicable laws.

39.     The Arizona Mining Reform Coalition ("AMRC") is a non-profit corporation that works in Arizona to improve state and federal laws, rules, and regulations governing hard rock mining to protect communities and the environment.  AMRC works to hold mining operations to the highest environmental and social standards to provide for the long term environmental, cultural, and economic health of Arizona.  Group members of the Coalition include: Apache – Stronghold, Center for Biological Diversity, Concerned Citizens and Retired Miners Coalition, Concerned Climbers of Arizona, Dragoon Conservation Alliance, Earthworks, Environment Arizona, Groundwater Awareness League, Maricopa Audubon Society, Patagonia Area Resource Alliance, Save the Scenic Santa Ritas, Grand Canyon Chapter of the Sierra Club, Sky Island Alliance, Spirit of the Mountain Runners, Tucson Audubon Society, and the Valley Unitarian Universalist Congregation.

40.     Center for Biological Diversity ("the Center") is a non-profit corporation

headquartered in Tucson, Arizona, with offices in a number of states and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in working to protect endangered species and wildlife habitat nationwide, and has 70,000 members throughout the United States and the world.

41.     The Sierra Club is one of the nation's oldest grassroots organizations whose mission is "to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; and to educate and enlist humanity to protect and restore the quality of the natural and human environments." The Sierra Club has more than 2.7 million members and supporters with 60,000 in Arizona as part of the Grand Canyon (Arizona) Chapter. Its members have long been committed to protecting and enjoying the Coronado National Forest and have a significant interest in the proposed Rosemont Mine and related activities.

42.     All Plaintiff groups bring this action on their own behalf, and on behalf of their members who derive scientific, aesthetic, recreational, and spiritual benefits from the natural lands and waters in the Santa Rita Mountains and nearby lands and waters threatened by the Rosemont Mine and the activities authorized by the 404 Permit, including the threatened and endangered species that would be significantly impacted by the proposed Rosemont Mine, such as jaguar, ocelot, northern Mexican gartersnake, Chiricahua leopard frog, Gila chub, Gila topminnow, southwestern willow flycatcher, and western yellow-billed cuckoo.

43.     Plaintiffs and their members, and the children, grandchildren, and future descendants of their members, will be significantly, immediately, and irreparably injured by the construction and operation of the Rosemont Mine as authorized by the 404 Permit. Plaintiffs and their members use the lands in the Santa Rita Mountains ecosystem, along with the nearby lands and waters (such as those in the congressionally-established Las Cienegas National Conservation Area) that will be adversely affected by the Rosemont Project, including the lands and waters at and downstream from the Mine site (including the sites of the discharges authorized by the Corps), lands and waters at, adjacent to, or downstream of the other discharge sites authorized by the Corps (including the new Sonoita Creek discharges), the lands crossed by the approved transmission line, water pipeline, and roads, the travel routes for the Mine's ore concentrate and transportation operations, and the lands and waters that will be adversely affected by the Mine, for recreational, scientific, aesthetic, spiritual, economic, and conservation purposes. Plaintiffs and their members derive recreational, scientific, aesthetic, spiritual and commercial benefits from these lands, waters, and wildlife.  Their uses include hiking, camping, backpacking, wading, picnicking, viewing and enjoying wildlife and aquatic life in their natural environment, taking their children and grandchildren to these lands and waters to use and enjoy these resources and values, and enjoying the unspoiled lands and waters of the Santa Rita Mountains and its adjacent public lands and downstream waters that will be adversely affected by the Project.  These uses are incompatible with the Rosemont Mine and its adverse environmental effects, as approved by the Corps, and would be precluded and/or significantly impaired if the Mine was constructed and

operated as approved in the 404 Permit.  As they have for many years, members of Plaintiff groups have visited these lands and waters within the last year for these uses, and intend on continuing their regular use and enjoyment of these lands and waters in 2019, including this spring and summer, and in future years.

44.     Plaintiffs' future enjoyment of these lands and waters will be irreparably harmed by the Corps' disregard of its statutory and legal duties in issuing the 404 Permit and by the unlawful injuries caused by the challenged actions.

45.     In addition, Plaintiffs and their members have been and will be irreparably harmed by the Corps' failure to conduct a proper NEPA and CWA analysis and to fully involve the public, including Plaintiffs and their members, in the required CWA public notice and NEPA process.  The Corps' failure to provide any public notice and public review for the new "native material" discharges as well as the new discharges into Sonoita Creek and at the stock tanks, approved as part of Rosemont's new mitigation plan, has, and continues to, harm Plaintiffs' and their members' ability to participate in these required public review processes.

46.     Plaintiffs submitted extensive comments to the Corps and other federal and state agencies with regulatory responsibility over the Mine during the environmental review and permitting process for the Project.

47.     Defendant United States Army Corps of Engineers is an agency of the United States Department of Defense.  The Corps is responsible for reviewing and issuing Section 404 permits under the CWA, as it did here.

48.     Defendant General D. Peter Helmlinger, sued in his official capacity, is the

Commander of the Northwestern Division of the Corps and is the Corps official who issued and is responsible for the challenged 404 Permit.  Although General Helmlinger was recently installed as the Commander of the Northwestern Division, he retained his authority over the Rosemont 404 Permit from his previous post as Commander of the South Pacific Division.  The Corps' decision to issue the 404 Permit and ROD is the final agency action challenged in this case.

49.     Plaintiffs have suffered and will suffer actual, concrete injuries that are traceable to the Corps' conduct and would be redressed by the requested relief.  Plaintiffs have no adequate remedy at law.

## STATUTORY AND REGULATORY BACKGROUND

**The Clean Water Act**

50.     The CWA is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

51.     The CWA prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit.  33 U.S.C. § 1311(a).

52.     "(1) . . . the term fill material means material placed in waters of the United States where the material has the effect of: (i) Replacing any portion of a water of the United States with dry land; or (ii) Changing the bottom elevation of any portion of a water of the United States. (2) Examples of such fill material include, but are not limited to: rock, . . . overburden from mining or other extraction activities, and materials used to create any structure or infrastructure in the waters of the United States."  33 C.F.R.§ 323.2(e).

53.     "The term *discharge of fill material* means the addition of fill material into waters of the United States.  The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; . . . placement of overburden, slurry, or tailings or similar mining-related materials . . .."  33 C.F.R. § 323.2(f).

54.     Thus, the "[p]lacement" of tailings, overburden/waste rock, and associated materials into the WOUS in Barrel Canyon would constitute a discharge of fill material.  33 C.F.R. § 323.2(f).

55.     Constructing the mine pit in the WOUS in Wasp Canyon is equivalent to "the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction" in waters of the United States, and thus constitutes a discharge of fill material under the Corps' regulations.  33 C.F.R. § 323.2(f).

56.     Section 404 of the CWA authorizes the Corps to issue permits, after notice and opportunity for public comment, for the discharge of dredge or fill material into waters of the United States "at specified disposal sites."  33 U.S.C. § 1344.

57.     One of the fundamental congressional "goals and policy" in enacting the CWA is to ensure full public participation in Corps and EPA permitting decisions: "Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program . . . shall be provided for, encouraged, and assisted

by the Administrator and the States."  33 U.S.C. § 1251(e).

58.     Corps regulations require that proposed discharges be subject to "Public review and comment."  33 C.F.R. § 332.4(b).  "For an activity that requires a standard DA [Department of the Army/Corps] permit pursuant to section 404 of the Clean Water Act, the public notice must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for."  33 C.F.R. § 332.4(b)(1).  The 404 Permit for Rosemont is a "standard DA permit" subject to the "public review and comment" required by 33 C.F.R. § 332.4(b).

59.     "Public notice is the primary method of advising interested parties of the proposed activity for which a permit is sought, and of soliciting comments and information necessary to evaluate the probable impact on the public interest.  The notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."  33 C.F.R. § 325.3(a).

60.     Despite the fact that the 404 Permit authorizes the new discharge of "native material" in the waste rock and tailings sites, the new discharge of 8.9 acres of fill into Sonoita Creek, as well as smaller new discharges associated with the four stock tanks, the Corps never issued a Public Notice for these proposed discharges.  These discharges were never mentioned in the only Public Notice issued by the Corps for the Rosemont discharges, on December 6, 2011.

61.     Under the Corps permitting regulations, all new proposed discharges must first be included in a formal application, with detailed requirements, to ensure "sufficient public notice."  33 C.F.R. § 325.1(d)(1).  "Applicants for all individual DA permits must use

the standard application form (ENG Form 4345, OMB Approval No. OMB 49-R0420)."

33 C.F.R. § 325.1(c). "The application must include a complete description of the

proposed activity including necessary drawings, sketches, or plans sufficient for public

notice . . . ; [including] the location, purpose, and need for the proposed activity." 33

C.F.R. § 325.1(d)(1).

62.    Rosemont's proposals for the new discharges authorized in the 404 Permit and

ROD, including the new "native material" discharges, the Sonoita Creek discharges, and

the discharges associated with the four stock tanks, were not submitted and reviewed in

compliance with the Corps' permit application process in 33 C.F.R. Part 325, including

the necessary application form and information "sufficient for public notice."

63.    The Corps cannot issue a 404 permit if it "would be contrary to the public

interest." 33 C.F.R. § 320.4(a)(1). This requires the Corps to consider "the probable

impacts" of a proposed project on "[a]ll factors which may be relevant to the proposal[,]

including cumulative effects." Id. The decision must "reflect the national concern for

both protection and utilization of important resources." Id.

> All factors which may be relevant to the proposal must be considered including
> the cumulative effects thereof: among those are conservation, economics,
> aesthetics, general environmental concerns, wetlands, historic properties, fish and
> wildlife values, flood hazards, floodplain values, land use, navigation, shore
> erosion and accretion, recreation, water supply and conservation, water quality,
> energy needs, safety, food and fiber production, mineral needs, considerations of
> property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1).

64.    The Corps adopted regulations, known as the "public interest" factors, to

implement its permitting authority. 33 C.F.R. § 320.

> Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case.  The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.  The decision whether to authorize a proposal, and if so, the conditions under which it will be allowed to occur, are therefore determined by the outcome of this general balancing process.

Id. § 320.4(a)(1).

65.     In addition, the EPA has promulgated regulations, known as the "404(b)(1) Guidelines," for Section 404 permits.  33 U.S.C. § 1344(b)(1).  The EPA Guidelines are found at 40 C.F.R. Part 230, and although labeled as "Guidelines," they are binding regulations that must be complied with by the Corps.  "For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines."  33 C.F.R. § 320.4(a)(1).  The Corps must deny a 404 permit if "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines."  40 C.F.R. § 230.12(a)(3)(iv).

66.     The Corps reviews all proposed Section 404 permits and discharges into specified disposal sites to ensure compliance with both the Corps' public interest factors and EPA's 404(b)(1) Guidelines.  33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.2(f).

67.     The EPA Guidelines implement the CWA's overarching goal to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).

> (a) The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material.  (b) Congress has expressed a number of

policies in the Clean Water Act.  These Guidelines are intended to be consistent with and to implement those policies.  (c) Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern.

40 C.F.R. § 230.1.

68.     Under the EPA requirements contained in the 404(b)(1) Guidelines, the Corps is prohibited from issuing a 404 permit if the proposed discharge of dredged or fill material "will cause or contribute to significant degradation of the waters of the United States."

40 C.F.R. § 230.10(c):

> [N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. . . . [E]ffects contributing to significant degradation considered individually or collectively, include:
> (1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites.
> (2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;
> (3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or
> (4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

Id.

69.     In addition, "[n]o discharge of dredge or fill material shall be permitted if it: (1) [c]auses or contributes . . . to violations of any applicable State water quality standard."

40 C.F.R. § 230.10(b)(1).

70.     The 404(b)(1) Guidelines also prohibit the Corps from authorizing an application for dredge and fill activities if there is a practicable alternative which would have less adverse impact.  *See* 40 C.F.R. §§ 230.10(a), 230.12(a)(3)(i).  The Corps must document its findings of compliance or noncompliance with these restrictions.  Id. § 230.12(b). Practicable alternatives are those alternatives that are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." Id. § 230.10(a)(2).

71.     "[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

> (1) For the purpose of this requirement, practicable alternatives include, but are not limited to:
> (i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;
> (ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters."

40 C.F.R. § 230.10(a)(1).

72.     To ensure these mandatory CWA requirements are satisfied, the Corps must fully evaluate the direct, indirect, secondary, and cumulative impacts of the activity, including impacts to aesthetics, recreation, and fish and wildlife.  *See, e.g.*, 33 C.F.R. §§ 320.4(a)(1), 336.1(c)(5) (endangered species), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.30 (threatened and endangered species), 230.31 (fish and wildlife), 230.51 (recreational and commercial fisheries),

230.52 (water-related recreation), 230.53 (aesthetics).

73.     The Guidelines direct the Corps to analyze and minimize or prevent the on-site impacts resulting from the fill, such as the impacts from activities occurring on the fill. For example, the Corps must "control runoff and other discharges from activities to be conducted on the fill."  40 C.F.R. § 230.77(a).  *See also* 40 C.F.R. § 230.77(b), explaining that in the case of dams, the project should design water releases to accommodate the needs of fish and wildlife.  Thus, secondary effects are not limited in time or space to just the initial discharge.  Rather, they encompass all activities and impacts associated with the fill activities.

74.     The Corps "shall determine in writing the potential short-term or long-term effects of a proposed discharge of dredged or fill material on the physical, chemical, and biological components of the aquatic environment," 40 C.F.R. § 230.11, as well as compliance or noncompliance with the restrictions on discharge, 40 C.F.R. § 230.12(b).

75.     The Guidelines require the Corps to make detailed factual determinations regarding the direct, indirect, and secondary effects associated with the discharge activity: "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States.  Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F, with special emphasis on the persistence and permanence of the effects outlined in those subparts."  40 C.F.R. §230.10(c).

76.     One section of the required subpart B "factual determinations, evaluations, and

tests" is Section 230.11, which requires that "[t]he determinations of effects of each proposed discharge shall include the following: . . .

> (h) *Determination of secondary effects on the aquatic ecosystem.*
> (1) **Secondary effects are the effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material.** Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.
>
> (2) Some examples of secondary effects on an aquatic ecosystem are fluctuating water levels in an impoundment and downstream associated with the operation of a dam, septic tank leaching and surface runoff from residential or commercial developments on fill, and leachate and runoff from a sanitary landfill located in waters of the U.S. Activities to be conducted on fast land created by the discharge of dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands.

40 C.F.R. § 230.11(h) (emphasis added).

77. "Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime." 40 C.F.R. § 230.11(b). As shown in detail below, the construction and operation of the Mine, including the mine pit and permanent dewatering of the aquifer, will result in "significant changes in the hydrologic regime."

78. "Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact **either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern**." 40 C.F.R. § 230.1(c) (emphasis added). Thus, the Corps must consider the "known and/or probable impacts of other activities affecting the ecosystems

of concern" in order to determine whether the discharge at Rosemont, "will not have an unacceptable adverse impact."

79.     According to the regulatory preamble to EPA's promulgation of the 404(b)(1) Guidelines: "in authorizing a discharge which will create fast lands the permitting authority should consider in addition to the direct effects of the fill itself the effects on the aquatic environment of any reasonably foreseeable activities to be conducted on that fast land."  45 Fed. Reg. 85336, 85340-41 (Dec. 24, 1980).

80.     Regarding the "factual determinations" in § 230.11 (including secondary effects in 230.11(h)), EPA stated: "in response to many comments, we have moved the provisions on cumulative and secondary impact to the Factual Determination section to give them further emphasis.  We agree that such impacts are an important consideration in evaluating the acceptability of a discharge site."  45 Fed. Reg. 85343.

81.     In reviewing and issuing the 404 Permit to Rosemont, the Corps specifically refused to consider any of the "secondary effects" from construction and operation of the Mine, despite EPA's conclusion that under the 404(b)(1) Guidelines, the impacts from Mine operations are considered "secondary effects."  ROD at 43.

82.     As EPA determined: "[t]he requirement that secondary impacts be fully compensated is consistent with standard practice for projects of this magnitude and essential given that the range, extent, and severity of secondary adverse impacts upon aquatic resources are as significant as the direct impacts."  Nov. 7, 2013 letter from U.S. EPA Region IX Director of the Water Division to Corps, Attachment at 2.

83.     Instead, and as noted above in direct reversal of the Corps' and Rosemont's

previous position that the discharge into the WOUS at the Mine site would be "from fill of waste rock and tailings materials in Barrel and Wasp canyons," 2017 Final Mitigation Plan, the Corps only considered the effects from the initial filling of the WOUS associated with clearing/grubbing/grading and not from other Mine activities and/or operations:

> [w]ithin the proposed mine pit area, the permanent placement of fill material into 3.60 acres of waters of the U.S. as a result of clearing, grubbing, grading, and construction of facilities, would be completed prior to the excavation of the proposed mine pit to 2,900 feet. Construction, including excavation, of the mine pit, would not result in the discharge of fill material into waters of the U.S. Similarly, the proposed discharge of dredged and/or fill material into 32.80 acres of waters of the U.S. within the waste rock disposal area, dry stack tailings area, and plant site, would occur through clearing, grubbing, and grading, and not from the discharge of waste rock or tailings. Therefore, the effects of the proposed operations of the mine, including full excavation of the mine pit, are not within the Corps' purview under the Section 404(b)(1) Guidelines. The Corps' scope under the 404(b)(1) Guidelines extends only to those direct, secondary, and cumulative effects associated with the discharge of fill material into waters of the U.S., including direct, secondary, and cumulative effects to surface water quantity and quality. Any effects related to the excavation of the mine pit, including those related to groundwater quantity or quality, are outside of the Corps' scope under the Section 404(b)(1) Guidelines.

ROD at 14.

84.     As shown in the above figures (¶¶ 14-15), the Mine pit, waste rock, and tailings will be located and constructed in the WOUS disposal sites that will receive the fill. In addition to not even considering the severe impacts resulting from the Mine pit (such as the dewatering of the regional aquifer and creation of a pit lake predicted to be toxic), the Corps believed that it had no authority to require Rosemont to minimize or mitigate the contaminated runoff from the waste rock and tailings that will be dumped on top of the initial fill material:

> [t]able 105 in the Final EIS provides predicted runoff water quality of various contaminants from the project site as a result of waste rock, soil cover, and potential tailings seepage water.  These water quality impacts associated with runoff analyzed in the Final EIS would occur during operations of the mine, after waste rock and soil cover are placed, which, as described in Section III and above, is outside of the Corps' control and responsibility.

ROD at 39.

85.     The 404(b)(1) Guidelines also prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. § 230.10(d). Those seeking a 404 permit must mitigate the impacts of the proposed dredge and fill activities by "avoiding, minimizing, rectifying, reducing, or compensating for resource losses."  33 C.F.R. § 320.4(r)(1).

86.     The 404(b)(1) Guidelines require mitigation of a project's impacts reasonably associated with the authorized discharge.  The purpose of the compensatory mitigation program is to "offset unavoidable impacts to waters of the United States authorized through the issuance of permits by the U.S. Army Corps of Engineers pursuant to section 404 of the Clean Water Act."  40 C.F.R. § 230.91(a)(l).  The Corps "must determine the compensatory mitigation to be required in a DA [Department of Army] permit, based on what is practicable and capable of compensating for aquatic resource functions that will be lost as a result of the permitted activity."  Id. § 230.93(a).  Mitigation is required for "significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment."  33 C.F.R.

§ 320.4(r)(2).  These adverse effects to aquatic resource functions, whether direct or indirect, must be mitigated.  Id.; 40 C.F.R. § 230.93(a).

87.  First, the Corps must ensure that potential impacts from permitted activities have been avoided to the maximum extent practicable.  Id. § 230.91(c).  Second, remaining unavoidable impacts must be minimized to the extent appropriate and practicable.  Id. Third, compensatory mitigation is then required for any impacts that cannot be avoided or minimized.  Id.

88.  The Corps "must determine the compensatory mitigation to be required in a DA [404] permit, based on what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity."  40 C.F.R. § 230.93(a)(1).  In making this determination, "the district engineer must assess the likelihood for ecological success and sustainability, the location of the compensation site relative to the impact site and their significance within the watershed, and the costs of the compensatory mitigation project."  Id.

89.  The Corps regulations also require that the discharger provide "financial assurance" to cover mitigation costs "to ensure a high level of confidence that the compensatory mitigation project will be successfully completed":

> (n) *Financial assurances.* (1) The district engineer shall require sufficient financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with applicable performance standards. . . . (2) The amount of the required financial assurances must be determined by the district engineer, in consultation with the project sponsor, and must be based on the size and complexity of the compensatory mitigation project, the degree of completion of the project at the time of project approval, the likelihood of success, the past performance of the project sponsor, and any other factors the district engineer deems appropriate.  Financial assurances may be in the

> form of performance bonds, escrow accounts, casualty insurance, letters of credit, legislative appropriations for government sponsored projects, or other appropriate instruments, subject to the approval of the district engineer.

33 C.F.R. § 332.3(n).

90.    "The rationale for determining the amount of the required financial assurances must be documented in the administrative record for either the DA permit or the instrument." 33 C.F.R. § 332.3(n)(2).

91.    "The final mitigation plan must include the items described in paragraphs (c)(2) through (c)(14) of this section.. . ." 33 C.F.R. § 332.4(c)(1)(i). Item (c)(13) in that list is "Financial assurances." 33 C.F.R. § 332.4(c)(13). This requires that the final mitigation plan include: "A description of financial assurances that will be provided and how they are sufficient to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with its performance standards (see § 332.3(n))." 33 C.F.R. § 332.4(c)(13).

92.    Corps regulations require that the Permit include the mitigation requirements as a condition of the Permit:

> (k) *Permit conditions.*  (1) The compensatory mitigation  requirements for a DA permit, including the amount and type of compensatory mitigation, must be clearly stated in the special conditions of the individual permit or general permit verification (see 33 CFR 325.4 and 330.6(a)).  The special conditions must be enforceable. (2) For an individual permit that requires permittee-responsible mitigation, the special conditions must: . . . (iv) Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan.

33 C.F.R. § 332.3(k).

93.    The Corps' Regulatory Guidance Letter further states that the amount and analysis

of the required financial assurance must be documented in the administrative record for the Permit.  "District engineers must document the analysis used to determine the amount of the financial assurance, and must include this analysis in the administrative records for their permits."  <u>Guidance on the Use of Financial Assurances, and Suggested Language for Special Conditions for Department of the Army Permits Requiring Performance Bonds</u>, Regulatory Guidance Letter No. 05-1 (February 14, 2005), at 2.

94.     "[T]he district engineer must assess . . . the costs of the compensatory mitigation project."  40 C.F.R. § 230.93(a)(1).

95.     Despite the requirement that the amount and analysis of the required financial assurance to cover the mitigation plan be included in the record for the final permit, the 404 Permit (and supporting record) issued to Rosemont contains no such analysis or amount.

96.     Rather, "Special Condition 5" of the Permit merely requires Rosemont to submit the financial assurance covering the mitigation only prior to construction, **after** the Permit is issued: "[t]o ensure successful completion of the compensatory mitigation required in special conditions 1 and 2 in accordance with 33 C.F.R. 332.3(n), you shall establish a short-term financial assurance in the form of a letter of credit, escrow account, or other appropriate instrument.  You shall submit a proposal for the short-term financial assurance prior to initiation of construction activities in waters of the U.S. associated with this permit."  ROD at 71.

97.     "Special Condition 7" of the Permit, governing the mitigation measures required at the Sonoita Creek Ranch, does not require the approval or establishment of the financial assurance governing that mitigation until at least 12 years after Permit approval:

> Prior to the end of monitoring year 12 of the 15 year-year monitoring period, you shall establish a fully-funded endowment or other long-term financial assurance specifically approved by this office, in writing, for the management of the preserve required in Special Condition 1 in perpetuity.  Prior to the initiation of construction activities in waters of the U.S. authorized by this permit, you shall submit a proposal for the establishment of the endowment or other long-term financial assurance, including an itemized list of costs with justification, as well as a proposed phasing schedule for implementation of the financial assurance.

ROD at 72.

98.     *"This special condition is necessary to ensure avoidance and minimization of impacts to waters of the U.S. as well as ensure successful compensatory mitigation for the unavoidable losses of waters of the U.S. due to the construction of the proposed action. (33 C.F.R. 320.4(r)(1); 33 C.F.R. 325.4(a)(3); 33 C.F.R. 332; 40 C.F.R. 230)."* ROD at 73 (emphasis in original).

99.     Rosemont's final mitigation plan, submitted in 2017, acknowledged that the required financial assurance analysis and amount will only be submitted **after** the Permit is issued.  "**FINANCIAL ASSURANCE:**  Rosemont will be responsible for funding the long-term management and maintenance of the mitigation effort.  Details of the funding for the mitigation effort will be provided once the permit decision has been made."  Final Habitat Mitigation and Monitoring Plan, Sept. 12, 2017, ("HMMP"), at 68.

100.    Thus, despite the Corps' statement, both in the ROD and in its regulations, that the agency must analyze and determine the amount of the mitigation financial assurance

which "*is necessary to ensure avoidance and minimization of impacts to waters of the U.S. as well as ensure successful compensatory mitigation for the unavoidable losses of waters of the U.S. due to the construction of the proposed action*," ROD at 73, the Permit was issued without this critical information.

**The National Environmental Policy Act**

101.    Enacted in 1969, NEPA is the "basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  "The NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(c).

102.    "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken.  The information must be of high quality.  Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implement NEPA."  40 C.F.R. § 1500.1(b).

103.    Congress enacted NEPA to, among other things, "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "that will prevent or eliminate damage to the environment."  42 U.S.C. § 4321.  NEPA imposes a duty on federal agencies to "use all practicable means . . . to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment."  40 C.F.R. § 1500.2(f).

104.    The Council on Environmental Quality ("CEQ"), an agency within the Executive Office of the President, has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500-1508, which are "binding on all federal agencies." Id. § 1500.3.

105.    NEPA requires federal agencies to take a "hard look" at the environmental effects of their proposed action. Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 374 (1989).

106.    NEPA requires that all federal agencies "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a).

107.    Agencies "shall involve environmental agencies, applicants, and the public, to the extent practicable," in preparing an Environmental Assessment ("EA"). 40 C.F.R. § 1501.4(b).

108.    According to the CEQ:  "[s]ection 1506.6 requires agencies to involve the public in implementing their NEPA procedures, and this includes public involvement in the preparation of EAs [Environmental Assessments] and FONSIs [Findings of No Significant Impact].  These are public 'environmental documents' under Section 1506.6(b) and, therefore, agencies must give public notice of their availability." 46 Fed. Reg. 18,026 (Mar. 23, 1981) ("Forty Most Asked Questions Concerning CEQ's NEPA Regulations") answer to question 38.

109.    Federal agencies "shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in the decisions which affect the quality of the human environment . . .." 40 C.F.R § 1500.2.

110.    NEPA and its implementing regulations require federal agencies to prepare an "environmental impact statement" ("EIS") for "major Federal actions significantly

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.11.

111.    If an agency is unsure whether a proposed action will have significant environmental effects, it may prepare a shorter document called an "environmental assessment" ("EA") to determine if the proposed action may have significant environmental effects and whether an EIS is necessary. 40 C.F.R. § 1501.4(b).

112.    In issuing the 404 Permit, the Corps relied in part upon the Final EIS prepared by the Forest Service in 2013 ("2013 EIS").

113.    To purportedly analyze the impacts and alternatives associated with the 2017 HMMP mitigation plan, including the new permitted discharge of fill material in Sonoita Creek and the four stock tanks, the Corps prepared an EA which it released for the first time along with the 404 Permit ("2019 EA").

114.    An agency must prepare an EIS when there are substantial questions about whether a project "may" significantly degrade the environment. Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir. 2005). "[T]his is a low standard." Cal. Wilderness Coalition v. U.S., 631 F.3d 1072, 1097 (9th Cir. 2011).

115.    "'Significantly' as used in NEPA requires considerations of both context and intensity." 40 C.F.R. § 1508.27. In determining whether a proposed project may result in significant impacts, the agency must analyze ten "Intensity" criteria listed in 40 C.F.R. §1508.27(b). "The following should be considered in evaluating intensity: . . . (4) The degree to which the effects on the quality of the human environment are likely to be highly controversial. (5) The degree to which the possible effects on the human

environment are highly uncertain.. . . (7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts.  Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot he avoided by terming an action temporary or by breaking it down into small component parts.. . . (8) The degree to which the action . . . may cause loss or destruction of significant scientific, cultural, or historical resources.  (9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.  (10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

116.    The potential presence of even one significance factor is sufficient to require the preparation of an EIS.  Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 865 (9th Cir. 2005) citing Nat'l Parks & Conservation Ass'n v. Babbitt, 241 F.3d 722, 731 (9th Cir. 2001).

117.    The Corps' determination in the 2019 EA that the project "will not have a significant impact" on the environment, ROD at 48, does not contain the required analysis and findings regarding the context and intensity factors in 40 C.F.R. § 1508.27(b) needed to support such a finding.

118.    To comply with NEPA, the agency must also consider all direct, indirect, and cumulative environmental impacts of the proposed action.  40 C.F.R. §§ 1502.16, 1508.8, 1508.25(c).  Direct effects are caused by the action and occur at the same time and place as the proposed project.  40 C.F.R. § 1508.8(a).  Indirect effects are caused by the action

and are later in time or farther removed in distance, but are still reasonably foreseeable. 40 C.F.R. § 1508.8(b).  Both types of impacts include "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as "aesthetic, historic, cultural, economic, social or health [effects]."  Id.  Cumulative effects are defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

119.    Where an agency relies upon a previously prepared and issued EIS, NEPA's regulations require an agency to supplement its prior NEPA review when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c).

120.    The Corps did not prepare a Supplemental EIS, despite the fact that Rosemont's HMMP mitigation plan, submitted in September 2017 well after the Final EIS was issued in 2013 and never subjected to public review under NEPA, forms the basis of the decision to issue the 404 Permit.

121.    Instead of preparing a Supplemental EIS, the Corps issued the 2019 EA.  Despite relying on the 2019 EA in issuing the 404 Permit, the Corps never subjected the EA to any public review under NEPA.  The Corps did not prepare a draft EA for public review, or

provide any public notice of the preparation of the EA.  Indeed, the first time the public became aware of the EA was when it was issued on March 8, 2019 to accompany the ROD and 404 Permit.

## THE ROSEMONT MINE AND ITS IRREPARABLE AND PERMANENT IMPACTS TO THE AQUATIC ECOSYSTEMS OF THE SANTA RITA MOUNTAINS

122.    The Rosemont Mine would be a large-scale open-pit copper mine on the east side of the Santa Rita Mountains, covering well over 5,000 acres.  The Forest Service and Corps (via the 404 Permit) approved the "Barrel Alternative," which modified Rosemont's initial proposal.  The Barrel Alternative places all of the tailings (mine waste resulting from the initial processing of the copper ore) and waste rock/overburden (rock excavated from the mine pit that never undergoes processing or copper recovery) in upper Barrel Canyon and the lower portion of Wasp Canyon.  FEIS Appendix 5, CWA Section 404(b)(1) Alternatives Analysis, Figure 9.

123.    The 404 Permit allows Rosemont to begin construction of the Mine by authorizing the fill discharges in the WOUS in Barrel Canyon.  The mine pit will be constructed in the WOUS in Wasp Canyon.  *See* Figures/maps in ¶¶ 14-15.

124.    "[T]here are approximately 101.60 acres of potentially jurisdictional waters of the U.S. in and around the project site.  These waters of the U.S. are comprised of 154 individual ephemeral washes and springs that encompass 18 linear stream miles, and 2 wetlands."  ROD at 6.

125.    The selected action will develop the proponent's mineral deposit using open-pit mining techniques.  The mine will consist of an open pit; plant site and support

facilities; waste rock and tailings facilities; and ancillary facilities, including access and maintenance roads and electrical supply and water supply lines. The pit will require 18 to 24 months before full-scale mining can occur, and will ultimately be up to 6,500 feet in maximum diameter, with a final elevation of about 3,050 feet above mean sea level. The pit will disturb about 955 acres, of which 590 acres are private lands and 365 acres are NFS lands. In total, the selected alternative would result in 5,431 acres of land being disturbed, consisting of 1,197 acres of private land, 574 acres of State land, 3,653 acres of NFS land, and 3 acres of BLM land.

USFS ROD 33.

126.    Active mining will occur for an estimated 20 to 25 years. Blasting in the pit will typically occur once per day during daylight hours. Mineral material will be transported from the pit to a crusher in mine haul trucks; following crushing, the mineral material will be transported via conveyors to the grinding and flotation unit. Dewatered tailings will be transported using a conveyor system from the dewatering plant to the tailings facility for final placement. The conveyors will transfer the tailings to a radial stacker, and the tailings will then be spread and compacted by dozers. The compacted tailings will be encapsulated by a perimeter buttress formed of waste rock and a covering of waste rock (referred to as the waste rock cap) that will be placed by haul trucks traveling on haul roads.

USFS ROD 35.

127.    "Over the life of the mine, it is estimated that 661,429,000 tons of sulfide ore will be processed and 1,249,161,000 tons of waste rock produced." Id.

128.    The waste rock dump for the approved Barrel Alternative would cover approximately 1,460 acres. The tailings waste facility would cover approximately 987 acres. FEIS Vol. 5.

129.    "Total fresh water to be used during operation is estimated to be about 4.8 million gallons per day. Most of this would be supplied by groundwater wells in the Santa Cruz Valley." FEIS 43. "[I]t is currently estimated that the project would use between 4,700 and 5,400 acre-feet per year of fresh water, for a total use over the mine life of

approximately 100,000 acre-feet." Id. at 41. "One acre-foot equals 325,851 gallons."

Id. Thus, the Mine is projected to use 32.5 billion gallons of water during operation.

130.    In addition to water use for operations, and in order to keep the pit dry during

mining, the mine pit would be actively pumped or dewatered during the active mining

phase and then would act as a hydraulic sink to the regional aquifer in perpetuity.

> During active mining, the loss of water would be greater.  Estimates of the pit
> dewatering rate range as high as 650 gallons per minute.  The total volume of
> water removed from the aquifer during the entire active mine life ranges from
> about 13,000 acre-feet to 18,500 acre-feet.

Id. (citations omitted).

131.    The groundwater resource commitment associated with the flow into the mine pit
is the approximately 17,800 to 18,500 acre-feet of groundwater withdrawn to
maintain minable conditions in the pit during the approximately 20-year active
mine life. This water would be withdrawn either from the pit sump itself or with
the use of dewatering wells or drains.

FEIS 1138.

132.    After closure of the mine, a mine pit lake would form.  Estimates of the amount of
water lost in perpetuity from the aquifer due to evaporation by the mine pit lake
ranges from 170 acre-feet per year to 370 acre-feet per year.  Loss of this water
from the aquifer in the Davidson Canyon/Cienega Basin would continue in
perpetuity as a result of the formation of the mine pit lake and is an irreversible
impact.

Id. (citations omitted).

133.    EPA, which is required under both the CWA and NEPA to review and comment

upon the EISs produced by the Corps and other federal agencies, detailed the water

resources that will be severely affected by the mine's dewatering:

> The mine pit would reverse groundwater flow direction well beyond the project,
> and cause permanent regional drawdown of groundwater that currently sustains

hundreds of acres of springs, seeps, streams, and wetlands and their aquatic and wetland dependent fish, wildlife and plant species.  The persistence and health of aquatic resources associated with Cienega Creek and its major tributaries of Barrel Canyon, Davidson Canyon, Empire Gulch, Gardner Canyon and other waters are dependent on contributions of water from the site of the proposed mine.

Nov. 7, 2013 letter from U.S. EPA Region IX Director of the Water Division to Corps.

134.   The environmentally-damaging nature of the proposed project *(i.e.,* a large-scale, long-lasting, extractive mineral mine) and its geographic location *(i.e.,* large, high-functioning, undisturbed landscape) will combine to cause and/or contribute to significant, persistent degradation of the regional aquatic environment.  This sensitive area is largely within National Forest boundaries, is adjacent to both federal and local nature preserves, is home to ten federally listed species, and is a hydrologic source area for state designated Outstanding Resource waters.  These aquatic resources are recognized as being of regional and national importance.

EPA Analysis of Rosemont Project Impacts, Attachment to Nov. 7, 2013 EPA letter.

135.   The project will impact aquatic and wetland resources within Pima County's Cienega Creek Natural Preserve and the Bureau of Land Management's (BLM) Las Cienegas National Conservation Area (NCA).  The National Landscape Conservation System was established to protect some of the most remarkable public lands in the American West.  At its nearest point, the mine site lies approximately 3 miles from the NCA.  The Las Cienegas NCA was established by Congress and the President, in large part, to conserve, protect and enhance the unique and nationally important aquatic, wildlife, vegetation and riparian resources such as those in the Cienega Creek watershed.  Six types of rare ecosystems are protected within the NCA, including aquatic ecosystems such as cienegas (marshlands), cottonwood-willow riparian wetlands, and mesquite bosques.

Id.

136.   The consequence of groundwater drawdown from the proposed mine pit is the indirect loss or conversion of hundreds of acres of riparian vegetation, including wetlands, and the drying of streams currently characterized by permanent flow. These large-scale shifts in the amount and species composition of riparian areas and the loss of stream surface flows is an example of an ecological regime shift; a large threshold change in the ecological state or condition of the Cienega Creek watershed to drier conditions."

Id.

137.    EPA further noted "the presence of tens to hundreds of acres of jurisdictional waters/wetlands in the assessment area likely to be impacted by groundwater drawdown."  Nov. 7, 2013 letter Attachment 4 n. 6.

138.    The U.S. Bureau of Land Management ("BLM"), in comments to the U.S. Fish and Wildlife Service ("FWS"), concluded that "[t]he proposed pit presents a clear and present threat to ground water that supports all perennial surface water on the LCNCA located to the south and east of the proposed mine site."  Feb. 3, 2012 email from BLM to FWS.

139.    The dewatering will also eliminate or severely reduce flows protected by federal water rights.  BLM owns 21 "offsite surface water rights within the area of groundwater drawdown."  FEIS at 421.  These include important springs and Empire Gulch within the LCNCA.  Id. at 422.  "These levels of drawdown would almost certainly affect or eliminate flow in Helvetia Spring and possibly Chavez and Zackendorf Springs."  Id. at 431; see id. at 341-345 (maps of expanding groundwater drawdown).

> [T]here are an additional 262 offsite surface water rights (see table 87) within the area of groundwater drawdown that could possibly be indirectly impacted by the project.  Of these, 47 percent of the surface water right holders are public agencies: the Coronado, BLM (water rights primarily associated with the Las Cienegas National Conservation Area), ASLD, and AGFD.

Id. at 431.

140.    BLM holds federal water rights in these three springs as well as for Empire Gulch, obtained from private sources.  According to the FEIS, in discussing the impacts from the

mine's dewatering on federal water rights: "Water rights along Empire Gulch would likely be impacted by the changes described."  FEIS at 529.

141.    BLM also holds other water rights in the LCNA, obtained from private sources, for Empire Spring, which is the source of the perennial portion of Upper Empire Gulch. BLM's water right for Empire Gulch within the LCNCA is for 1,000 gallons/minute, for "Recreation, Fish, & Wildlife" and "stockwatering."

142.    BLM has issued the Las Cienegas NCA Resource Management Plan.  The Forest Service ROD acknowledged that the Mine would be inconsistent with that Plan:

> The Las Cienegas NCA Resource Management Plan lists a number of goals for management of the Conservation Area.  Predicted impacts from the Rosemont Copper Project would be inconsistent with a number of these goals, including goals to maintain and improve watershed health; maintain and improve native wildlife habitats and populations; maintain and restore native plant diversity and abundance; protect water quantity; and maintain the region's scenic beauty and open spaces.  While the selected action contains a number of mitigation measures to reduce impacts, potential impacts are not expected to be completely offset. Therefore, the conflict between implementation of the Rosemont Copper Project and achieving the goals of the resource management plan cannot be rectified.

USFS ROD at 77.

143.    Regarding the dewatering impacts to wildlife, the Corps' public interest requirement ensures "the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application."  33 C.F.R. § 320.4.

144.    The Mine's direct impacts at the site, as well as the dewatering, will severely and adversely affect threatened and endangered species, including the Gila chub, Gila topminnow, Chiricahua leopard frog, northern Mexican gartersnake, and other listed

species noted in the FEIS such as the western yellow-billed cuckoo and southwestern

willow flycatcher.  Several of these species, including the Gila chub, Chiricahua leopard

frog, and jaguar, also have critical habitat in the action area that would be adversely

impacted by the Mine.

145.    BLM described the significant adverse impacts from the dewatering on wildlife

and habitat, especially the water dependent habitat in the LCNCA:

> Habitat loss or degradation will occur for all aquatic species and riparian
> dependant species including migratory birds. **Essentially the aquatic and
> riparian ecosystems on the LCNCA will be at risk of collapse from GW
> depletion. Areas where federally listed species are being recovered would be
> degraded or lost.**  Designated CH for Gila chub and would be severely degraded
> or lost as would critical habitat proposed for the Chiricahua leopard frog.  The
> Huachuca water umbel has increased from 1 known population in 1990 to over
> 100 populations (plant patches) inventoried during June in surveys on Cienega
> Creek within the LCNCA.  These gains would be lost and the status of the species
> on the LCNCA would decline.  Population expansion (recovery) and viability
> would be drastically altered for Huachuca water umbel, giant sedge, Giant spotted
> whiptail lizard, Gila chub, Gila topminnow, longfin dace, Sonora mud turtle
> (*Kinosternon sonoriense*), Mexican garter snake, Southwestern willow flycatcher,
> yellow-billed cuckoo, grey hawk (*Buteo nitidus*) and a host of other neotropical
> migratory birds.

BLM comment letter to USFS, August 1, 2011 (bold emphasis added).

146.    This pumping/dewatering and related activities will significantly and adversely

affect the listed species and habitat noted above which depend on the flows in the springs

and waters of Empire Gulch, Cienega Creek, and other affected waters.  For example, as

noted in the April, 2016 amended Biological Opinion issued by the U.S. Fish and

Wildlife Service:

> The proposed action contributes incremental effects that will, at varying levels,
> further diminish surface flows, the dimensions of pool habitat, and reduce water

46

quality, resulting in significant degradation of the aquatic ecosystem on which the Gila chub, Gila topminnow, desert pupfish, Huachuca water umbel, Chiricahua leopard frog, and northern Mexican gartersnake depend.

Upper Empire Gulch (EG1) may suffer the most appreciable effects, with the potential to be subject to over 300 days of zero flow by 50 years post-mining. The number, depth, volume, and surface area of upper Empire Gulch's pools may all be appreciably reduced, primarily due to mine effects, thus significantly degrading the aquatic habitat available in the reach.

FWS Amended Biological Opinion, 60 (Apr. 2016) ("2016 BiOp").

147.    As another example, regarding the critical habitat for the Chiricahua leopard frog: "Degradation and ultimate disappearance of surface water as modeled in the upper portion of Empire Gulch, would permanently remove the longest standing and most prolific site occupied by the Chiricahua leopard frog in the Las Cienegas NCA metapopulation." Id. at 150.

148.    This is in addition to direct impacts at the site, including "Complete loss of current and potential habitat for Chiricahua leopard frog will occur within the security fence of the mine." 2016 BiOp at 148. The discharges authorized by the 404 Permit will occur within the security fence. FEIS Appendix 5, CWA Section 404(b)(1) Alternatives Analysis, Figure 9.

149.    Despite all these acknowledged impacts, neither the Corps nor the Forest Service analyzed or required any mitigation measures for these lost flows in the LCNCA. "[N]o mitigation measures are proposed that would directly offset the impacts predicted to occur along Empire Gulch." FEIS at 546.

150.    Rosemont's final mitigation plan, issued in 2017 and relied upon by the Corps in

the 404 Permit (the 2017 "HMMP"), does not include any mitigation to protect these federal water rights, nor protect the waters and water flows and associated habitat in the LCNCA, including Empire Gulch.

151.   Barrel, Wasp, and downstream Davidson Canyon, which will receive the direct discharges and seepage from the waste rock and tailings, as well as Empire Gulch and Cienega Creek, which will suffer the above-detailed dewatering effects resulting from the discharges of fill material that creates the waste disposal site, are subject to water quality standards set by the Arizona Department of Environmental Quality ("ADEQ").  These standards have been established to protect the designated beneficial uses of these waters for aquatic life, human and animal uses, and recreation.  Ariz. Admin. Code ("A.A.C."), R18-11-101 *et seq*.; *see* FEIS at 451-461 (text and tables of water quality standards). ADEQ water quality standards and regulations are found at http://apps.azsos.gov/public_services/Title_18/18-11.pdf.

152.   A portion of Davidson Canyon has been designated an Outstanding Arizona Water [OAW] by the ADEQ after being nominated in 2005 by Pima County.  The designated reach begins approximately 12 river miles downstream of its confluence with Barrel Canyon and extends 3.2 miles to its confluence with Cienega Creek.  This reach begins approximately where perennial and intermittent stream flow begins, which is associated with discharge from the Reach 2 Spring.

FEIS at 523.

153.    "All of Cienega Creek has also been designated an Outstanding Arizona Water by the ADEQ after being nominated in 1990 by Pima County.  The designated reach begins at the confluence of Gardner Canyon and extends 28.3 miles to Pantano Dam."  Id.

154.   "The Outstanding Arizona Water designation ensures that existing surface water

quality will be maintained and protected for the designated use of the surface water."

FEIS at 523.

155.   State water quality regulations dictate numeric water quality standards both for surface waters and for groundwater.. . .   State regulations also identify a narrative water quality standard for surface water.. . .   The narrative water quality standards also state that a wadeable, perennial stream shall support and maintain organism richness comparable to that of a stream with reference conditions in Arizona.

FEIS at 451.

156.   Under the "Antidegradation" provisions of Arizona water quality standards, discharges are prohibited unless they "will not degrade existing water quality in the downstream OAW."  R18-11-107.01.  "Existing water quality shall be maintained and protected in a surface water that is classified as an OAW."  R18-11-107.

157.    According to state regulations, "[a] wadeable, perennial stream shall support and maintain a community of organisms having a taxa richness, species composition, tolerance, and functional organization comparable to that of a stream with reference conditions in Arizona."  R18-11-108.E.  "The narrative biological criteria in this Section apply to a wadeable, perennial stream with either an aquatic and wildlife (cold water) or an aquatic and wildlife (warm water) designated use."  R-18-11-108.01.A.

158.    The Arizona wadeable/perennial narrative water quality standard at R18-11-108.E. applies to the perennial reaches of Empire Gulch, Cienega Creek, and Davidson Canyon.

159.   As EPA stated in its comments on the Administrative Final EIS ("AFEIS"), in August 2013, shortly before the FEIS was issued:

relatively small changes in groundwater levels can and often do result in

significant reductions in associated surface water.  Because the surface waters in question here contain very little water during the driest times of year, the EPA believes that impacts to Empire Gulch could include not only transition from perennial to intermittent stream flow, but transition from intermittent to ephemeral flow or complete drying of all or portions of stream reaches.

EPA August 2013 comments, at 12.

160.    The change from being a perennial stream to an ephemeral or intermittent stream caused by the dewatering (alone and in combination with modeled impacts from climate change), such as is predicted to occur for Upper Empire Gulch and other waters, would violate the Arizona wadeable/perennial water quality standard at R18-11-108.E; R-18-11-108.01.A.

161.     Neither the Corps nor USFS analyzed or proposed in the FEIS, USFS ROD, Corps ROD, Corps EA, or Corps 404 Permit any mitigation to prevent the flow losses in Empire Gulch or Cienega Creek due to the project's dewatering, to prevent the perennial reaches of Empire Gulch from becoming intermittent or ephemeral due to the dewatering, or to prevent the violation of the wadeable/perennial water quality standard in Empire Gulch caused by the dewatering.

162.    Upper Cienega Creek currently meets the regulatory definition of a wadeable, perennial stream.  As such, regulatory requirements specific to biological integrity (taxa richness, species composition, tolerance, and functional organization comparable to that of a stream with reference conditions in Arizona) and bottom deposits would need to be met.

FEIS at 554-55.

163.    Despite both streams qualifying as wadeable/perennial streams, the Corps never determined whether the wadeable/perennial standard for Empire Gulch and Upper Cienega Creek would be met.

164.    In addition to its failure to protect all existing stream uses and water quality due to the Mine's dewatering/drawdown, the USFS determined that the direct discharges from the waste rock that will be located in the WOUS disposal site have the potential to violate water quality standards.

> The screening analysis for runoff from waste rock indicates that two constituents may be elevated in mine runoff at levels that suggest they could present antidegradation problems: total and dissolved molybdenum, and total and dissolved sulfate.  The screening analysis for runoff from soil cover suggests that molybdenum and sulfate would not be elevated but that dissolved arsenic, dissolved iron, and dissolved sodium could present antidegradation problems.  In addition, dissolved and total mercury is substantially higher.

FEIS at 549.

165.    For the soil cover placed on the waste rock, predicted water quality for runoff from soil also exceeds water quality standards in Barrel Canyon for dissolved silver, as well as total lead and dissolved mercury.  FEIS Table 105 predicts exceedances of surface water quality standards from the approved soil cover for dissolved silver, as well as total lead and dissolved mercury.

166.    The predicted concentration of dissolved silver in stormwater runoff from the waste rock facility is 0.0025 mg/L, compared with the surface water quality standard of 0.00081 mg/L.

167.    According to the FEIS:

> Runoff from waste rock is predicted to meet Arizona Surface Water Quality Standards for all constituents except dissolved silver; risk of exceedance is mitigated by waste rock segregation techniques and suggests that dissolved silver would likely be below standards as well.

FEIS at 447 (Table 97).

> It is known for certain that stormwater would contact both soils and waste rock in some manner. The most likely scenario would involve stormwater contacting both soil cover (on the slopes of the waste rock facility) and waste rock (in the conveyance channels of the waste rock facility). The percentage contribution from each source is not possible to easily predict, nor is it possible to predict the beneficial effects of waste rock segregation. Dissolved silver is the only constituent that would be likely to exceed surface water standards under any waste rock/soil mixing scenario.

FEIS at 473.

168.    Because the FEIS admits that it is not possible to predict the beneficial effects of waste rock segregation, FEIS at 473, the potential mitigation of "waste rock segregation techniques" (quoted above from FEIS 447, Table 97) cannot be relied upon to support the Corps' conclusion that the Project will comply with all state water quality standards in Barrel Canyon/Davidson Canyon.

169.    In addition, the seepage from the tailings facility that will be located at the WOUS disposal site may violate water quality standards. Although the FEIS says that the probability of tailings seepage "daylighting" to surface waters "is low," "[p]redicted water quality in the event tailings seepage were to appear in Barrel Canyon exceeds applicable surface water quality standards for dissolved silver, dissolved cadmium, total and dissolved lead, dissolved mercury, and total selenium." FEIS at 473.

170.    FEIS Table 112 (FEIS at 550-552) shows that the Project will increase the level of several pollutants. For example, in the column labeled "Percent Difference between Pre- and Postmine Watershed Water Quality," Arsenic (dissolved) will increase by 16%, Iron

(dissolved) will increase by 11%, Mercury (dissolved) will increase by 1050%, Mercury (total) will increase by 201%, and Sodium will increase by 21%.

171.    As noted above, the Corps believed that it was not required to review the pollution released by the waste rock and tailings because these facilities would be constructed on top of the initial fill resulting from the clearing/grubbing/grading in the WOUS at these sites.  ROD at 13.  Thus, the Corps did not require any mitigation to reduce these pollutant increases.  As such, the Corps has failed to minimize the substantial increases in pollutant discharges into Barrel Canyon and downstream Davidson Canyon and lower Cienega Creek.

172.    Mitigation plans to prevent the potential for exceedances of water quality standards were not contained in the 2013 FEIS or the 2019 EA, nor subject to public review under NEPA.  This includes the lack of mitigation for the loss of flows due to the dewatering, the creation of the contaminated mine pit lake, and from the pollutant loadings noted above.

173.    The 2017 HMMP and the 2019 EA which relies upon it, does contain some mitigation for the loss of on-site stormwater flows to downstream waters such as the OAW of Davidson Canyon.  The loss of flows is due to the fact that surface lands at major Mine facilities, such as the mine pit, will no longer be contributing stormwaters to the watershed.  "[T]he predicted reduction in average annual postclosure runoff volume from the affected watershed is 17.2% as a result of capture of runoff by mine facilities." ADEQ, Basis for State Certification Decision, Rosemont Copper Project, at 13.

174.    The 2013 FEIS determined that much of the loss of flows would come from construction and operation of the Mine pit area, which instead of contributing water downstream, would now be a permanent hydraulic sink that eliminates water from the watershed:

> There are still several areas (the mine pit itself and diversions to the west of the mine pit) that would not discharge downstream in perpetuity.  All precipitation falling within and near the pit would be retained in the pit.  The diversion channel west of the pit would collect precipitation in stormwater retention ponds along the southern toe of the waste rock facility and would be allowed to infiltrate as aquifer recharge, but it would not be able to flow downstream as surface water due to topography.
> . . .
> Postclosure, all runoff from the closed and reclaimed waste rock and tailings facilities and the plant site would be allowed to discharge downstream.  Only two general areas of the mine site would not discharge runoff downstream.  These include the mine pit itself and diversions to the west of the mine pit.

FEIS at 425-26.

175.    As stated by the Corps, this mitigation is required in order to meet the state antidegradation requirements to protect the OAW of Davidson Canyon:

> The Corps concurs with comments submitted by USEPA and others that a reduction in flows downstream may result in a loss of assimilative capacity in the OAWs, which could, in turn, result in adverse effects to water quality, although the extent of these effects is uncertain, due to the distance of the OAWs.  The Corps worked with the applicant to develop a mitigation proposal to minimize effects to downstream waters of the U.S. as a result of reduced stormwater flows.

ROD at 41.

176.    "In order to minimize effects to downstream surface water quantity, you shall remove the Barrel Canyon East, McCleary Canyon, Rosemont Crest, and Gunsight Pass stock tanks, as described in your Final HMMP."  Permit at 5 (Special Condition 2).

177.    In its 2017 HMMP, Rosemont recalculated/lowered the predicted loss of flows and proposed that mitigation for the lost flows would be accomplished by removing/breaching four stock tanks in the watershed.  The 2019 EA analyzed the loss of flows resulting from the construction and operation of the mine pit (i.e., elimination of lands contributing downstream flows) and accepted Rosemont's mitigation plan to offset these losses:

> [a]s noted in Section VII of this ROD, and further described in the EA for the compensatory mitigation in Attachment G, the applicant developed a proposal to remove four existing stock tanks within the immediate vicinity of the proposed mine, in order to provide additional flows to the Davidson Canyon Wash.

ROD at 41.  However, "the proposed removal of the four stock tanks may not fully compensate for downstream reductions in surface water flows prior to reclamation, although these effects, which are uncertain, would be minimized."  ROD at 41-42.

178.    The construction of the mine pit at the location of the WOUS site in Wasp Canyon will result in a mine pit lake that is predicted to be extremely hazardous to wildlife, due to the predicted toxicity and chemical pollution in the pit lake waters.

> The results of geochemical modeling for the mine pit lake . . . indicate that various contaminant levels that would result from these mining processes may exceed surface water quality standards for wildlife (see the "Groundwater Quality and Geochemistry" resource section of this chapter).  For all action alternatives, the mine pit lake water quality could exceed standards for cadmium, lead, copper, mercury, selenium, and zinc, three of which are known to bioaccumulate (i.e., cadmium, mercury, and selenium).  Estimates indicate that surface water quality standards for wildlife for ammonia (chronic exposure) also may be exceeded in the mine pit lake as a result of buildup of nitrogen residue from the use of ammonium nitrate explosives (see the "Groundwater Quality and Geochemistry" resource section of chapter 3).

FEIS at 664.

179.   As acknowledged in the 2013 FEIS:

Wildlife groups that are most likely to be directly impacted by toxins potentially present in the mine pit lake include invertebrates (i.e., insects, etc.) and birds. Wildlife most likely to be indirectly impacted includes any animals that prey on insects or birds that have come in contact with the water in the mine pit lake. Acute exposure by avian species is the most likely scenario to occur, given the depth and isolation of the pit lake and general inaccessibility by wildlife.  Chronic exposure is unlikely to occur directly, but chronic exposure could occur indirectly through predation on insects.

Geochemical modeling indicates that some surface water quality standards for acute exposure to warmwater aquatic species and wildlife could be exceeded: [listing predicted exceedances of copper, zinc, cadmium, lead, mercury, and selenium].

FEIS at 389-90; *see also* FEIS at 665 (discussing toxicity impacts to wildlife).

180.   Despite this, no mitigation is proposed to prevent these direct and indirect effects from the pit lake to wildlife, especially birds, bats, insects, and the related food chain. Mitigation discussed in the FEIS "does not apply to the pit lake that could develop during the postclosure period."  FEIS at 665.  The Corps' ROD, Permit, and EA do not contain any discussion of mitigation for the harmful effects from the construction of the pit and resulting pit lake.

181.   In addition, the contaminated pit lake will violate Arizona state law mandating protection of birds and wildlife.  As stated by the Arizona Game & Fish Department ("AGFD"):

ARS 17-236 prohibits the take or injury of any bird . . . except as may occur in normal horticultural and agricultural practices and except as authorized by [Game and Fish] Commission order.  No exceptions are made for mining. The project must be planned so as to eliminate violation of 17-236 and compliance with the Migratory Bird treaty Act in coordination with the Department and USFWS.

June 30, 2011 AGFD comments on Preliminary Draft EIS, at 17-18.

182.    The Corps (and USFS) failed to meet these concerns, forcing AGFD to reiterate

these serious concerns in 2013:

> The text describes how the water quality in the mine pit lake could exceed standards for cadmium, lead, copper, mercury, selenium, ammonia and zinc at levels toxic to invertebrates and birds.  The FEIS section on Groundwater Quality notes that the pit lake may also be acidic.

> The FEIS does not describe any mitigation measures for the mine pit lake.  CEQ requires a discussion of mitigation measures, even if the mitigation is beyond the authority of the federal agency to implement.

AGFD Comments to USFS, at 6-7 (Aug. 15, 2013).  In its formal Objection to the FEIS

and Draft ROD submitted to the USFS in 2014, AGFD reiterated its position that the

creation of the contaminated pit lake violates both NEPA and state wildlife law. "Pit lake

toxicity is described at 664, 665 and 683 [of the FEIS], and multiple other areas as having

potential take on bats, birds, and other wildlife, but no alternatives or effective mitigation

is offered for migratory birds or other wildlife exposed to the pit lake."  AGFD Objection

at 30 (Feb. 14, 2014).

**The Corps and EPA Both Previously Determined that the Mine's Discharges and Impacts Would Violate the Clean Water Act, that Rosemont's Proposed Mitigation Plan Was Inadequate, and that the 404 Permit Could Not Be Issued.**

183.    On October 26, 2011, the applicant, a subsidiary of Augusta Resource Corporation at that time, applied for a DA standard individual permit to the U.S. Army Corps of Engineers, Los Angeles District (SPL) under Section 404 of the CWA to discharge dredged or fill material into waters of the U.S. consistent with the Barrel Alternative (Alternative 4 in the Environmental Impact Statement (EIS)).

ROD at 1.

184.   As a result, the Corps issued the Public Notice for Rosemont's proposed 404 Permit on December 6, 2011, with the public comment period lasting until January 19, 2012.  This corresponded with the only public comment period on the Draft EIS, which ended on January 31, 2012.  This was the last public comment period for both the 404 Permit process under the CWA and the EIS process under NEPA.

185.   Since that time, Rosemont's 404 permit application has been reviewed, and severely and regularly criticized, by both the Corps and EPA, as well as other governments such as Pima County.  Based upon these reviews, these agencies determined that the Mine and its 404 discharges would violate the CWA.

186.   A month before the FEIS was issued in 2013, EPA stated:

> EPA's careful review of this information, including our assessment of the full range of probable direct and secondary adverse impacts to the aquatic ecosystem resulting from permit issuance, leads us to conclude that the proposed Rosemont Mine project does not comply with [Clean Water Act regulations] 40 CFR §§ 230.10(b), (c) and (d) of the Guidelines and should not be permitted as proposed.

Nov. 7, 2013 letter from EPA regional headquarters to the Corps' District Engineer.

187.   A similar letter was sent by the Corps' Office of the Commander and District Engineer to Rosemont on May 13, 2014.  After noting that the Corps had reviewed Rosemont's "final mitigation plan" submitted in April 2014, the Corps stated:

> Upon review of your final mitigation plan comprised of the *Rosemont Copper Project Habitat Mitigation and Monitoring Plan* and the *Rosemont Copper Project CWA section 404 Permit Management and Monitoring Program Cost Estimates, Financial Assurance Mechanisms, and Protection Instruments,* both dated April 1, 2014, the *Rosemont Copper Project April 2014 HMMP Supplemental Information* document dated April 8, 2014 and the *Response to Comments Rosemont Copper Project Habitat Mitigation and Monitoring Plan Summary* addendum dated April 24, 2014, I have determined that the proposed compensatory mitigation would not fully compensate for the unavoidable adverse impacts that would remain after all

58

appropriate and practicable avoidance and minimization measures have been achieved.. . . The shortfall in compensation derives from an assessment of the risks to success associated with your proposed compensatory mitigation, limited environmental lift from the compensatory mitigation, and the limited amount of restoration and enhancement of actual waters of the United States.

188.   Around the same time, Pima County reiterated its position that the Rosemont Project would not comply with the CWA.  The County particularly noted that the "mitigation plan" submitted by Rosemont and reviewed in the FEIS by the USFS and Corps failed to meet the stringent requirements for mitigation under the 404 regulations. In a December 30, 2013, letter from Pima County and Pima County Regional Flood Control District to the Corps, the County stated that the mitigation proposal failed because it cannot produce the necessary mitigation credits due to an unpredictable and insufficient long-term water supply.

Pima County and the RFCD share many of the same concerns over the mitigation proposal as those expressed by the US Environmental Protection Agency (EPA) in their November 7, 2013 letter.  Among the many concerns raised by the EPA was the fact that Rosemont must demonstrate clear compliance with the Clean Water Act, and neither the EIS nor the scant mitigation proposal contained in the Final Environmental Impact Statement (FEIS) demonstrate such compliance.

189.   The Corps continued its review of the 404 Permit application, including Rosemont's submittals of revisions to its mitigation plan.

190.   Based on its analysis of the record, in July of 2016, the L.A. District of the Corps issued its determination that the 404 Permit should be denied due to numerous violations of the CWA. [1]

---

[1] Under CWA regulations, the Corps decision on the 404 Permit is made by the District office (here, the L.A. District).  However, the regulations allow the Governor of the state in which the discharges would occur to request, as Governor Douglas Ducey did in a

191.    Despite requests to the Corps under the Freedom of Information Act ("FOIA") to release the L.A. District's determination, the Corps has refused to provide this document and supporting materials.

192.    Although the Plaintiffs and public have yet to be provided the L.A. District's determination, the Plaintiffs do have access to a letter in which Division Commander Helmlinger informed Rosemont that, based on the record, the Corps' recommendation was to deny the 404 Permit as in violation of the CWA.

193.    In a December 28, 2016 letter from the Commander, South Pacific Division, of the U.S. Army Corps of Engineers to Hudbay/Rosemont, then-Colonel Helmlinger notified and explained to Hudbay/Rosemont that the L.A. District of the Corps concluded that Rosemont's 404 permit would violate the CWA and should be denied.

> The key CWA 404(b)(1) factors identified by the District that support a permit denial are determinations that the proposed Rosemont Mine will cause or contribute to violations of state water quality standards and significant degradation of waters of the United States, including shortfalls in the proposed compensatory mitigation.. . .  In this case, the District concluded that implementation of the proposed project would cause or contribute to violations of state water quality standards, and that minimization and mitigation measures, along with proposed monitoring were inadequate to ensure that degradation did not occur.  The District further concluded that implementation of the proposed project would result in significant degradation of waters of the United States, as a result of a substantial reduction of functions and services and that the project would contribute to the degradation of Outstanding Arizona Waters.  The District concluded that implementation of the proposed project would, among other things, adversely affect sediment delivery, hydrological functions, surface water quality, and use by humans and wildlife, including listed species.

---

letter to the Corps on May 28, 2015, that that the higher-level Division office make the final permit determination.  33 C.F.R. § 325.8(b)(1).  Thus, Division Commander and Defendant General Helmlinger was the officer who made the final permit decision in this case.

The District also concluded that mitigation proposed to offset project impacts would be inadequate.  Specifically, while enhancement parcels would be appropriate and sufficient to mitigate indirect impacts to 123.5 acres of waters of the United States, the permanent loss of 40.4 acres of waters would not be mitigated by the proposed re-establishment at Sonoita Creek Ranch, along with proposed mitigation on Davidson Canyon parcels and on proposed mitigation parcels, located outside of the impacted watersheds.

. . .

Finally, the District concluded that implementation of the proposed project would be contrary to the public interest. Among the key public interest concerns are adverse effects to cultural resources and traditional cultural properties important to tribes.

194.    Shortly before this, Pima County reiterated its findings that the 404 Permit would violate the CWA.  *See* October 21, 2016 Letter from Pima County to the Corps Division office; *see also* May 5, 2017, Letter from Pima County to the Corps of Engineers and EPA requesting that the Corps not issue Rosemont a 404 permit.

195.    During 2017, EPA and the Corps continued their review of the Permit application, including Rosemont's revised mitigation plans.

196.    On or about September 12, 2017, Rosemont/Hudbay submitted its revised mitigation plans to the Corps and EPA, entitled "Final Habitat Mitigation and Monitoring Plan, Permit NO. SPL-2008-00816-MB Rosemont Copper Project," known as the 2017 HMMP.

197.    On September 14, 2017, the Corps' South Pacific Division requested EPA's review and technical comments on the HMMP.

198.    In a November 30, 2017 letter from EPA to the Chief of the Corps' South Pacific Division Operations and Regulatory Office, EPA attached over 70 single-spaced pages of detailed analysis on the 404 Permit application, the impacts from the Mine and its

discharges, including a lengthy critique of Rosemont's Final 2017 HMMP mitigation plan.  In the cover letter, EPA stated: "[a]s with prior EPA reviews, we continue to find the permitted activities of the proposed mine will significantly degrade Cienega Creek, Davidson Canyon, and their tributaries despite the actions proposed in the HMMP."

199.    One of the detailed attachments to the November 30, 2017 EPA letter was entitled ***"Environmental Consequences of the Proposed Rosemont Copper Mine:  Significant Degradation to Waters of the United States."*** (Emphasis in original).  EPA detailed the various reasons why the 404 Permit could not be legally issued by the Corps: "Following a comprehensive analysis of the impacts on the physical, chemical and biological components of the aquatic environment, **EPA has concluded that the Rosemont Mine will result in significant degradation to waters.**  This document explains the basis for EPA's determination." (Emphasis added).

200.    The following are just some of EPA's legal and factual conclusions contained in that analysis:

> p. 1 – "Construction of the Rosemont Mine will result in the permanent filling and loss of 40.4 acres jurisdictional substrate of streams covering 18 linear miles.. . . This will result in a permanent and irrevocable significant adverse effect to the aquatic ecosystem by altering the substrate elevations and bottom contours of waters; jurisdictional waters will be permanently filled and all ecological functions associated with the jurisdictional substrate will be lost."

> p. 1 – "The discharge of fill material into jurisdictional streams, seeps, and springs . . . will permanently and adversely alter all existing natural physical and chemical characteristics, and functions of the aquatic ecosystem at the project site."

> p. 1-2 – "In addition, the project will result in permanent significant adverse effects to flows and normal surface and groundwater fluctuations of high functioning receiving waters through the direct discharge of fill material and the secondary impacts resulting from streamflow diversion, channel morphology

through erosion, contamination and elevated levels of suspended sediment in the water column."

p. 2 – "Elevated levels of suspended sediment or moderate-to-high turbidity will have significant adverse effects on aquatic organisms in Barrel and Davidson Canyon Washes and Cienega Creek."

"The discharge of fill material will permanently and significantly change the chemistry and the physical characteristics of the receiving water below the mine site through the introduction of heavy metals and constituents in suspended and dissolved forms. The addition of contaminants will reduce the suitability of downstream waters for populations of aquatic organisms. Decreases in surface (stormwater) discharges from the mine site will directly and permanently alter existing surface and baseflow hydrologic contributions to downstream receiving waters resulting in changes to the quantity and quality of existing high functioning waters. Thus, there will be adverse changes in the location, dimensions, structure, and dynamics of aquatic communities living in the receiving waters."

p. 4 – "Discharges of Fill Material into Streams and Springs to Construct the Mine Site Will Cause Unacceptable Adverse Impacts to Wildlife and Wildlife Habitat."

p. 6 – "The FWS Amended Biological Opinion findings support a finding under the Guidelines that the proposed mine will result in the significant adverse impairment and destruction of aquatic, wetland and riparian habitats upon which ten threatened and endangered species depend (Table 1). This includes, but is not limited to, significant adverse effects of the mine on elements of the aquatic environment which are particularly crucial to the health and survival of threatened and endangered species such as adequate quantities of good quality water, spawning and maturation (*e. g.,* rearing) and nesting areas, protective cover, adequate and reliable food supply, and resting areas for migratory species (Refer to 40 CFR §230.30(b)(2))."

p. 12 – "Therefore, mine-related reductions in the surface flow and surface flow contributions to low-water flow in Davidson Canyon and lower Cienega Creek ONRWs will result in significant degradation of the aquatic ecosystem."

p. 13 – "Reduction in Sediment Delivery Will Cause Unacceptable Adverse Impacts to Waters in Barrel and Davidson Canyons and Lower Cienega Creek."

p. 14 – "Discharge of Contaminants from the Rosemont Mine Will Cause

Unacceptable Adverse Impacts to Waters in Barrel and Davidson Canyons and Lower Cienega Creek."

p. 18 – EPA has determined that contamination from the Rosemont Mine will lower existing water quality in Davidson Canyon and Cienega Creek ONRWs. Designated as Tier 3 waters, lowering of water quality is prohibited and therefore in violation of State Water Quality Standards.

p. 30 – Rosemont's HMMP "does not prevent or replace the impacts that give rise to the significant degradation finding."

p. 32 – "The Rosemont Mine will degrade and destroy waters in the Cienega Creek watershed containing regionally rare, largely intact mosaics of some of the highest quality stream and wetland ecosystems in Arizona.  These environmental consequences are substantial and unacceptable and contrary to the goals of the CWA.. . .   [EPA] maintains that impacts associated with this project will result in significant degradation (40 CFR 2310.10((c)) of our Nation's waters."

EPA summarized (p. 32):

"EPA has determined the Rosemont Mine will result in the following effects which individually and cumulatively contribute or cause significant degradation:

1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, wildlife and special aquatic sites;
2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical and chemical processes;
3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability; and
4) Significantly adverse effects of the discharge of pollutants on recreational, aesthetic, and economic values."

201.    Regarding the violation of state and federal water quality standards, including state and federal anti-degradation requirements, EPA determined in the same attachment that:

p. 2 – The discharge of fill material will permanently and significantly change the

chemistry and the physical characteristics of the receiving water below the mine
site through the introduction of heavy metals and constituents in suspended and
dissolved forms."

p. 3 – "The Rosemont Mine will significantly degrade downstream reaches of
Davidson Canyon and Cienega Creek.  The state designation of Davidson Canyon
and Cienega Creek as 'Outstanding Arizona Waters' affords them special
protection, prohibiting any lowering of water quality.  Federal regulations for
state-designated ONRWs similarly state: *Where high quality waters constitute an
outstanding National resource, such as ... waters of exceptional recreational or
ecological significance, that water quality shall be maintained and protected*
[citing 40 C.F.R. §131.12(a)(3)]." (Emphasis in original).

p. 14 – "Based on our analysis of the water quality data, stormwater runoff from
the mine's waste rock and soil cover contaminated with lead, mercury,
molybdenum, selenium, silver, sodium and sulfate will degrade the water quality
of Barrel Canyon, Davidson Canyon and Cienega Creek."

p. 18 – "EPA has determined that contamination from the Rosemont Mine will
lower existing water quality in Davidson Canyon and Cienega Creek ONRWs.
Designated as Tier 3 waters, lowering of water quality is prohibited and therefore
in violation of State Water Quality Standards.  Violation of water quality standards
is also prohibited under the Guidelines (40 CFR 230.10(b))."

p. 18-19 – the state's §401 certification "lacks sufficient specific preventative
actions to safeguard the water quality of Tier 3 waters in the Cienega Creek
watershed."

p. 19 – "As shown in Table 2, mine runoff consisting of heavy metals . . . will be
released in concentrations exceeding the stormwater quality for Davidson Canyon
ONRW.  These heavy metals and other constituents will be transported
downstream through stormwater and lower the water quality of Davidson Canyon
and Cienega Creek in violation of water quality standards."

p. 19 – "Changes in stream hydrogeomorphology from the mine will result in
increases in total dissolved solids, suspended sediments, lowering of dissolved
oxygen and increases in temperature from declining pool levels resulting lower
water quality in lower Cienega Creek, in violation of water quality standards."

p. 28 – "The proposed mine will result in the lowering of water quality in the
ONRW through: 1) heavy metal contamination; 2) increased total sediment in
surface water flow; and 3) alteration of the physical, chemical and biological
integrity of the stream.  These adverse water quality impacts to downstream

ONRWs will be permanent."

202.    Another attachment to the EPA's November 30, 2017 letter to the Corps was entitled: **"Significant and Irreversible Environmental Consequences of Groundwater Drawdown from the Proposed Rosemont Mine."** (Emphasis in original).  "This document explains the secondary effects of groundwater drawdown from the proposed Rosemont Mine, which causes or contributes to a significant degradation of waters."

203.    The following are just some of EPA's legal and factual conclusions contained in that analysis:

> p. 4 – "Groundwater drawdown from the Rosemont Mine will cause unacceptable adverse impacts to surface waters, including wetlands of the Cienega Creek watershed."

> p. 9 – "The Guidelines (40 CFR Part 230) support an interpretation of secondary effects to include those surface effects to aquatic resources induced by hydrological modifications associated with the discharge of dredged material authorized."

> p. 10 – "In the case of the Rosemont Mine, subsurface drawdown clearly constitutes a significant change in the hydrologic regime affecting surface water. **These operational affects are strongly 'associated' with the discharge of dredged and fill materials, since they would not occur in the absence of a §404 CWA permit.**" (emphasis added).

> p. 12 – "EPA maintains the secondary impacts associated with this project will cause [or] contribute to significant degradation of our Nation's waters (40 CFR 230.10(c))."

204.    In that document, EPA explained why, pursuant to the 404(b)(1) Guidelines, **"Groundwater Drawdown is a Regulated Secondary Effect Under §404 Clean Water Act."**  (Emphasis added).  In that discussion, EPA submitted a detailed

analysis of "**§404 CWA permit decisions regulating the secondary effects of groundwater drawdown**" (emphasis in original), describing numerous examples across the country, including a copper mine in Arizona, where the Corps conducted the required analysis of secondary effects – analysis the Corps refused to do at Rosemont.  EPA, "Significant and Irreversible Environmental Consequences of Groundwater Drawdown from the Proposed Rosemont Mine," at 11-12.

205.    EPA also submitted to the Corps, as another attachment in its November 30, 2017 package, a detailed analysis of Rosemont's final 2017 HMMP, concluding that it failed to adequately compensate for the impacts caused by the issuance of the 404 Permit.  That 26-page attachment was entitled: "EPA Analysis of the *Final Habitat Mitigation and Monitoring Plan Permit NO. SPL-2008-00816-MB Rosemont Copper Project dated September 12, 2017 EPA Comments October 5, 2017 (Revised November 30, 2017).*"

206.    "EPA has reviewed the *Final Habitat Mitigation and Monitoring Plan Permit NO. SPL-2008 00816-MB Rosemont Copper Project dated September 12, 2017 (HMMP).* The mitigation proposed in the final HMMP includes two components: the Sonoita creek Ranch (SCR) project and the onsite stock tank removal.  Rosemont Copper Company (Rosemont) submitted the mitigation package to compensate for impacts to waters of the United States by the proposed Rosemont Copper Mine (Rosemont Mine).  **Our review of the HMMP affirms our position that the mitigation does not comply with EPA's 404(b)(1) Guidelines and the requirements of the Mitigation Rule.  The HMMP**

**proposed by Rosemont fails to offset the proposed mine's impacts to aquatic**

**resources in the Cienega Creek watershed.**" (emphasis added). Id.

207.    In that part of the HMMP, Rosemont proposes to substantially alter the flow and function of Sonoita Creek and directly fill 8.9 acres of Sonoita Creek.  As EPA noted in its analysis of the HMMP quoted above, "Sonoita Creek Ranch is Not in the Same Watershed as the Mine Impacts and Consequently Does Not Offset the Pervasive Damage to Aquatic Resources in the Cienega Creek Watershed." EPA Analysis of the *Final Habitat Mitigation and Monitoring Plan*, at 2.

## Despite Its Own Previous Conclusions, and EPA's Detailed Findings and Conclusions, the Corps Reversed Course and Issued the 404 Permit.

208.    Despite all of the evidence in the record, as determined and documented over many years by the Corps' L.A. District, the EPA, and General (then Colonel) Helmlinger noted above, General Helmlinger nevertheless issued the 404 Permit on March 8, 2019.

209.    In issuing the Permit, the Corps found that none of the Mine's discharges would violate state and federal water quality standards, or "cause or contribute to significant degradation of waters of the United States."  The Corps also found that Rosemont's 2017 HMMP mitigation plan fully compensated for Mine impacts and satisfied the CWA regulations.  *See generally*, ROD and EA.

210.    This is despite the fact that, outside of the new "native material" substantial change in of the activity/fill alternative, no material aspect of the Mine's construction or operations, or the Mine's direct, indirect, cumulative, or secondary impacts changed since

the 2014 and 2016 Corps findings that the Project and its discharges would violate the CWA and its regulations.

211.    As detailed above, the primary reason for the Corps' change of position is that it now considers the only discharge to be reviewed and regulated as the initial fill of the WOUS at the Mine site resulting from the clearing/grubbing/grading, and not any other aspect of the Mine.  ROD at 14.

212.    This is very different from the description of the fill/discharge in the 2011 Public Notice and reviewed in the FEIS, which determined that the impacts to potential Waters of the U.S. will result from placement of the waste rock in the WOUS.  Dec. 6, 2011 Public Notice at 4; *see also* Rosemont's 2017 HMMP, which stated that "direct impacts result from fill of waste rock and tailings material in Barrel and Wasp canyons . . ." HMMP at 6.

213.    Further, in the 2011 Draft EIS, the Corps' described the activity under its jurisdiction that required mitigation as: "[i]mplementation of the proposed Project will result in direct impacts to approximately 37.7 acres of potential waters of the U.S. from the construction of the waste rock dumps, tailings piles, leach pad, plant site, and pit." Appendix E to the 2011 Draft EIS, "U.S. Army Corps of Engineers' Habitat Monitoring Plan, Proposed Mitigation Concept." (Note: the approved Barrel Alternative removed the leach pad).

214.    Similarly, regarding the construction of the mine pit in the WOUS site in Wasp Canyon, the Corps had determined in the 2011 Public Notice: "[i]mpacts to potential WUS in the pit will result from initial blasting and excavation of ore and waste rock.

Following a blast, rubblized material, including that found in potential WUS, will be picked up with a loader, placed into a haul truck, and then deposited . . . within the waste rock area."  2011 Public Notice at 4.

215.    The 2011 Public Notice described the "Fill Type" for the "Project Feature[s]" of the waste rock and dry stack tailings as either "ROM [run-of-mine] Rock" or "Selected ROM Rock."  Public Notice at 11 (Table 2).

216.    Now, the Corps states that none of these Mine activities and/or operations will be considered, or any of the impacts from the waste rock, tailings, or mine pit minimized or prevented, because the only discharge is the initial fill of the WOUS at the Waste Rock and Tailings sites consisting of "native material."  ROD at 19 (Table 2); ROD at 12-13, ROD at 14.

217.    In the 2011 Public Notice, the "Project Feature[s]" that would involve the "Fill Type" of "Native Material" included "Surface Water Management," "Plant Site," the two access roads and the off-site water and transmission line sites.  Public Notice at 11.  The 2011 Public Notice never mentioned or proposed that "Native Material" would be discharged at the waste rock and tailings sites.  Id.

218.    Despite this complete reversal of its position as to the type of fill materials discharged into the WOUS at the site, the Corps never provided any public notice or opportunity to comment on this switch.  The first time the public saw this new position was when the Permit, ROD, and EA were issued on March 8, 2019.

219.    According to the Corps, this initial work conveniently eliminates the WOUS at the site and any Corps responsibility to review impacts or protect waters, as "no waters of the

U.S. will exist" after the initial filling of the WOUS associated with the

clearing/grubbing/grading. ROD at 13.

**Failure to Allow Public Review Under the CWA and NEPA**

220.    The final 2017 HMMP, or any mitigation plan submitted to the Corps after the

close of the Corps' public comment period or comment period on the Draft EIS in

January, 2012, was never submitted for public review under the CWA and NEPA.

221.    The public was never notified of the Corps' plan to authorize direct discharges

into Sonoita Creek or at the stock tank location as part of its 404 Permit review.

222.    No mention was made in the December 2011 Public Notice of any mitigation plan

regarding Sonoita Creek, the discharges into that water, or any other aspects of the

HMMP that Rosemont added after the Draft EEIS was issued in 2011.

223.    Similarly, no mention was made in the December 2011 Public Notice of any

discharge of "native material" into the WOUS at the waste rock and tailings sites.

224.    Plaintiff SSSR formally requested, in multiple letters, that the Corps allow public

comment on the post-FEIS mitigation measures that Rosemont added and which the

Corps now relied on to issue the 404 Permit.  *See* Dec. 11, 2017 and Oct. 19, 2018 letters

to Corps; *see also*, Nov. 28, 2017 and Nov. 1, 2018 letters from attorneys for the Tohono

O'odham Nation, Pascua Yaqui Tribe, and Hopi Tribe to Corps requesting public review

and comment of the new mitigation and supporting documents.

225.    Despite receiving these documents and the significant new information contained

within them, and despite reviewing new mitigation and other plans submitted by

Hudbay/Rosemont, the Corps did not provide the public with any additional opportunities

to comment as part of the NEPA process after the issuance of the Draft EIS and Corps

Public Notice in 2011.

226.    Neither the Plaintiffs, nor the general public, were given an opportunity to

comment upon these mitigation measures, new proposed discharges, and other new

information during the Corps' public notice or NEPA public review process, including

the brand new proposals regarding the new "native material" discharge or the proposal to

discharge 8.9 acres of fill in Sonoita Creek.

227.    The 2019 EA, which purportedly analyzes the HMMP and the new discharges into

Sonoita Creek and at the stock tank sites, was only first disclosed and released to the

public on March 8, 2019, as a final document.

228.    Overall, and as detailed by EPA as noted above, the 2017 HMMP relied upon in

the 404 Permit fails to meet the above-noted mitigation requirements for the indirect as

well as direct resource losses caused by the Mine and the authorized discharges.

229.    The new 859-page Final Habitat Mitigation and Monitoring Plan (HMMP), dated

September 12, 2017, is substantially different from the 6-page "Proposed Mitigation

Concept" included in the 2011 Draft EIS, the 6-page Conceptual HMMP included in the

Final EIS or the 108-page revised HMMP that was submitted in September 2014

following the publication of the FEIS.

230.    Appendix E to the 2011 Draft EIS, labeled "U.S. Army Corps of Engineers'

Habitat Monitoring Plan," consisted of the 6-page "Proposed Mitigation Concept," and is

the only document regarding mitigation that has been subject to any public review and

comment under NEPA and the CWA.  The first 4.5 pages are a description of the

proposed project and the 2008 rule for compensatory mitigation for losses of aquatic

resources, leaving a scant page and a half discussion of the possible types of mitigation

available for the Rosemont Project, without identifying any geographic location for

mitigation.

231.    There has been a considerable amount of additional significant new

information relevant to environmental concerns since the publication of the

December 2013 FEIS, including detailed and expert scientific and technical

analysis questioning the impacts and effectiveness of the various incarnations of

Rosemont's HMMP mitigation plan.  *See* Dec. 11, 2017, letter from SSSR to

General Helmlinger.

## **CLAIMS FOR RELIEF**

### **Claim 1: Violation of the CWA and APA:**
**The Corps' Eleventh-Hour, Unexplained Decision to Substantially Change the Activity Being Permitted Violates the CWA and APA.**

232.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this

Complaint herein by reference.

233.    In the 2011 Public Notice on Rosemont's application for a 404 permit, the Corps

described the activity to be permitted as the "discharge [of] fill material into Barrel

Canyon and associated tributaries including Wasp Canyon, McCleary Canyon, Trail

Canyon, and other unnamed ephemeral washes for construction of the proposed

Rosemont Copper Project open pit mine."  Public Notice at 1.

234.    The Public Notice further described the "fill material" to include "19,941 cubic

feet of waste rock" and "66,792 cubic feet of mine tailings." Public Notice at 11, Table 2.

235.   The Public Notice further advised the public and other reviewing agencies that "[i]mpacts to potential WUS [waters of the United states] within the waste rock storage area will result from the placement of ROM [Run of Mine] waste rock."  Public Notice at 4.

236.   More than seven years later, after extensive review, analysis, and critical comments in response to the Public Notice by the EPA, the Corps' LA District, tribal governments, federal, state and local agencies, and the public explaining why the permit would violate the CWA and Section 404(b) Guidelines, the Corps abruptly reversed course and in the ROD issued on March 9, 2019 narrowly described for the first time the permitted activity as "clearing, grubbing, and grading;" and described the fill material as "native materials."  *See e.g.* ROD at 13.

237.   Even though the overall Mine proposal has not changed, the Corps now takes the position that as a result of approving the filling of the WOUS with "native materials," it no longer has any jurisdiction or responsibility to consider the direct, indirect, and secondary impacts from the disposal of waste rock and mine tailings, dewatering, and other serious impacts on waters and aquatic ecosystems protected under the CWA.

238.   The Corps' newfound description of the permitted activity is also the apparent basis for its eleventh-hour rejection of the Corps' LA District and EPA's determinations that the permit cannot be issued because it violates the 404(b)(1) Guidelines and Arizona water quality standards.

239.   The Corps' newfound description of the permitted activity is akin to a new mass-grading alternative that was only first noticed to the public when it was authorized as part

of the final 404 Permit and ROD on March 8, 2019.  However, neither the ROD nor 404 Permit analyzed or considered whether this new alternative is the least environmentally damaging practicable alternative.  40 C.F.R. § 230.10(a).  The Corps has also not shown that this newly created alternative serves a legitimate purpose, is necessary for the Mine, and/or is in the public interest.

240.    The Corps has not explained its abrupt, eleventh-hour, major change in position, let alone provided the "reasoned explanation" the APA requires.  *Motor Vehicle Mfrs. Ass'n v. State Farm Ins*., 463 U.S. 29, 42 (1983).

241.    Further, the Corps' failure to issue a new Public Notice with its radically revised definition of the permitted activity, despite the passage of nearly eight years, denies the public and reviewing agencies of any opportunity to comment upon or contest the redefinition.

242.    The Corps' actions are arbitrary, capricious, contrary to the CWA and its implementing regulations, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. §§ 701-706.

**Claim 2:  Violation of the CWA:**
**Failure to Consider Indirect/Secondary/Cumulative Impacts**
**In Issuing the 404 Permit.**

243.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

244.    Under the CWA and its implementing regulations, the Corps must fully evaluate the direct, secondary, and cumulative impacts of the permitted activity, including impacts

to the aquatic ecosystem, fish and wildlife, aesthetics, recreation, and cultural resources. *See, e.g.*, 33 C.F.R. §§ 320.4(a)(1), 336.1(c)(5) (endangered species), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.30 (threatened and endangered species), 230.31 (fish and wildlife), 230.51 (recreational and commercial fisheries), 230.52 (water-related recreation), 230.53 (aesthetics).  The Corps must make a detailed "[d]etermination of secondary effects on the aquatic ecosystem. (1) Secondary effects are the effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material."  40 C.F.R. § 230.11(h).

245.   "Fundamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern."  40 C.F.R. § 230.1(c).   "Consideration shall also be given to the potential diversion or obstruction of flow, alterations of bottom contours, or other significant changes in the hydrologic regime."  40 C.F.R. § 230.11(b).  The Guidelines direct the Corps to analyze and minimize or prevent the on-site impacts resulting from the fill, such as the impacts from activities occurring on the fill.  For example, the Corps must "control runoff and other discharges from activities to be conducted on the fill."  40 C.F.R. § 230.77(a).

246.   The Corps' failure to consider the indirect, secondary, and cumulative impacts of the Rosemont Mine, including impacts from the construction and operation of the waste

rock dump, tailings facility, and mine pit, on water flows, water quality, wildlife, wildlife habitat, the Las Cienegas National Conservation Area, federal reserve water rights, and other significant and important public resources in issuing the 404 Permit is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

247.    The Corps interpretation that secondary effects under the 404 (b)(1) Guidelines does not include any of the predicted and foreseeable negative effects on water quality and the aquatic ecosystem that the Mine's operations will cause, is in direct contradiction of EPA's interpretation, and is arbitrary and capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

**Claim 3:  Violation of the CWA and the Corps' Regulations:**
**Failure to Comply with the Corps' Public Interest Review Criteria.**

248.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

249.    The Corps cannot issue a 404 permit if it "would be contrary to the public interest."  33 C.F.R. § 320.4(a)(1).  This requires the Corps to consider "the probable impacts" of a proposed project on "[a]ll factors which may be relevant to the proposal[,] including cumulative effects."  Id.

> All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

33 C.F.R. § 320.4(a)(1).

250.    A permit must be denied if it is contrary to the public interest or does not comport with the Section 404(b)(1) Guidelines.  33 C.F.R. §§ 320.4, 323.6; 40 C.F.R. §§ 230.10, 230.12.

251.    In the "Public Interest Review" section of the ROD, "the Corps concludes that issuance of the permit is not contrary to the public interest."  ROD at 69.  In making that determination, the Corps specifically reviewed and considered that "[t]he proposed action, which would produce resources such as copper, molybdenum, and silver, would further the objective of the applicant as well as stated interests of both Arizona and the United States in the development of mineral resources."  ROD at 56.  The ROD further highlighted "the public need for these minerals . . . [and] the economic benefits associated with the development of the proposed action."  Id.; *see also* ROD at 60 (finding that "[b]eneficial effects would occur as a result if increases in employment and local, state, and federal tax revenue as a result of the proposed construction and operations of the mine.").

252.    Despite relying on these purported economic benefits from operation of the Mine, and the resulting increase in copper supplies, to find that the "proposed action" is not contrary to the public interest, the Corps arbitrarily refused to consider the negative

effects from the construction and operation of the Mine on the various environmental and other resources listed in 33 C.F.R. § 320.4(a)(1).

253.    Regarding the new "native material" discharge, the Corps failed to justify why this approved alternative was in the public interest, when it is clear that this alternative serves no legitimate public purpose.

254.    The Corps' failure to fully consider all required and relevant factors in making its public interest determination, and the Corps' issuance of the 404 Permit that is contrary to the public interest, is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

**Claim 4:  Violation of the CWA and EPA's Section 404(b)(1) Guidelines:**
**Authorizing an Activity That Will Result in Significant Degradation of**
**Waters of the U.S.**

255.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

256.    "For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines."  33 C.F.R. § 320.4(a)(1).

257.    The Corps is prohibited from issuing a 404 permit if the proposed discharge of dredged or fill material "will cause or contribute to significant degradation of the waters of the United States."  40 C.F.R. § 230.10(c):

[N]o discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States. . . . [E]ffects contributing to significant degradation considered individually or collectively, include:

(1) Significantly adverse effects of the discharge of pollutants on human health or welfare, including but not limited to effects on municipal water supplies, plankton, fish, shellfish, wildlife, and special aquatic sites.

(2) Significantly adverse effects of the discharge of pollutants on life stages of aquatic life and other wildlife dependent on aquatic ecosystems, including the transfer, concentration, and spread of pollutants or their byproducts outside of the disposal site through biological, physical, and chemical processes;

(3) Significantly adverse effects of the discharge of pollutants on aquatic ecosystem diversity, productivity, and stability. Such effects may include, but are not limited to, loss of fish and wildlife habitat or loss of the capacity of a wetland to assimilate nutrients, purify water, or reduce wave energy; or

(4) Significantly adverse effects of discharge of pollutants on recreational, aesthetic, and economic values.

Id.

258.    The consideration of whether issuance of the 404 Permit "will cause or contribute to significant degradation of the waters of the United States" must include consideration of the direct as well as indirect, secondary, and cumulative impacts resulting from the issuance of the 404 Permit.  "Findings of significant degradation related to the proposed discharge shall be based on upon appropriate factual determinations, evaluations, and tests required by subparts B and G, after consideration of subparts C through F."  Id. "Subpart B" includes § 230.11, which requires, among other duties, the "[d]etermination of secondary effects on the aquatic ecosystem.  (1) Secondary effects are the effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material."  40 C.F.R. §§ 230.11(h).

259.    The Corps' issuance of the 404 Permit violates the CWA and the 404(b) Guidelines because the authorized discharges and the resulting direct, indirect, secondary, and cumulative effects will cause and contribute to significant degradation of waters of the United States.  40 C.F.R. § 230.10(c).

260.    The Corps' failure to prevent significant degradation of waters of the United States from the direct discharges at the Mine site, as well as indirect, secondary, and cumulative water quality impacts caused by Mine operations including the dewatering, is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

### Claim 5:  Violation of the CWA and Section 404 (b)(1) Guidelines:
**Authorizing an Activity that Will Violate State Water Quality Standards Violates the CWA.**

261.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

262.    "No discharge of dredge or fill material shall be permitted if it: (1) Causes or contributes . . . to violations of any applicable State water quality standard."  40 C.F.R. § 230.10(b)(1).

263.    The Corps' issuance of the 404 Permit violates the CWA and the 404(b) Guidelines because the authorized discharges and the resulting direct, indirect, secondary, and cumulative effects will cause and contribute to violations of state water quality standards.  40 C.F.R. § 230.10(b)(1).

264.   The Corps' failure to prevent violations of Arizona water quality standards resulting from the direct discharges at the Mine site, as well as indirect, secondary, and cumulative water quality impacts caused by Mine operations including the dewatering, is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

### Claim 6:  Violation of the CWA and NEPA:
**Failure to Adequately Analyze and Mitigate Mine Impacts.**

265.   Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

266.   The 404(b)(1) Guidelines prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. § 230.10(d).  Those seeking a 404 permit must mitigate the impacts of the proposed dredge and fill activities by "avoiding, minimizing, rectifying, reducing, or compensating for resource losses."  33 C.F.R. § 320.4(r)(1).

267.   The 404(b)(1) Guidelines also require full mitigation of a project's impacts.  The purpose of the compensatory mitigation program is to "offset unavoidable impacts to waters of the United States authorized through the issuance of permits by the U.S. Army Corps of Engineers pursuant to section 404 of the Clean Water Act."  40 C.F.R. § 230.9l(a)(l).  The Corps "must determine the compensatory mitigation to be required in a

DA permit, based on what is practicable and capable of compensating for aquatic

resource functions that will be lost as a result of the permitted activity."  Id. § 230.93(a).

Mitigation is required for "significant resource losses which are specifically

identifiable, reasonably likely to occur, and of importance to the human or aquatic

environment." 33 C.F.R. § 320.4(r)(2).  These adverse effects to aquatic resource

functions, whether direct or indirect, must be mitigated.  Id.; 40 C.F.R. § 230.93(a).

268.    Under NEPA an EIS must: (1) "include appropriate mitigation measures not already

included in the proposed action or alternatives," 40 C.F.R. § 1502.14(f), and (2) "include

discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered

under 1502.14(f))."  40 C.F.R. § 1502.16(h).  The Corps must evaluate any mitigation

measures it adopts and relies on in approving an agency action for their effectiveness.

269.    In addition, the Corps is required to "[s]tate whether all practicable means to avoid or

minimize environmental harm from the alternative selected have been adopted, and if not,

why they were not.  A monitoring and enforcement program shall be adopted and

summarized where applicable for any mitigation."  40 C.F.R. § 1505.2(c).  "Any such

measures that are adopted must be explained and committed in the ROD."  *Forty Most*

*Asked Questions Concerning CEQ's Nat'l Envtl. Policy Act Regulations*, 46 Fed. Reg.

18026, 18036 (Mar. 23, 1981).

270.    Even if the Corps is correct, under the CWA, that it need not analyze the indirect,

secondary, and cumulative impacts, and mitigation therefrom, due to the dewatering or

pit lake formation, NEPA requires that such mitigation be analyzed.  "All relevant,

reasonable mitigation measures that could improve the project are to be identified, even if

they are outside the jurisdiction of the lead agency or the cooperation agencies. . ." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18026, 18031 (March 23, 1981).

271.   The Corps acknowledged that, regardless of its position limiting its authority and review under the CWA to just the fill associated with the initial clearing/grubbing/grading, it must analyze mitigation measures from operation of the Mine itself: "the NEPA scope of analysis includes the entire surface footprint of the proposed mine, tailings and waste rock, roads, utilities, and other infrastructure.  In addition, because of the involvement of the USFS, the scope of the NEPA document includes construction, operations, reclamation, and closure of the proposed mine (see p. 1 of the Final EIS)."

272.   Yet the 2013 FEIS specifically did not analyze mitigation for the loss of water flows and wildlife habitat in Empire Gulch, due to the Forest Service's legal position that it had no authority to analyze or impose such measures.  "Due to the Forest Service's jurisdictional limitation that mitigation measures can be required only on NFS [National Forest Service] surface resources, no mitigation measures are proposed that would directly offset the impacts predicted to occur along Empire Gulch."  FEIS at 546.  "[T]he Forest Service does not have authority to require mitigations for surface resources beyond the boundaries of the Forest Service, such as those requested by the objectors."  USFS Objection Response 0084-144.  "The Forest Service authority related to mitigation is limited to protection of surface resources on NFS lands."  FEIS at 94.

273.   Even if the USFS' position on its purported lack of authority to analyze and require mitigation in Empire Gulch (which lies largely on BLM lands) is correct (which

Plaintiffs have challenged in <u>Save the Scenic Santa Ritas v. U.S. Forest Service</u>, No. 4:17-cv-00576-TUC-JAS), the Corps is under no such limitation under the CWA and NEPA.

274.    The Corps' failure to adequately analyze, minimize, and mitigate the impacts resulting from the direct discharges at the Mine site, as well as indirect, secondary, and cumulative impacts caused by Mine operations including the mine pit lake and dewatering, is arbitrary, capricious, an abuse of discretion, contrary to the CWA, NEPA, and their implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

**<u>Claim 7: Violation of the CWA and Corps' Regulations:</u>**
**The Mitigation Plan and Permit Fail to Include an Analysis and Determination of the Amount of the Financial Assurance Covering the Approved Mitigation Plan.**

275.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

276.    Corps regulations require that the discharger provide a "financial assurance" to cover mitigation costs "to ensure a high level of confidence that the compensatory mitigation project will be successfully completed."  33 C.F.R. § 332.3(n).  Without such an analysis and amount, the agency cannot determine "that the compensatory mitigation project will be successfully completed" in violation of the 404(b)(1) Guidelines (40 C.F.R. Part 230) and Corps mitigation regulations (33 C.F.R. Part 332).  Of the twelve items that the "final mitigation plan must include," item (c)(3) is "Financial assurances." 33 C.F.R. § 332.4(c)(13); 33 C.F.R. § 332.4(c)(1)(i).  This requires that the final

mitigation plan include: "A description of financial assurances that will be provided and how they are sufficient to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with its performance standards (see § 332.3(n))."  33 C.F.R. § 332.4(c)(13).

277.    Additionally, "[t]he district engineer must assess . . . the costs of the compensatory mitigation project."  40 C.F.R. § 230.93(a)(1).

278.    Neither the ROD nor the Permit contains any analysis of the costs of the proposed mitigation plan or what the amount or type of financial assurance will be provided.  For the Sonoita creek mitigation, the amount and form of the financial assurance will not be submitted for at least 12 years—long after the damage to aquatic resources will become irreversible.  Because no analysis or amount for the financial assurance was provided or reviewed, the Corps issued the 404 Permit and approved the mitigation plan without knowing how the financial assurance and mitigation plan "are sufficient to ensure a high level of confidence that the compensatory mitigation project will be successfully completed."  Id.

279.    Corps regulations require that the Permit include the financial assurance amount as part of an approved mitigation plan as a condition of the Permit.  33 C.F.R. § 332.3(k).

280.    Despite the requirement that the amount and analysis of the required financial assurance to cover the mitigation plan be included in the record for the final permit, the 404 Permit issued to Rosemont, including the approved HMMP mitigation plan, contains no such analysis or amount.

281.   The Corps' failure to analyze and describe the amount of the financial assurance for mitigation prior to issuance of the Permit is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

## Claim 8:  Violation of the CWA:
**Failure to Provide Public Notice and Comment on the New "Native Material" Discharges, the HMMP and New Discharges to Sonoita Creek and the Stock Tanks.**

282.   Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

283.   The Corps relies on Rosemont's 2017 HMMP mitigation plan to support the issuance of the 404 Permit.  Yet the HMMP, including the new fill discharges to 8.9 acres of waters of the U.S. in Sonoita Creek, and the new fill discharges associated with the four stock tanks, was never subject to public notice, review, or comment.

284.   The Draft EIS and Public Notice in 2011 did not contain any detailed mitigation plan for public review.  The significant changes to the mitigation plan after the issuance of the FEIS and contained in the 2017 HMMP were also never subject to public review.

285.   Corps regulations require that proposed discharges be subject to "Public review and comment."  33 C.F.R. § 332.4(b).  "For an activity that requires a standard DA [Department of the Army/Corps] permit pursuant to section 404 of the Clean Water Act, the public notice must contain a statement explaining how impacts associated with the

proposed activity are to be avoided, minimized, and compensated for."  33 C.F.R. § 332.4(b)(1).

286.    "Public notice is the primary method of advising interested parties of the proposed activity for which a permit is sought, and of soliciting comments and information necessary to evaluate the probable impact on the public interest.  The notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."  33 C.F.R. § 325.3(a).

287.    The 2011 Public Notice—the only Public Notice the Corps issued for the proposed Rosemont Mine—failed to mention the now-approved new discharges of "native material" at the Mine site, the discharges of 8.9 acres of fill in Sonoita Creek, and/or the new fill discharges associated with the four stock tanks.  Thus, the public was never given the opportunity to review and comment on these new discharges, in violation of the Corps Public Notice regulations.

288.    The Corps' failure to provide proper public notice and the opportunity for meaningful public comment on the new discharges and the HMMP is arbitrary, capricious, an abuse of discretion, contrary to the CWA, and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. §§ 701-706.

**Claim 9:  Violation of NEPA:**
**Failure to Provide Public Notice and Comment on the New "Native Material"**
**Discharges, the HMMP and New Discharges to Sonoita Creek and the Stock Tanks.**

289.    Plaintiffs hereby re-allege and incorporate all preceding paragraphs of this Complaint herein by reference.

290.    Despite the significant and substantial changes to the Rosemont Project since the FEIS was issued in 2013 (and the Draft EIS that was issued in 2011), such as the various iterations of the HMMP culminating in the 2017 final HMMP (including the new Sonoita Creek discharges/fill), the Corps never subjected these changes to public review under NEPA.

291.    Indeed, the Corps relies on the new HMMP as a primary justification for reversing the stated recommendation of the District Engineer to deny the permit.  ROD at 3.  Yet no details on the mitigation plan were provided in the 2011 Public Notice, and little more was provided in the Draft EIS.

292.    A public notice, such as the Corps in this instance, that contains no substantive information on mitigation is deficient under NEPA.  Here, the notice not only fails to concentrate on the "truly significant" issues posed by the application, *see* 40 C.F.R. § 1500.1(b), but it also fails to "solicit appropriate information from the public," *see* 40 C.F.R. § 1506.6(d).  By failing to provide any public review of these critical aspects of the project, the agency failed to "make [a] diligent effort[ ] to involve the public," *see* 40 C.F.R. § 1506.6(a), and to "involve . . . the public . . . to the extent practicable."  *See* 40 C.F.R. § 1501.4(b).  The Corps' deficient public notice violates the NEPA regulations related to agency requirements for public involvement and deprives the public of its

procedural right to an adequate opportunity to participate in the permit evaluation process.

293.    The EA's brief analysis of mitigation does not cure these deficiencies, as it was never subject to public review, and indeed the public only first became aware of the EA on the day that the Permit was issued.

294.    The Corps' failure to provide proper notice and opportunity to comment on the changes to the Mine plan, including the mitigation plan and new discharges associated with the Mine or mitigation plan, is arbitrary, capricious, an abuse of discretion, contrary to the NEPA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. § 706(2).

**Claim 10:  Violation of NEPA:**
**The 2019 EA Violates NEPA.**

289.    Plaintiffs hereby incorporate by reference all preceding paragraphs.

290.    The Corps entirely failed to provide any notice or pre-decisional opportunities for public input or involvement prior to issuing the final 2019 EA.   The Corps thereby failed to involve the public and other agencies, to the extent practicable, in preparing the 2019 EA, 40 C.F.R. § 1501.4(b); and failed to make diligent efforts to involve the public in preparing the 2019 EA.  40 C.F.R. § 1506.6(a).

291.    The Corps failed to provide sufficient evidence and analysis within the 2019 EA that would be necessary to determine whether or not the proposed action may result in significant impacts on the environment and thereby require an EIS, including

consideration of the direct, indirect, and cumulative impacts of the proposed action.  40 C.F.R. § 1508.9.  The Corps also failed to provide any consideration of alternatives in the EA.  Id.

293.    The Corps failed to consider and assess the NEPA "significance factors" in preparing the 2019 EA, including, but not limited to, the factors concerning controversy, uncertainty, and cumulative impacts, and prior to determining that the proposed action would not require an EIS.  40 C.F.R. § 1508.27.

294.    The 2019 EA is arbitrary, capricious, an abuse of discretion, contrary to the NEPA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA.  5 U.S.C. § 706(2).

## **REQUEST FOR RELIEF**

For the foregoing reasons, Plaintiffs respectfully request that this court:

A.    Declare that the Corps violated the CWA, NEPA, and the implementing regulations and policies of these laws;

B.    Set aside and vacate the Corps ROD, 404 Permit, and EA;

C.    Enjoin the Corps from allowing, authorizing, or approving any action in reliance on the Corps ROD and 404 Permit until the Corps has complied with the CWA, NEPA, and the implementing regulations and policies of these laws;

D.    Award Plaintiffs their reasonable fees, costs, expenses, and disbursements, including attorneys' fees, under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable federal law; and

E.      Grant such additional relief as this court deems equitable, just, and proper.

Respectfully submitted this 27th day of March, 2019.

*/s/Allison N. Melton*
Allison N. Melton
Center for Biological Diversity
128 Cascadilla St./#3024
Crested Butte, CO  81224
CO Bar # 45088 (Applicant *Pro Hac Vice*)
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org

Roger Flynn,
Jeffrey C. Parsons
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
Colo. Bar # 21078 (Applicant *Pro Hac Vice*)
Colo. Bar. # 30210 (Applicant *Pro Hac Vice*)

(303) 823-5738; Fax (303) 823-5732
Email: wmap@igc.org

Marc D. Fink
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
MN Bar # 343407 (Applicant *Pro Hac Vice*)
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org

*Attorneys for Plaintiffs*

<u>Certificate of Service</u>

I, Allison N. Melton, attest that I served the following persons/offices with this Complaint, by mailing it certified mail pursuant to FRCP 4.

Brig. Gen. D. Peter Helmlinger
Commander, Northwestern Division
U.S. Army Corps of Engineers

P.O. Box 2870
Portland, OR 97208-2870

Lieutenant General Todd T. Semonite
Chief, U.S. Army Corps of Engineers
441 G Street, NW
Washington, DC 20314

William P. Barr, Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

U.S. Attorney's Office, District of Arizona, Tucson
405 W. Congress Street, Suite 4800
Tucson, AZ 85701-5040

*/s/ Allison N. Melton*
Allison N. Melton