Allison N. Melton (CO Bar No. 45088)
Center for Biological Diversity
128 Cascadilla St./#3024
Crested Butte, CO  81224
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org

Marc D. Fink (MN Bar No. 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota  55805
Phone: 218-464-0539
Email: mfink@biologicaldiversity.org

Roger Flynn (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar # 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main Street, #2
Lyons, CO  80540
Phone: 303-823-5738
Email: wmap@igc.org
*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
TUCSON DIVISION

| | |
|---|---|
| Save the Scenic Santa Ritas et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S. Army Corps of Engineers et al., <br><br> Defendants, <br><br> and <br><br> Rosemont Copper Company, <br><br> Defendant-Intervenor. | No. 4:19-cv-00177-TUC-JAS (Lead) <br> No. 4:19-cv-00205-TUC-JAS (C) <br><br><br> **MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY INJUNCTION BY SAVE THE SCENIC SANTA RITAS (19-cv-177)** |

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 3

   I.     The Section 404 Permit ................................................................................... 3

   II.  The Rosemont Mine's Severe and Permanent Impacts
        to the Aquatic Ecosystems of the Santa Ritas. ........................................... 8

   III.  The Corps and EPA Both Previously Determined that the
         Mine's Discharges and Impacts Would Violate the Clean Water Act. ................. 12

STANDARDS FOR PRELIMINARY RELIEF ................................................... 15

ARGUMENT .......................................................................................................... 16

   I.     Plaintiffs Are Likely to Succeed on the Merits. ........................................ 16

      A. The Corps' Eleventh-Hour Decision to Substantially Change
         the Activity Being Permitted Violates the CWA and the Public
         Notice and Review Requirements of NEPA and the CWA. ............................... 19

         1.    Violation of the CWA Public Notice and Review Requirements. ............... 19

         2.    Violation of NEPA's Public Notice and Comment Requirements. .............. 24

      B. The Corps' Failure to Consider Secondary and Cumulative Impacts
         Violates the CWA. ........................................................................................ 25

      C. Failure to Comply with the Corps' Public Interest Regulations. ........................... 34

      D. Failure to Prevent Significant Degradation of Waters of the U.S.
         and Violation of Water Quality Standards. ........................................................ 37

      E. Failure to Adequately Analyze and Mitigate Mine Impacts. ................................ 38

      F. The Corps Failed to Include an Analysis and Determination of the
         Amount of the Financial Assurance Covering the Mitigation Plan. ...................... 40

   II.  The Project Will Result in Immediate and Irreparable Harm
      to Plaintiffs' Interests in Protecting High Quality Waters,
      Wildlife, and Related Natural Resources of the Santa Ritas. ............................... 42

III. The Balance of Hardships and the Public Interest Tip
Sharply in Favor of Plaintiffs..................................................................45

A. The Public Interest Weighs Heavily in Favor of a Preliminary Injunction. .........45

B. The Interests of the Corps and Rosemont Are Not Sufficient
to Override the Interests of Plaintiffs and the Public...........................................47

IV.    No More Than a Nominal Bond Is Appropriate in this Case. ..............................47

# TABLE OF AUTHORITIES

**Cases**

Alliance for the Wild Rockies v. Cottrell,

   632 F.3d 1127 (9th Cir.2011)……………………………………….……15, 16, 46

Amoco Prod. Co. v. Vill. of Gambell, Alaska,

   480 U.S. 531 (1987)………………………………………………………………42

Bering Strait Citizens for Responsible Res. Development v.

U.S. Army Corps of Eng'rs,

   524 F.3d 938 (9th Cir. 2008)……………………………………….…………25

Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency,

   766 F.2d 1319 (9th Cir. 1985)………………….....…………………….…………47

Cal. v. Block,

    690 F.2d 753 (9th Cir. 1982)……....……………………………………..24

Cascadia Wildlands v. Scott Timber Co.,

   715 Fed. Appx. 621 (9th Cir. 2017)………...……………………………..44

Clatsop Residents Against Walmart v. U.S. Army Corps of Eng'rs,

   735 Fed.Appx. 909 (9th Cir. 2018)…………………………………………….36

Ctr. for Biological Diversity v. Gould,

   150 F.Supp.3d 1170 (E.D.Cal. 2015)………………………………...………..25

FCC v. Rosboro Lumber,

   50 F.3d 781 (9th Cir. 1995)……………………………………………………45

Fox Bay Partners v. U.S. Corps of Eng'rs,

   831 F.Supp. 605 (N.D.Ill. 1993)   ………………………………………….31

Friends of the Earth v. Brinegar,

    518 F.2d 322, 323 (9th Cir. 1975) …………………………………………………48

Great Basin Res. Watch v. BLM,

    844 F.3d 1095 (9th Cir. 2016) ………………………………………………….25

Greater Yellowstone Coalition v. Flowers,

    359 F.3d 1257 (10th Cir. 2004) …………………………………………...30, 36

L.A. Mem'l Coliseum Comm. v. NFL,

    634 F.2d 1197 (9th Cir. 1980) …………………………………………………47

League of Wilderness Defenders v. Zielinski,

    187 F. Supp. 2d 1263 (D. Ore. 2002) …………………………………47, 48

Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.,

    463 U.S. 29 (1983) …………………………………………………………...33

N. Alaska Envtl. Ctr. v. Hodel,

    803 F.2d 466 (9th Cir. 1986) …………………………………………………47

Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 886 F.3d 803

    (9th Cir. 2018) …………………………………………………………...44

Native Ecosystems Council v. U.S. Forest Serv.,

    428 F.3d 1233 (9th Cir. 2005) …………………………………………………19

Ocean Advocates v. U.S. Army Corps of Eng'rs,

    402 F.3d 846 (9th Cir. 2005) …………………………………………...16, 35

Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,

    674 F.Supp.2d 783 (S.D.W.Va. 2009) ……………………..23, 24, 25

Or. Natural Desert Assoc. v. Rose,

    2019 WL 1855419 (9th Cir. Apr. 25, 2019) ………………………………...25

Republic of the Phil. v. Marcos,

    862 F.2d 1355 (9th Cir. 1988) …………………………………………………15

Riverside Irrigation District v. Andrews,

    758 F.2d 508 (10th Cir. 1985) ……………………………………….29, 30, 35

S. Fork Band Council of W. Shoshone v. Dep't of Interior,

    588 F.3d 718 (9th Cir. 2009) …………………………………………...42, 46

Save Our Sonoran v. Flowers,

    408 F.3d 1113 (9th Cir. 2005) ………………………32, 39, 42, 43, 45, 46, 47

Sayler Park Vill. Council v. U.S. Army Corps of Engr's,

    2003 WL 22423202 (S.D. Ohio 2003) …………………………………..32

Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs,

    472 F.3d 1097 (9th Cir. 2006) …………………………………...45, 46

Seattle Audubon Soc'y v. Evans,

    771 F.Supp. 1081 (W.D. Wash. 1991) ………………………………..46

Sierra Club v. U.S. Army Corps of Eng'rs,

    2012 WL 13040281 (S.D.Tex. 2012) ………………………………..31

Sierra Club v. Van Antwerp,

    709 F.Supp.2d 1254 (S.D. Fla. 2009) ………………………………..31

Sierra Club. v. Bosworth,

    510 F.3d 1016 (9th Cir. 2007) ………………………………………46

White Tanks Concerned Citizens v. Strock,

    563 F.3d 1033 (9th Cir. 2009) ……………………………………………...32, 39

Winter v. Natural Res. Def. Council,

    555 U.S. 7 (2008) ……………………………………………………...15

**Statutes**

5 U.S.C. §706(2) ……………………………………………………..16

33 U.S.C. §1251(a) …………………………………………………..16

33 U.S.C. §1251(e) …………………………………………………..20

33 U.S.C. §1311(a) …………………………………………………..16

33 U.S.C. §1344 ……………………………………………………..16

33 U.S.C. §1344(b)(1) ……………………………………………..17

42 U.S.C. §4332(2)(C) ……………………………………………...19

**Regulations**

33 C.F.R §336.1(c)(8) ……………………………………………...18

33 C.F.R §323.2(f) …………………………………………………..17

33 C.F.R. §§320.4(a)(1) ……………………………………17, 18, 26, 34, 35, 36

33 C.F.R. §320.4(r)(1) ……………………………………………18, 38

33 C.F.R. §320.4(r)(2) …………………………………………….....38

33 C.F.R. §320.4(c) ………………………………………………..17

33 C.F.R. §323.2(e)(2) ……………………………………………...16

33 C.F.R. §325.1(d)(1) ……………………………………………...22

33 C.F.R. §325.3(a) ………………………………………………..20

33 C.F.R. §325.4(a) …………………………………………………..35

33 C.F.R. §332.3(k)(2) ……………………………………………...40

33 C.F.R. §332.3(n) …………………………………………………………………..40

33 C.F.R. §332.3(n)(1) …………………………………………………..40

33 C.F.R. §332.3(n)(2) …………………………………………………..40

33 C.F.R. §332.4(b) …………………………………………………………………..20

33 C.F.R. §332.4…………………………………………………………………...(b)(1)

33 C.F.R. §332.4(c)(1)(i) …………………………………………………...40

33 C.F.R. §332.4(c)(13) …………………………………………………...40

33 C.F.R. §336.1(c)(5) ……………………………………………………18, 26

33 C.F.R. §336.1(c)(8) …………………………………………………...26

40 C.F.R. §1501.4(b) …………………………………………………...19

40 C.F.R. §230.11(a)-(h) ……………………………………………………18, 26

40 C.F.R. §1500.1(a) …………………………………………………...18

40 C.F.R. §1500.1(b) ……………………………………………………18, 24

40 C.F.R. §1500.2(d) …………………………………………………...24

40 C.F.R. §1502.14(f) …………………………………………………...38

40 C.F.R. §1502.16(h) …………………………………………………...38

40 C.F.R. §1506.6(a) …………………………………………………...24

40 C.F.R. §230.1(a) …………………………………………………………17

40 C.F.R. §230.1(c) …………………………………………………………28

40 C.F.R. §230.10(b) …………………………………………………...17

40 C.F.R. §230.10(b)(1) …………………………………………………...37

40 C.F.R. §230.10(c) ……………………………………………………31, 37

40 C.F.R. §230.10(d) ……………………………………………………18, 38

40 C.F.R. §230.10(c)……………………………………………………………17, 26

40 C.F.R. §230.11 …………………………………………………………28

40 C.F.R. §230.11(g) …………………………………………………………...31

40 C.F.R. §230.11(h) …………………………………………………27, 29, 31,

40 C.F.R. §230.11(h)(1) ……………………………………………………...18

40 C.F.R. §230.3(b) …………………………………………………………30

40 C.F.R. §230.30(b)(2) ……………………………………………………...30

40 C.F.R. §230.30(b)(3) ……………………………………………………...30

40 C.F.R. §230.77(a) ……………………………………………………18, 28

40 C.F.R. §230.77(b) …………………………………………………………...28

40 C.F.R. §230.91(a)(l) ……………………………………………………...38

40 C.F.R. §230.93(a) ……………………………………………………...38

40 C.F.R. §230.93(a)(1) ...…………………………………………………...8

40 C.F.R. §230.93(a)(1) ……………………………………………………...40

40 C.F.R. 230.10(b) …………………………………………………………...37

40 C.F.R. 230.20-23…………………………………………………………18, 26

40 C.F.R. 230.53 ……………………………………………………...18, 26

40 C.F.R. 1508.9 …………………………………………………………..19

**Other Authorities**

45 Fed.Reg. 85336 (Dec. 24, 1980) …………………………………...28, 29

46 Fed.Reg. 18026 (Mar. 23, 1981) …………………………………………38

58 Fed.Reg. 45008 (Aug. 25, 1993) …………………………………...29, 30

Clatsop Residents Against Walmart v. U.S. Army Corps of Eng'rs,

Fed. Def.-Appellees Answering Brief 2017 WL 1757558 (Apr. 26, 2017) …...36

Greater Yellowstone Coal. v. Flowers,

Fed. Def.-Appellees Answering Brief, 2003 WL 23723859 (July 29, 2003) …...36

**INDEX OF KEY DOCUMENTS**

(All citations to Exhibits 1-56 refer to the Exhibits filed by the Tribes with their Complaint in the consolidated case 19-cv-205, at ECF 9 – 15).

| **Agency Document** | **Exhibit Number** |
|---|---|
| April 18, 2019 Transcript of Status Conference | Fink Dec., Exh. A |
| May 8, 2019 Rosemont Notice of Activities | Fink Dec., Exh. B |
| 2017 EPA letter to the Corps, with Attachments | Fink Dec., Exh. D |
| 2019 Corps' Record of Decision (ROD) | Exh. 12 |
| 2017 Forest Service Record of Decision (ROD) | Exh. 14 |
| 2011 Corps' Public Notice | Exh. 19 |
| 2016 Corps letter to Hudbay | Exh. 29 |
| 2019 Corps' Environmental Assessment (EA) | Exh. 36 |
| 2017 Habitat Mitigation and Monitoring Plan (HMMP) | Exh. 41 |
| 2019 Corps 404 Permit | Exh. 45 |

**INTRODUCTION**

Plaintiffs Save the Scenic Santa Ritas, *et al.* (collectively "SSSR") submit this Memorandum in Support of their Motion for Preliminary Injunction.  SSSR challenges the decisions of the U.S. Army Corps of Engineers ("Corps") to issue a permit under Section 404 of the Clean Water Act ("CWA") ("404 Permit") to Rosemont Copper Company and its parent company, Hudbay Minerals, Inc. ("Hudbay"), to discharge "dredged or fill material" into designated "Waters of the United States" ("WOTUS") at the Rosemont Mine site, without which the Mine could not be constructed or operated.

The 404 Permit enables Rosemont to construct and operate a mining project that will dump well over a billion tons of mine waste and rock into the waters and adjacent lands of Barrel and Wasp Canyons, permanently eliminating these waters and their surrounding riparian areas.  The Mine will result in irreparable damage to the lands and waters in the Santa Ritas, especially on federal public lands used by Plaintiffs' members and visitors from across the nation.  These lands and waters are nationally recognized for their environmental, wildlife, scenic, and cultural values.

As early as summer 2019, Rosemont intends to commence with extensive drilling operations, road construction and reconstruction, excavation and installation of a water delivery pipeline and high-voltage electrical transmission line, and the associated impacts to vegetation and the desert environment.  Fink Dec., Exh. A at 10-15, Exh. B. As detailed in the Tribes' Motion for Preliminary Injunction, this will result in immediate impacts to irreplaceable cultural and religious values and resources.

In addition, Rosemont intends to begin large-scale clearing, grubbing, and dredge and fill activities at the Mine site this fall (Fink Dec., Exh. A at 17) and may subsequently begin the excavation of the mine pit, and construction of large-scale mine

1

facilities and infrastructure, all prior to the resolution of this case on the merits.

All this impending destruction is the result of the Corps' eleventh-hour decision to reverse its previous determination that the discharges and mine operations that the 404 Permit authorized would violate numerous provisions of the CWA and thus could not be approved.  This reversal also dismisses the expert views and detailed analysis by the U.S. Environmental Protection Agency ("EPA"), other agencies, and Pima County, who all concluded that the discharges and associated Mine impacts would result in irreparable, significant impacts in violation of the CWA.

The Corps' reversal led it to disregard the massive impacts of the project and artificially limit its consideration to just the initial filling of the WOTUS with "native material."  This was a transparent attempt to divest itself of the statutory authority and obligation to fully consider all of the foreseeable consequences of its decision in approving a project that will result in irreversible damage to the aquatic ecosystem that the 404 permit program was designed to protect.

To make matters worse, the Corps' new position and crabbed interpretation of its jurisdiction was never disclosed to the public or subjected to comment by the public or other agencies, as required by both the binding CWA regulations and the National Environmental Policy Act ("NEPA").  Until the day the 404 Permit was issued, the public was kept in the dark about the Corps' reversal of its previous findings, its refusal to consider the full scope of the Mine's impacts, its rejection of EPA's factual findings and controlling legal positions, and its plans to approve the initial activity of grading and filling the WOTUS with "native materials" instead of the dumping of massive quantities of "waste rock and mine tailings" as originally proposed in Rosemont's permit application and described to the public in the Corps' one and only 2011 Public Notice.

Such blatant violations of our nation's bedrock environmental laws cannot

survive judicial review. SSSR respectfully requests that this Court issue an immediate injunction to prevent the impending start of Project construction and its immediate and irreparable destruction of public resources.

## FACTUAL BACKGROUND

### I.    The Section 404 Permit

Because the Mine would be located on federal public land administered by the U.S. Forest Service ("USFS") (except for a portion of the mine pit and tailings waste facility, which would be located on Rosemont's private lands), USFS prepared a Final Environmental Impact Statement ("FEIS") in 2013 and issued a Record of Decision in June of 2017. Exh. 14.[1] The Corps was a "cooperating agency" in preparing the FEIS, and the Corps relied upon the 2013 FEIS in issuing the 404 Permit. Exh. 12 (ROD, p. 1-2). To construct and operate the mine, Rosemont needed both final authorization from the USFS and the 404 Permit. After the Corps issued the 404 Permit, USFS approved the revised Mining Plan of Operation ("MPO") on March 20, 2019, authorizing Project construction and operation. Fink Dec., Exh. C.

The 404 Permit and related Record of Decision ("ROD") issued by the Corps approved "the permanent and temporary discharge of dredged or fill material into 39.00 acres of waters of the United States on the proposed mine site." Exh. 12 (ROD, p. 1). The 404 Permit and ROD also authorize "the permanent discharge of fill material into 9.48 acres of waters of the U.S. for the proposed compensatory mitigation under Section 404 of the CWA." Id. Of this total, 8.9 acres of fill discharge will occur in Sonoita Creek, which lies in a different watershed over 10 air miles from the Mine site. Exh. 45 (404 Permit, p. 2). The remaining fill discharges associated with the new mitigation plan

---

[1] All citations to Exhibits 1-56 refer to the Exhibits filed by the Tribes with their Complaint in the consolidated case 4:19-cv-205, at ECF 9 – ECF 15.

3

will occur at four stock tanks at the Mine site.  Id.

The general discharge locations are shown in this Figure from the 404 Permit, Exh. 45 (404 Permit, Figure 2):



4

The WOTUS are found throughout the Mine site, including in the proposed locations of the mine pit, waste rock dump, and tailings (mine waste) facility.



Exh. 12 (ROD, Figure 2).

5

The mine pit would be located in the WOTUS sites in Wasp Canyon and its tributaries and the waste rock dump and tailings waste facility would be located in the WOTUS sites in Barrel Canyon and its tributaries:



Exh. 15 (FEIS Appendix, Figure 9). "The proponent [Rosemont] must have an issued [404] permit in order to conduct project activities within the boundaries of WUS [WOTUS] that have been determined to be jurisdictional under CWA." Exh. 14 (FS ROD, p. 96).

In the 2011 Public Notice for Rosemont's 404 Permit Application, the Corps described the proposed activities very differently from what it eventually approved. The 2011 Notice stated that Rosemont would dispose 19,941 cubic feet of waste rock into 8.24 acres of WOTUS at the waste rock dump site, and 66,792 cubic feet of waste rock into 20.70 acres of WOTUS at the tailings waste site. Exh. 19 (Notice, Table 2).

Throughout the administrative process, there was no indication that the Corps was reconsidering its characterization of the fill material as described in the 2011 Public Notice. Rather, as recently as 2017, Rosemont confirmed the direct discharge of waste rock into the WOTUS at the site: "The Rosemont Project will directly impact approximately 40.4 acres of ephemeral washes (Figure 4). Approximately half (19.2 acres) of these direct impacts results from fill of waste rock and tailings material in Barrel and Wasp canyons . . .." Exh. 41 (Rosemont's 2017 Final Habitat Mitigation and Monitoring Plan ("HMMP"), p. 6).

Yet in the 2019 404 Permit, the Corps stated for the first time that the only discharge at these locations is the initial fill of "native material" with no mention of the massive amounts of waste rock discharges that had been the focus of the 2011 Public Notice. Exh. 12 (ROD, p. 12-14, 19). As the result of this last-minute change in position, the Corps refused to consider, minimize, or mitigate the severe impacts of the vast majority of the Mine activities and operations, including the significant, adverse impacts from the waste rock, mine tailings, and mine pit.

Similarly, even though this new rationale was never mentioned in the 2011 Public

7

Notice or analyzed in the 2013 FEIS, the Corps now asserts that because the disposal of the massive amounts of waste rock will occur after the streams have already been filled with "native material," the agency need not consider the adverse cumulative and secondary effects to the aquatic ecosystem from the mining operations.  Exh. 12 (ROD, p. 13).  As the Corps stated, "[f]or this reason, the operation of the mine is not within the Corps' jurisdiction."  Id.

The 404 Permit also authorizes additional discharges, and new discharge locations, allowing Rosemont: (1) "[t]o permanently discharge fill material into 8.9 acres of waters of the U.S. . . . on the Sonoita Creek/Rail X Ranch sites"; and (2) discharge fill material into WOTUS at four stock tanks.  Exh. 45 (404 Permit, p. 2).  None of these new discharges were included in the 2011 Public Notice, as Corps' regulations require, or subjected to public review under NEPA.

## II. The Rosemont Mine's Severe and Permanent Impacts to the Aquatic Ecosystems of the Santa Ritas.

The Rosemont Mine would be a large-scale open-pit copper mine on the east side of the Santa Ritas, covering well over 5,000 acres.  The approved Project places all the tailings and waste rock in upper Barrel Canyon and the lower portion of Wasp Canyon.  *See* above figures.

"[T]here are approximately 101.60 acres of potentially jurisdictional waters of the U.S. in and around the project site.  These waters of the U.S. are comprised of 154 individual ephemeral washes and springs that encompass 18 linear stream miles, and 2 wetlands."  Exh. 12 (ROD, p. 6).  "Over the life of the mine, it is estimated that 661,429,000 tons of sulfide ore will be processed and 1,249,161,000 tons of waste rock produced."  Exh. 14 (FS ROD, p. 35).  The waste rock dump would cover approximately 1,460 acres in Barrel Canyon and an unnamed tributary.  Exh. 15 (FEIS Appendix, p. 36,

38).  The tailings waste facility would cover approximately 987 acres in Wasp and Barrel Canyons.  Id.

"Total fresh water to be used during operation is estimated to be about 4.8 million gallons per day.  Most of this would be supplied by groundwater wells in the Santa Cruz Valley."  Exh. 13 (FEIS, p. 43).

> After closure of the mine, a mine pit lake would form.  Estimates of the amount of water lost in perpetuity from the aquifer due to evaporation by the mine pit lake ranges from 170 acre-feet per year to 370 acre-feet per year.  Loss of this water from the aquifer in the Davidson Canyon/Cienega Basin would continue in perpetuity as a result of the formation of the mine pit lake and is an irreversible impact.

Exh. 9 (FEIS, p. 1138) (citations omitted).

> The mine pit would reverse groundwater flow direction well beyond the project, and cause permanent regional drawdown of groundwater that currently sustains hundreds of acres of springs, seeps, streams, and wetlands and their aquatic and wetland dependent fish, wildlife and plant species. . . .  These impacts would be a direct consequence of the CWA 404 permit action under consideration by the Corps, and represent a large and permanent change in the regional ecology of the Cienega Creek watershed to a significantly drier, less biological diverse stream and riparian condition.

Exh. 16 (2013 EPA letter, p. 2).

The U.S. Bureau of Land Management ("BLM") concluded that "[t]he proposed pit presents a clear and present threat to ground water that supports all perennial surface water on the LCNCA located to the south and east of the proposed mine site."  Exh. 48 (2012 BLM email, p. 2).  The LCNCA is the congressionally-designated Las Cienegas National Conservation Area located on BLM lands near the Project site.

The Mine will also severely affect threatened and endangered species, including the jaguar, Gila chub, Gila topminnow, Chiricahua leopard frog, and northern Mexican gartersnake.  Several of these species, including the jaguar, Gila chub, and Chiricahua

leopard frog, also have critical habitat in the area that the Mine would adversely impact.

> Habitat loss or degradation will occur for all aquatic species and riparian dependent species including migratory birds.  Essentially the aquatic and riparian ecosystems on the LCNCA will be at risk of collapse from GW depletion.  Areas where federally listed species are being recovered would be degraded or lost.

Exh. 50 (2011 BLM comments, p. 14).

Despite these acknowledged impacts, neither the Corps nor the Forest Service analyzed or required any mitigation measures for these lost flows in the LCNCA.  "[N]o mitigation measures are proposed that would directly offset the impacts predicted to occur along Empire Gulch."  Exh. 5 (FEIS, p. 546).  Rosemont's final mitigation plan, relied upon by the Corps in the 404 Permit (2017 HMMP), does not include any mitigation to protect these federal water rights, nor protect the waters and water flows and associated habitat in the LCNCA, including Empire Gulch.  Exh. 41 (HMMP).

Barrel, Wasp, and downstream Davidson Canyon, which will receive the direct discharges and seepage from the waste rock and tailings, as well as Empire Gulch and Cienega Creek, which will suffer the above-detailed dewatering effects, are subject to water quality standards set by the Arizona Department of Environmental Quality ("ADEQ").  These standards have been established to protect the designated beneficial uses of these waters for aquatic life, human and animal uses, and recreation.  Exh. 5 (FEIS, p. 451-461 (text/tables of water quality standards)).

"A portion of Davidson Canyon has been designated an Outstanding Arizona Water [OAW] by the ADEQ."  Exh. 5 (FEIS, p. 523).  "All of Cienega Creek has also been designated an Outstanding Arizona Water by the ADEQ."  Id.  "The Outstanding Arizona Water designation ensures that existing surface water quality will be maintained and protected for the designated use of the surface water."  Id.

USFS determined that the direct discharges from the waste rock that will be

located in the WOTUS disposal site have the potential to violate water quality standards. *See* Exh. 5 (FEIS, p. 475-77 (Table 105)) (predicting exceedances of water quality standards from the soil cover for dissolved silver, as well as total lead and dissolved mercury). Further, "[p]redicted water quality in the event tailings seepage were to appear in Barrel Canyon exceeds applicable surface water quality standards for dissolved silver, dissolved cadmium, total and dissolved lead, dissolved mercury, and total selenium." Id. (FEIS, p. 473). The Project will increase the level of several pollutants, including: Arsenic 16%, Iron 11%, Mercury (dissolved) 1050%, Mercury (total) 201%, and Sodium 21%. Id. (FEIS 550-552 (Table 112)).

The construction of the 2,900 feet deep mine pit at the location of the WOTUS sites in Wasp Canyon will result in a pit lake that is predicted to be extremely hazardous to wildlife, due to the predicted toxicity and chemical pollution in the pit lake waters. "[T]he mine pit lake water quality could exceed standards for cadmium, lead, copper, mercury, selenium, and zinc, three of which are known to bioaccumulate (i.e., cadmium, mercury, and selenium)." Exh. 9 (FEIS, p. 664).

> Wildlife groups that are most likely to be directly impacted by toxins potentially present in the mine pit lake include invertebrates (i.e., insects, etc.), birds, and bats. Wildlife most likely to be indirectly impacted includes any animals that prey on insects, birds, or bats that have come in contact with the water in the mine pit lake.

Id. (FEIS, p. 665). Despite this, no mitigation is proposed to prevent these direct and indirect effects from the pit lake to wildlife, especially birds, bats, insects, and the related food chain. Mitigation discussed in the FEIS "does not apply to the pit lake that could develop during the postclosure period." Id. (FEIS, p. 665).

11

III.    **The Corps and EPA Both Previously Determined that the Mine's Discharges and Impacts Would Violate the Clean Water Act.**

Since the Corps issued its only Public Notice in 2011, Rosemont's 404 permit application and supporting materials have been reviewed and severely criticized by the Corps' Los Angeles District,[2] EPA, Pima County, and others.  Based on these reviews, these agencies determined that the Mine and its 404 discharges would violate the CWA.

> EPA's careful review of this information, including our assessment of the full range of probable direct and secondary adverse impacts to the aquatic ecosystem resulting from permit issuance, leads us to conclude that the proposed Rosemont Mine project does not comply with [CWA regulations] 40 CFR §§ 230.10(b), (c) and (d) of the Guidelines and should not be permitted as proposed.

Exh. 16 (2013 EPA letter, Attachment, p. 1).

Based on its analysis of the record, in July of 2016, the Corps' Los Angeles District issued its determination that the 404 Permit should be denied due to numerous violations of the CWA.  Exh. 26.  On December 28, 2016, then-Colonel Helmlinger explained the District's conclusions to Hudbay/Rosemont:

> The key CWA 404(b)(1) factors identified by the District that support a permit denial are determinations that the proposed Rosemont Mine will cause or contribute to violations of state water quality standards and significant degradation of waters of the United States, including shortfalls in the proposed compensatory mitigation. . . .  In this case, the District concluded that implementation of the proposed project would cause or contribute to violations of state water quality standards, and that minimization and mitigation measures, along with proposed monitoring were inadequate to ensure that degradation did not occur.  The District further concluded that implementation of the proposed project would result in significant degradation of waters of the United States, as a result of a substantial reduction of functions and services and that the project would contribute to the degradation of Outstanding Arizona Waters.  The District concluded that implementation of the proposed project would, among other things, adversely affect sediment delivery, hydrological functions, surface water quality, and use by humans and wildlife, including listed species.

---

[2]  The Corps' Los Angeles District includes Arizona, and is within the agency's South Pacific Division.  *See* https://www.usace.army.mil/locations.aspx.

> The District also concluded that mitigation proposed to offset project impacts would be inadequate. Specifically, while enhancement parcels would be appropriate and sufficient to mitigate indirect impacts to 123.5 acres of waters of the United States, the permanent loss of 40.4 acres of waters would not be mitigated by the proposed re-establishment at Sonoita Creek Ranch, along with proposed mitigation on Davidson Canyon parcels and on proposed mitigation parcels, located outside of the impacted watersheds.
>
> . . .
>
> Finally, the District concluded that implementation of the proposed project would be contrary to the public interest. Among the key public interest concerns are adverse effects to cultural resources and traditional cultural properties important to tribes.

Exh. 29 (2016 letter from Corps to Hudbay, p. 1-2).

In a November 30, 2017 letter from EPA to the Corps, EPA attached over 70 pages of detailed analysis of the permit application, the impacts from the Mine and its discharges, and a lengthy critique of the 2017 HMMP. Fink Dec., Exh. D. One section of EPA's letter was entitled *"Environmental Consequences of the Proposed Rosemont Copper Mine: Significant Degradation to Waters of the United States."* Id. at 29.[3] "Following a comprehensive analysis of the impacts on the physical, chemical and biological components of the aquatic environment, EPA has concluded that the Rosemont Mine will result in significant degradation to waters." Id.

Regarding the violation of water quality standards, including anti-degradation requirements, EPA determined:

> The proposed mine will result in the lowering of water quality in the ONRW through: 1) heavy metal contamination; 2) increased total sediment in surface water flow; and 3) alteration of the physical, chemical and biological integrity of the stream. These adverse water quality impacts to downstream ONRWs will be permanent.

---

[3] Because this EPA letter includes three attachments with separate numbering, all page cites to Exhibit D will be to the overall pdf numbering of Exhibit D in its entirety.

Id. at 56.

Another attachment to EPA's letter was entitled: *"Significant and Irreversible Environmental Consequences of Groundwater Drawdown from the Proposed Rosemont Mine."* Id. at 66. "In the case of the Rosemont Mine, subsurface drawdown clearly constitutes a significant change in the hydrologic regime affecting surface water. **These operational affects are strongly 'associated' with the discharge of dredged and fill materials, since they would not occur in the absence of a §404 CWA permit.**" Id. at 75 (emphasis added). "EPA maintains the secondary impacts associated with this project will cause [or] contribute to significant degradation of our Nation's waters (40 CFR 230.10(c))." Id. at 77.

EPA further explained why, pursuant to the CWA regulations at 40 C.F.R. Part 230, "Groundwater Drawdown is a Regulated Secondary Effect Under §404 Clean Water Act." Id. at 74. EPA submitted a detailed analysis of "§404 CWA permit decisions regulating the secondary effects of groundwater drawdown," describing numerous examples, including a copper mine in Arizona, where the Corps conducted the required analysis of secondary effects, which the Corps ultimately refused to do at Rosemont. Id. at 76-77.

EPA also concluded that the 2017 HMMP fails to adequately mitigate or compensate for the impacts caused by the issuance of the 404 Permit.

> Our review of the HMMP affirms our position that the mitigation does not comply with EPA's 404(b)(1) Guidelines and the requirements of the Mitigation Rule. The HMMP proposed by Rosemont fails to offset the proposed mine's impacts to aquatic resources in the Cienega Creek watershed.

Id. at 3. Regarding Rosemont's new "mitigation" in Sonoita Creek, EPA determined: "Sonoita Creek Ranch is Not in the Same Watershed as the Mine

14

Impacts and Consequently Does Not Offset the Pervasive Damage to Aquatic Resources in the Cienega Creek Watershed." Id. at 4.

Despite all the evidence in the record, General Helmlinger nevertheless issued the 404 Permit on March 8, 2019, even though no material aspect of the Mine's construction or operations, or the Mine's direct, secondary, or cumulative impacts have changed.

**STANDARDS FOR PRELIMINARY RELIEF**

To obtain preliminary relief, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008).  Assuming that irreparable harm is sufficiently likely and the public interest favors a stay, "[a] preliminary injunction is appropriate when a plaintiff demonstrates . . . that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor."  Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (irreparable harm from logging on public lands).  "Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."  Id. at 1131.  "Serious questions going to the merits" are defined as:

> "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."  Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a "fair chance of success on the merits."

Republic of the Phil. v. Marcos, 862 F.2d 1355, 1362 (9th Cir. 1988).  As shown below, SSSR satisfies all four parts of this test, and the preliminary injunction should be issued.

15

## ARGUMENT

### I.      Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on all of their claims, although a likelihood of success on any claim warrants relief.  At a minimum, an injunction should issue because Plaintiffs have shown "that serious questions going to the merits were raised."  Alliance for the Wild Rockies, 632 F.3d at 1134-35.  Pursuant to the APA, a federal court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] . . . (D) without observance of procedures required by law."  5 U.S.C. §706(2).  In determining whether the Corps' actions violated the CWA or NEPA, "[courts] 'must not 'rubber-stamp' . . . administrative decisions [they] deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 859 (9th Cir. 2005) (citations omitted).

### The Clean Water Act

The CWA is designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters."  33 U.S.C. §1251(a).  The CWA prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit.  33 U.S.C. §1311(a).  CWA Section 404 authorizes the Corps to issue permits, after notice and opportunity for public comment, for the discharge of dredge or fill material into waters of the United States "at specified disposal sites."  33 U.S.C. §1344.  "Examples of such fill material include, but are not limited to: rock, . . . overburden from mining or other extraction activities."  33 C.F.R. §323.2(e)(2).

> The term *discharge of fill material* means the addition of fill material into waters of the United States.  The term generally includes, without limitation, the

16

following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt, or other material for its construction; . . . placement of overburden, slurry, or tailings or similar mining-related materials . . ..

33 C.F.R. §323.2(f).  Thus, the "[p]lacement" of tailings and overburden/waste rock into the WOTUS at the site would constitute a discharge of fill material.  Id.

The Corps cannot issue a 404 permit if it "would be contrary to the public interest."  33 C.F.R. §320.4(a)(1).  This requires the Corps to consider "the probable impacts" of a proposed project on "[a]ll factors which may be relevant to the proposal[,] including cumulative effects."  Id.  The Corps' public interest requirement also ensures "the conservation of wildlife resources by prevention of their direct and indirect loss and damage due to the activity proposed in a permit application."  33 C.F.R. §320.4(c).

In addition, EPA has promulgated binding regulations, known as the "404(b)(1) Guidelines," for 404 permits.  33 U.S.C. §1344(b)(1).  "The purpose of these Guidelines is to restore and maintain the chemical, physical, and biological integrity of waters of the United States through the control of discharges of dredged or fill material."  40 C.F.R. §230.1(a).  "For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the Environmental Protection Agency's 404(b)(1) guidelines."  33 C.F.R. §320.4(a)(1).

Under the 404(b)(1) Guidelines, the Corps is prohibited from issuing a 404 permit if the proposed discharge "will cause or contribute to significant degradation of the waters of the United States."  40 C.F.R. §230.10(c).  In addition, "[n]o discharge of dredge or fill material shall be permitted if it: (1) [c]auses or contributes . . . to violations of any applicable State water quality standard."  40 C.F.R. §230.10(b).

17

To ensure these mandatory CWA requirements are satisfied, the Corps must fully evaluate the individual and cumulative impacts of the activity upon various public resources. *See* 33 C.F.R. §§320.4(a)(1), 336.1(c)(5) (endangered species), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.53 (aesthetics). The Guidelines mandate that "[t]he determinations of effects of each proposed discharge shall include the following: . . .

> (h) **Determination of secondary effects on the aquatic ecosystem.**
> (1) Secondary effects are the effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material. Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.

40 C.F.R. §230.11(h)(1) (emphasis in original). The Guidelines also require the Corps to "control runoff and other discharges from activities to be conducted on the fill." 40 C.F.R. §230.77(a).

The EPA Guidelines also prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §230.10(d). Projects must mitigate the impacts of the fill activities by "avoiding, minimizing, rectifying, reducing, or compensating for resource losses." 33 C.F.R. §320.4(r)(1).

**The National Environmental Policy Act**

NEPA is the "basic national charter for protection of the environment." 40 C.F.R. §1500.1(a). "NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implement NEPA." 40 C.F.R. §1500.1(b).

NEPA requires federal agencies to prepare an "environmental impact statement"

18

("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. §4332(2)(C).  If an agency is unsure whether a proposed action may have significant environmental effects, it may prepare an "environmental assessment" ("EA") to determine if the proposed action may require an EIS.  40 C.F.R. §§1501.4(b), 1508.9.  An agency must prepare an EIS when there are substantial questions about whether a project "may" significantly degrade the environment.  Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1239 (9th Cir.2005).

In issuing the 404 Permit, the Corps relied on the 2013 EIS prepared by the Forest Service.  Exh. 12 (ROD, p. 1-2).  To purportedly analyze the impacts and alternatives associated with the 2017 HMMP mitigation plan, including the new permitted discharge of fill material in Sonoita Creek and at the four stock tanks, the Corps prepared an EA which it released for the first time along with the 404 Permit ("2019 EA").  Exh. 36.

A.  The Corps' Eleventh-Hour Decision to Substantially Change the Activity Being Permitted Violates the CWA and the Public Notice and Review Requirements of NEPA and the CWA.

To avoid redundancy, SSSR adopts and incorporates the Tribes' arguments regarding how the Corps' abrupt, eleventh-hour, major change in position violated the CWA and APA.  See Tribes' Argument Section I.A, p. 19-24.

In addition, the Corps' failure to provide any public notice for this abrupt reversal violates the public notice and review requirements of the CWA and NEPA.

1.  Violation of the CWA Public Notice and Review Requirements.

One of the fundamental congressional "goals and policy" in enacting the CWA is to ensure full public participation in Corps and EPA permitting decisions: "Public participation in the development, revision, and enforcement of any regulation, standard, effluent limitation, plan, or program . . . shall be provided for, encouraged, and assisted

by the Administrator and the States."  33 U.S.C. §1251(e).  In line with Congress' goals and policy, the Corps' regulations require that all proposed discharges be subject to "Public review and comment."  33 C.F.R. §332.4(b).  "[T]he public notice must contain a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for."  33 C.F.R. §332.4(b)(1).  "Public notice is the primary method of advising interested parties of the proposed activity for which a permit is sought, and of soliciting comments and information necessary to evaluate the probable impact on the public interest.  The notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment."  33 C.F.R. §325.3(a).

This was not, however, done here.  The sole Corps' Public Notice in 2011 shows that the Corps did not seek public review and comment for: (1) the discharge of "native material" at the waste rock and tailings locations; (2) the discharges of the 8.9 acres of fill into Sonoita Creek, or associated with the four stock tanks; or (3) any of the proposed mitigation at Sonoita Creek, which is now a critical component of the HMMP.

First, the 2011 Public Notice was clear that Rosemont's Project would require the disposal of 19,941 cubic feet of **waste rock** into 8.24 acres of WOTUS at the site of the waste rock facility, and 66,792 cubic feet of **waste rock** into an additional 20.70 acres of WOTUS at the location of the tailings facility.  Exh. 19 (Notice, p. 11, Table 2). The 2011 Notice further explained that the discharges from the "Project Feature[s]" of the Waste Rock and Dry Stack Tailings would **only** include "Excavated Waste Rock," or "ROM [Run-of-Mine] Rock."  Id.  "The waste rock storage area will receive pit-run, or run-of-mine (ROM), waste rock . . ..  Impacts to potential WUS [WOTUS] within the

waste rock storage area will result from the placement of ROM waste rock." Id., p. 4.[4]

The 2011 Public Notice also specifically distinguished these waste rock discharges from the type of fill material that would be discharged at other Project locations. Exh. 19 (Notice, p. 11, Table 2, stating that the "Project Feature[s]" that would involve the "Fill Type" of "Native Material" included "Surface Water Management," "Plant Site," the two access roads and the off-site water and transmission line sites). The 2011 Public Notice never mentioned or proposed that "Native Material" would be discharged at the waste rock and tailings sites. Id.

The characterization of the fill material remained consistent throughout the administrative process, as confirmed by Rosemont in 2017: "The Rosemont Project will directly impact approximately 40.4 acres of ephemeral washes (Figure 4). Approximately half (19.2 acres) of these direct impacts results from fill of waste rock and tailings material in Barrel and Wasp canyon . . .." Exh. 41 (HMMP, p. 6).

In issuing the 404 Permit in 2019, the Corps suddenly changed course and claimed that the only discharge at the waste rock and tailings locations is the initial fill consisting of "native material," with no mention of the waste rock discharges that had been the agency's and Rosemont's position since 2011. Exh. 12 (ROD, p. 19, Table 2); id. (ROD, p. 12-14). This is extremely significant because the Corps is using this new justification to claim it no longer needs to consider, minimize, or mitigate the severe impacts that will result from the Mine activities and operations, including from the waste rock, tailings, and mine pit. Id. (ROD, p.13) ("For this reason, the operation of the mine

[4] Similarly, in the 2011 Draft EIS, the Corps' described the regulated activity as: "[i]mplementation of the proposed Project will result in direct impacts to approximately 37.7 acres of potential waters of the U.S. from the construction of the waste rock dumps, tailings piles, leach pad, plant site, and pit." Fink Dec., Exh. E (2011 Draft EIS Appendix, p. 150). (Note: the approved Barrel Alternative removed the leach pad).

is not within the Corps' jurisdiction."). The Corps now asserts that because the disposal of waste rock and mine tailings will occur after the streams have been filled with "native material," it need not consider the adverse effects to the aquatic ecosystem from the mining operations.

This is a transparent, last-minute attempt by the Corps to avoid its statutory and regulatory obligation to consider the secondary consequences of authorizing the use of designated WOTUS for the purposes of constructing and operating the Project. Indeed, nothing pertaining to the Mine and its proposed impacts has substantively changed since the Corps' 2011 Public Notice. Just as in 2011, the Mine could not be constructed without the 404 Permit; the tailings, waste rock, and mine pit would be located in the same WOTUS sites as set forth in the initial Notice; and the discharge of fill is still for the "construction of the proposed Rosemont Copper Project." Exh. 19 (Notice, p. 1).

Second, the 2011 Public Notice entirely failed to disclose the discharge of the 8.9 acres of fill into Sonoita Creek, or the discharge associated with four stock tanks, all of which the 404 Permit authorized. Exh. 19. This fails to comply with the Corps' regulations, which require that all new proposed discharges must first be included in a formal application, with detailed requirements, to ensure "sufficient public notice." 33 C.F.R. §325.1(d)(1). "The application must include a complete description of the proposed activity including necessary drawings, sketches, or plans sufficient for public notice . . . ; [including] the location, purpose, and need for the proposed activity." Id. No such application was submitted for these two new discharges, let alone subjected to any public notice and comment.

Third, the 2011 Public Notice failed to mention any mitigation for Sonoita Creek, much less a mitigation plan even remotely like the final HMMP. Exh. 19. At the time of the 2011 Public Notice, the public was presented with a 6-page "Proposed Mitigation

22

Concept" that was included in Appendix E to the 2011 Draft EIS.  Fink Dec., Exh. E.

Similarly, the 2013 FEIS included a 6-page Conceptual HMMP.  Fink Dec., Exh. F.

Although the FEIS, which was not subject to public review under NEPA, mentioned

Rosemont's purchase of the Sonoita Creek Ranch, no details were provided regarding the

now-extensive work at that site.  Id., p. 3-4.  This mitigation plan has now ballooned into

the 859-page HMMP, including substantial and controversial work at Sonoita Creek,

including new fill discharges.  Exh. 41.[5]

Federal courts have not allowed the Corps to bypass the CWA's fundamental

public notice and review requirements for Section 404 permits.  As one court framed the

issues under the CWA:

> Did the notices provide sufficient data and detail to provide the public with an understanding of the material justification for the permits?  Or, said simply, did the notices provide sufficient information on compensatory mitigation?

> Because the notices contained no substantive information on mitigation, the clear answer to this question is no.  The notices did not ''give [the public] a clear understanding of the nature and magnitude of the activity to generate meaningful comment.'' See 33 C.F.R. §325.3(a)(1).  Without any substantive information on mitigation, the notices failed to provide an accurate picture of the Corps' reasoning and prevented useful criticism on the part of Plaintiffs and on the part of the public in general.  As a result, the lack of information on mitigation in the notices deprived Plaintiffs of an existing procedural right—the right to comment intelligently.

Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs, 674 F.Supp.2d 783, 804

(S.D.W.Va. 2009) ("OVEC") (citation omitted).

Here, there is no dispute that the Corps never provided notice to the public after its

initial 2011 Notice, which not only failed to contain any specific information on the later-

submitted mitigation plans, but also contained no inkling whatsoever that the Corps was

---

[5]  For the complete 2017 HMMP, see http://static.azdeq.gov/permits/rosemont/hmmp.pdf.

contemplating its eleventh-hour "native material" discharge and the new discharges into Sonoita Creek and at the stock tanks.

> 2.    *Violation of NEPA's Public Notice and Comment Requirements.*

In addition to violating its own CWA public notice regulations, the Corps' refusal to provide adequate public notice and comment opportunities on these new discharges and the mitigation measures at Sonoita Creek also violates NEPA.  "NEPA's public comment procedures are at the heart of the NEPA review process."  Cal. v. Block, 690 F.2d 753, 770 (9th Cir.1982).

> [A] public notice containing no substantive information on mitigation violates the CEQ [NEPA] regulations related to agency requirements for public involvement and deprives the public of its procedural right to an adequate opportunity to participate in the permit evaluation process.  *See Block*, 690 F.2d at 770.

OVEC at 809-810.

The Corps' 2019 EA was never subject to any prior notice and comment, and the Corps made no effort to involve the public in its preparation, in violation of NEPA.  Exh. 36; 40 C.F.R. §1500.2(d) (agencies "shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in the decisions which affect the quality of the human environment . . . ."); Id. at §1506.6(a) (NEPA requires agencies to "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures."); Id. at §1500.1(b) ("NEPA procedures must insure that environmental information is available to public officials and citizens *before* decisions are made and *before* actions are taken.") (emphasis added).

The Ninth Circuit has similarly rejected agency attempts to rely on new documents to support their decisions, when those documents were not subjected to the proper NEPA public review.  Reliance on such documents is arbitrary and capricious when "the public

never saw the forms and never had an opportunity to comment on them, 'frustrating NEPA's goal of allowing the public the opportunity to play a role in the decisionmaking process.' *Great Basin [Res. Watch v. BLM]*, 844 F.3d [1095] at 1104 [(9th Cir. 2016)]." Or. Natural Desert Assoc. v. Rose, 2019 WL 1855419, *4, n.4 (9th Cir. Apr. 25, 2019).

In Bering Strait Citizens for Responsible Resource Development v. U.S. Army Corps of Engineers, although the Ninth Circuit did not require that the Corps prepare a Draft EA in every case, the court did require that:

> An agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.

524 F.3d 938, 953 (9th Cir. 2008); *see also* Ctr. for Biological Diversity v. Gould, 150 F.Supp.3d 1170, 1181-83 (E.D.Cal. 2015) (relying on Bering Strait to find that the public was never given opportunity to comment on issues first analyzed by the agency in Final EA); OVEC, 674 F.Supp.2d at 810 ("[U]nder *Bering Strait,* sufficient information has not been provided to afford the public an adequate opportunity to weigh in on a FONSI unless and until as much environmental information as practicable concerning the FONSI has been disseminated and commented upon.").  Here, the Corps issued the final 2019 EA along with the 404 Permit, with no explanation as to why it could not involve the public in the preparation of that NEPA document, in violation of NEPA.

        B.     The Corps' Failure to Consider Secondary and Cumulative Impacts Violates the CWA.

In determining whether issuance of the 404 Permit for the Rosemont Mine would comply with the mandatory substantive requirements of the CWA, the Corps refused to consider the secondary and cumulative impacts of the proposed mine's construction and

related activities, including the dumping of waste rock and mine tailings on top of the "native fill," and mine pit excavation, in violation of the CWA.

To ensure the mandatory CWA requirements are satisfied, the Corps must evaluate the direct, secondary, and cumulative impacts of the activity on a number of resources. *See, e.g.*, 33 C.F.R. §§320.4(a)(1), 336.1(c)(5) (endangered species), 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§230.11(a)-(h), 230.20-23 (aquatic ecosystem), 230.53 (aesthetics). The EPA Guidelines require the Corps to make detailed factual determinations regarding the individual and collective effects associated with the discharge activity, and "no discharge of dredged or fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States."  40 C.F.R. §230.10(c). "Findings of significant degradation related to the proposed discharge shall be based upon appropriate factual determinations, evaluations, and tests required by subparts B and G …, with special emphasis on the persistence and permanence of the effects outlined in those subparts."  Id.

The "factual determinations, evaluations, and tests" mandated in subpart B include Section 230.11, that "[t]he determinations of effects of each proposed discharge shall include the following: . . .

> (h) *Determination of secondary effects on the aquatic ecosystem.*
> (1) **Secondary effects are the effects on an aquatic ecosystem that are** *associated with a discharge* **of dredged or fill materials, but do not result from the actual placement of the dredged or fill material.**  Information about secondary effects on aquatic ecosystems shall be considered prior to the time final section 404 action is taken by permitting authorities.
>
> (2) . . . Activities to be conducted on fast land created by the discharge of dredged or fill material in waters of the United States may have secondary impacts within those waters which should be considered in evaluating the impact of creating those fast lands.

26

40 C.F.R. §230.11(h) (emphasis added).

Tracking this regulatory language, EPA determined in its November 30, 2017 letter to the Corps that the "secondary effects" of Mine construction were required to be analyzed before the 404 permit could be issued. First, in considering the waste rock that will be dumped in the WOTUS locations, EPA found that "stormwater runoff from the mine's waste rock and soil cover contaminated with lead, mercury, molybdenum, selenium, silver, sodium and sulfate will degrade the water quality of Barrel Canyon, Davidson Canyon, and Cienega Creek." Fink Dec., Exh. D at 42.

Secondly, EPA determined that the significant groundwater drawdown caused by the Mine is a "Regulated Secondary Effect Under § 404 Clean Water Act." Id., at 74.

> In the case of the Rosemont Mine, subsurface drawdown clearly constitutes a significant change in the hydrologic regime affecting surface water. These operational affects are **strongly 'associated' with the discharge** of dredged and fill materials, since they would not occur in the absence of a §404 CWA permit.

Id., at 75 (emphasis added).

As EPA determined, "[e]valuating the secondary effects of groundwater drawdown under §404 CWA is not precedential," but rather is consistent with numerous §404 permit decisions. Id., at 76-77. Moreover, "[t]he requirement that secondary impacts be fully compensated is consistent with standard practice for projects of this magnitude and essential given that the range, extent, and severity of secondary adverse impacts upon aquatic resources are as significant as the direct impacts." Exh. 16 (2013 EPA letter, Attachment, p. 2).

Significantly, EPA found that when the secondary effects are properly considered, the environmental consequences of the Mine "are substantial and unacceptable," and that there is "no mitigation to prevent [these] unacceptable adverse secondary effects." Fink

Dec., Exh. D at 77.  Thus, "EPA maintains the secondary impacts associated with this project will cause [or] contribute to significant degradation of our Nation's waters (40 CFR 230.10(c)" id., necessitating a finding that the permit cannot be issued.

As further evidence that the Corps was required to consider not only the impacts of the "native material" used as the initial fill, but also the subsequent dumping of waste rock and mine tailings, and other mining activities, the Guidelines further direct the Corps to analyze and minimize or prevent the on-site impacts resulting from the fill, such as the impacts from activities occurring on the fill.  The Corps must "control runoff and other discharges from activities to be conducted on the fill."  40 C.F.R. §230.77(a); *see also* §230.77(b) (explaining that in the case of dams, the project should design water releases to accommodate the needs of fish and wildlife).

Thus, the secondary effects that the Corps was required to consider were not limited in time or space to just the initial discharge.  Rather, they encompassed all activities and impacts "associated with" the fill activities.  Furthermore, "[f]undamental to these Guidelines is the precept that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact **either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern**."  40 C.F.R. §230.1(c) (emphasis added).

Indeed, according to the regulatory preamble to EPA's promulgation of the 404(b)(1) Guidelines: "in authorizing a discharge which will create fast lands the permitting authority should consider in addition to the direct effects of the fill itself the effects on the aquatic environment of any reasonably foreseeable activities to be conducted on that fast land."  45 Fed.Reg. 85336, 85340-41 (Dec. 24, 1980).  And, regarding the "factual determinations" in §230.11, including secondary effects in

28

§230.11(h), EPA stated: "in response to many comments, we have moved the provisions on cumulative and secondary impact to the Factual Determination section to give them further emphasis.  We agree that such impacts are an important consideration in evaluating the acceptability of a discharge site."  Id. at 85343.

In another rulemaking implementing the CWA, the Corps and EPA rejected the very position the Corps has taken in the Rosemont 404 Permit—that the Corps' 404 permitting authority was limited to only the direct impacts of the discharge itself:

> EPA's longstanding interpretation of Section 404, as reflected in the Section 404(b)(1) Guidelines, demonstrates that EPA and the Corps are not limited to considering solely the environmental effects of the discharge itself.  The Guidelines expressly require consideration of "secondary effects," which are defined as
>
> > effects on an aquatic ecosystem that are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material.
>
> 40 C.F.R. §230.11(h).
> . . .
>
> EPA and the Corps believe that considering the primary and secondary effects of a discharge is clearly consistent with the language and intent of Section 404 to ensure protection of the aquatic system from effects associated with the discharge of dredged and fill material.

58 Fed.Reg. 45008, 45012 (Aug. 25, 1993).[6]

The agencies further noted that the direct-discharge-effects-only view was contrary to CWA precedent.  The agencies highlighted the Tenth Circuit's decision in Riverside Irrigation District v. Andrews, 758 F.2d 508, 513 (10th Cir. 1985):

---

[6] Although this rulemaking focused on whether "incidental fallback" from activities should be considered a "discharge of fill material" (not at issue in this case), and not on the scope of review for secondary effects, both agencies detailed their position on secondary effects "to help the public understand how we administered the Section 404 program generally."  58 Fed.Reg. at 45012.

29

> In this case, the Corps denied nationwide permit coverage for the construction of a dam, the operation of which would have resulted in depleted stream flows that would adversely affect habitat of an endangered species. **Even though the discharge of fill material itself to construct the dam would not have had an adverse impact, the court held that the CWA authorized the Corps to consider the total environmental impact of the discharge, including indirect effects such as the impact of the operation of the dam on flows downstream and associated wildlife impacts.**

58 Fed.Reg. at 45012 (emphasis added).  The court in Riverside concluded that "the Corps was required to consider all effects, direct and indirect, of the discharge for which authorization was sought."  758 F.2d at 513.

Additional courts have acknowledged the Corps' duty to consider secondary and cumulative effects resulting from issuance of a 404 permit.  In Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257, 1272, n. 15 (10th Cir. 2004), the Tenth Circuit upheld a Corps 404 permit in part because of the Corps' analysis of the "upland aspects" of the entire development, not just the limited direct impact of the fill itself: "the Corps' § 404(b)(1) analysis should, and we believe did, take into account the impact of the Canyon Club development as a whole on bald eagle nesting and foraging habitat."  Id. at 1272, n 15.  The court highlighted the Corps' requirement to consider the impacts on the "aquatic ecosystem," which includes "habitat for interrelated and interconnecting communities and populations of plants and animals."  Id., *quoting* 40 C.F.R. §230.3(b).

In confirming the need to consider the adverse impact of the "development as a whole" on wildlife habitat and species, the court further found that: "[a] discharge of dredged or fill material may adversely affect these species either by directly impacting these [wildlife habitat] elements, [citing §230.30(b)(2)], or by '*facilitating incompatible activities*,' *id*., §230.30(b)(3)."  Id. (emphasis in original).  At Rosemont, there is no question that issuance of the 404 Permit will "facilitate incompatible activities" as part of

the Mine's construction and operations, which will adversely affect wildlife and habitat.

In Sierra Club v. Van Antwerp, 709 F.Supp.2d 1254 (S.D. Fla. 2009), the plaintiffs challenged the issuance of Section 404 permits to limestone mining companies. To determine whether the permitted activities would cause or contribute to "significant degradation" of the aquatic ecosystem, the court stated that it "must decide whether the Corps considered, as required by the CWA and implementing regulations, as well as NEPA, the significant adverse effects on municipal water supplies (which were a reasonably foreseeable result of the mining)." Id. at 1270.

In Sierra Club v. U.S. Army Corps of Engineers, 2012 WL 13040281 (S.D.Tex.2012), the plaintiffs challenged the issuance of a 404 permit for a stretch of new highway.  The court relied on the "secondary effects" analysis requirements in 40 C.F.R. §230.11(h), and the "cumulative effects" determinations in §230.11(g), to find that the Corps failed to consider the "reasonably foreseeable development" and cumulative effects on the nearby operation of a dam and associated water flow conditions.  Id. at *18-19 ("Federal Defendants do not dispute that the Corps was required to consider the cumulative impacts at Addicks [the nearby dam] under the CWA and the 404 Guidelines.").

The same was true in Fox Bay Partners v. U.S. Corps of Engineers, 831 F.Supp. 605 (N.D.Ill.1993), where the court upheld the Corps' denial of a 404 permit for a commercial marina.  The court relied on §230.11(h) and §230.10(c) to find that "the Corps must look not only at the direct effects of a discharge but also at the indirect effects."  Id. at 609.  There, even though "[n]o one claims that the proposed fill or construction [of a marina boat ramp] itself will cause a significant degradation of the waters of the Fox River and Chain-O-Lakes," the court found that the Corps properly

considered the degradation that would result from increased boat traffic on the river and lakes that would result from building the boat ramp.  Id.

The court's analysis in Sayler Park Vill. Council v. U.S. Army Corps of Engineers, 2003 WL 22423202 (S.D. Ohio 2003) is also applicable here, as the court enjoined the upland development associated with a 404 permit for a barge facility on the Ohio River, where "the upland portion . . . would be practically useless without the water-based portion" and the upland development would have potential adverse visual effects on nearby historic properties.  The court highlighted the need for an injunction of the entire project, including the upland portion, as "Federal courts have recognized that both economic pressure and regulatory inertia may substantially and improperly impact the decision-making of a federal agency."  Id.

Ninth Circuit decisions reviewing these issues under NEPA also support Plaintiffs' position.  In Save Our Sonoran v. Flowers, 408 F.3d 1113 (9th Cir. 2005), a case challenging a 404 permit, the court upheld a preliminary injunction against the entire development, even though the acreage of the WOTUS discharge was limited.  Like here, the Corps had failed to review the impacts from the project as a whole, focusing only on the limited direct impacts from the fill discharge.  "[B]ecause the uplands are inseparable from the washes, the district court was correct to conclude that the Corps' permitting authority, and likewise the court's authority to enjoin development, extended to the entire project."  Id. at 1124; see also White Tanks Concerned Citizens v. Strock, 563 F.3d 1033, 1042 (9th Cir. 2009) ("Because this project's viability is founded on the Corps' issuance of a Section 404 permit, the entire project is within the Corps' purview.").

As shown in the above figures (p. 6-7), the mine pit, waste rock, and tailings will be located and constructed in the WOTUS disposal sites that will receive the fill that the Corps permitted.  In addition to not considering the severe impacts resulting from

32

construction and operation of the Mine (such as the resulting permanent dewatering of the regional aquifer and creation of a permanent, toxic pit lake), the Corps claimed it had no obligation to consider the adverse impacts of the contaminated runoff from the waste rock and tailings that will be dumped on top of the initial fill material, and no authority to require Rosemont to minimize or mitigate these impacts.  Exh. 12 (ROD, p. 14, 39).

In refusing to consider the secondary effects resulting from mine construction and activities, the Corps argues that "the causal connection between the impacts to groundwater and the discharge of fill is simply too attenuated."  Exh. 12 (ROD, p. 43).  The Corps references EPA's General Counsel Opinion in 1983 as grounds.  Id.  However, that Opinion says that "impacts that may be caused by the subsequent operation of a project or by associated development may be considered, depending on the directness of the causal connection, the predictability of such impacts, and a general rule of reason."  Fink Dec., Exh. G (Opinion, at 9).  Without the 404 Permit, there is no question that the Rosemont Mine could not be constructed or operated.  Thus, the "causal connection" between the 404 Permit and Mine construction is certain, and the acknowledged "predictability" of the adverse impacts from dewatering, pit lake contamination, and contaminated runoff is evidenced throughout the record.

In sum, the Corps' statement that the impacts from Mine construction are "too attenuated" to be considered under the 404(b)(1) Guidelines flies in the face of the EPA's expert determination, ignores relevant factors, "failed to consider an important aspect of the problem [and] offered an explanation for its decision that runs counter to the evidence before the agency" and is thus arbitrary and capricious under the APA.  Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983).

33

C.    Failure to Comply with the Corps' Public Interest Regulations.

The Corps cannot issue a 404 permit if it "would be contrary to the public interest." 33 C.F.R. §320.4(a)(1). This requires the Corps to consider "the probable impacts" of a proposed project on "[a]ll factors which may be relevant to the proposal[,] including the cumulative effects." Id. "Evaluation of the probable impact which the proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case." Id.

> All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.

Id.

For the Rosemont Mine, the Corps concluded that "issuance of the permit is not contrary to the public interest." Exh. 12 (ROD, p. 69). In making that determination, the Corps reviewed and considered that "[t]he proposed action, which would produce resources such as copper, molybdenum, and silver, would further the objective of the applicant as well as stated interests of both Arizona and the United States in the development of mineral resources." Id. (ROD, p. 56). The ROD further highlighted "the public need for these minerals . . . [and] the economic benefits associated with the development of the proposed action." Id.; see also id. (ROD, p. 60) (finding that "[b]eneficial effects would occur as a result of increases in employment and . . . tax revenue as a result of the proposed construction and operations of the mine.").

Despite relying on these purported economic **benefits** from operation of the Mine, including increased copper supplies, to find that the "proposed action" is not contrary to

the public interest, the Corps arbitrarily refused to consider the **negative effects** from the construction and operation of the Mine on the various environmental and other resources listed in 33 C.F.R. §320.4(a)(1). Exh. 12 (ROD, p. 58-59) (stating that the Corps' public interest review "does not include mine operations," and that the severe effects resulting from groundwater drawdown "are outside of the Corps' control and responsibility, and therefore are not applicable to the action under consideration.").

During the administrative process when the Corps properly considered and weighed all the relevant factors, the agency concluded "that implementation of the proposed project would be contrary to the public interest." Exh. 29 (2016 Corps' letter to Hudbay, p. 2). It was only because of the Corps' unilateral, eleventh-hour refusal to consider the indirect, secondary, and cumulative impacts from Mine construction and operation that the Corps reached the opposite determination. However, this "blinders-on" approach to secondary and cumulative effects is not allowed as it violates the Guidelines. Section I.B., *supra*. "To require [the Corps] to ignore the indirect effects that would result from its actions would be to require it to wear blinders that Congress has not chosen to impose." Riverside, 758 F.2d at 512.

In addition to the above-analyzed cases, the Ninth Circuit has recognized the Corps' duty to consider these impacts in order to ensure that issuance of the 404 permit is in "the public interest." In Ocean Advocates, after finding that the Corps failed to consider the cumulative impacts from increased shipping traffic resulting from the issuance of a 404 permit for an oil refinery dock, the court noted that upon remand and consideration of these effects, "the Corps may impose conditions on **the operation** of permitted terminals at any time 'to satisfy legal requirements or to otherwise satisfy the public interest.' 33 C.F.R. §325.4(a)." 402 F.3d at 871 (emphasis added).

35

In Clatsop Residents Against Walmart v. U.S. Army Corps of Engineers, 735 Fed.Appx. 909 (9th Cir. 2018), the court upheld a Corps 404 permit needed to construct a Walmart, including the Corps' public interest review, because the Corps had "balanced the 'benefits which reasonably may be expected to accrue from the proposal . . . against its reasonably foreseeable detriments.' 33 C.F.R. §320.4(a)(1)," which included the potential indirect detrimental effects of the Walmart "on small businesses."  Id. at 912; *see also* Corps' brief in Clatsop, 2017 WL 1757558, **45-46 (noting that the Corps' public interest determination considered the potential indirect effects of the Walmart, including adverse impacts on smaller businesses and traffic).

The same was true in Greater Yellowstone Coalition, 359 F.3d at 1272 n. 15, discussed above, where the Corps successfully argued to the court that it properly considered the impacts of the "development as a whole" on wildlife and habitat, not just impacts from the fill itself.  The Corps had argued that the impacts of a proposed project "beyond those associated with the proposed discharge into waters of the United States – such as the environmental impacts of upland aspects of the overall project – are for the most part meant to be addressed . . . through the Corps' public interest review," and that the Corps had "thoroughly considered and addressed the impacts on bald eagles from upland aspects of the proposed Project as part of its public interest and NEPA reviews." Greater Yellowstone Coal. v. Flowers, Fed. Def.-Appellees Answering Brief, 2003 WL 23723859, *33-34.

Just as the Corps properly considered in its public interest determinations the regional cumulative effects to wildlife from the golf course development in Greater Yellowstone, and on the regional economy and traffic resulting from the Walmart project in Clatsop, the Corps was required here to consider the cumulative and indirect impacts from construction and operation of the Rosemont Mine—impacts that EPA specifically

36

found to violate the CWA's prohibition against "significant degradation," and that the Corps previously found to be against the public interest.  Exh. 29.

> D.   Failure to Prevent Significant Degradation of Waters of the U.S. and Violation of Water Quality Standards.

Because the Corps illegally refused to consider the secondary and cumulative impacts from Mine construction and operation, the Corps failed to rebut the substantial evidence in the record, found by EPA and previously by the Corps, that the Mine "will cause or contribute to significant degradation of the waters of the United States," 40 C.F.R. §230.10(c), and "causes or contributes . . . to violations of any applicable State water quality standard," 40 C.F.R. §230.10(b)(1).  Fink Dec., Exh. D (2017 EPA letter at 66, stating that "[f]ollowing a comprehensive analysis of the impacts on the physical, chemical and biological components of the aquatic environment, EPA has concluded that the Rosemont Mine will result in significant degradation to waters."); id. (2017 EPA letter at 46, stating that "EPA has determined that contamination from the Rosemont Mine will lower existing water quality in Davidson Canyon and Cienega Creek ONRWs," which "is prohibited under the Guidelines (40 C.F.R. 230.10(b))."); Exh. 29 (2016 Corps letter, p. 1 ("The key CWA 404(b)(1) factors identified by the District that support a permit denial are determinations that the proposed Rosemont Mine will cause or contribute to violations of state water quality standards and significant degradation of waters of the United States.")).  Because such effects are not allowed under the 404(b)(1) Guidelines, the issuance of the 404 Permit violated the CWA.

Further, to avoid redundancy, SSSR adopts the Tribes' arguments regarding additional evidence of "significant degradation" and water quality violations.  *See* Tribes' Argument Section I.C., p. 35-37.

E.   Failure to Adequately Analyze and Mitigate Mine Impacts.

The 404(b)(1) Guidelines prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem."  40 C.F.R. §230.10(d).  Those seeking a 404 permit must mitigate the impacts of the proposed dredge and fill activities by "avoiding, minimizing, rectifying, reducing, or compensating for resource losses."  33 C.F.R. §320.4(r)(1).  The purpose of the compensatory mitigation program is to "offset unavoidable impacts to waters of the United States authorized through" 404 permits.  40 C.F.R. §230.91(a)(l); *see also* §230.93(a).  Mitigation is required for "significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment."  33 C.F.R. §320.4(r)(2).  These adverse effects to aquatic resource functions, whether direct or indirect, must be mitigated.  Id.; *see also* 40 C.F.R. §230.93(a)(1).

Additionally, under NEPA, an EIS must: (1) "include appropriate mitigation measures not already included in the proposed action or alternatives," 40 C.F.R. §1502.14(f), and (2) "include discussions of: . . . Means to mitigate adverse environmental impacts (if not already covered under 1502.14(f))."  40 C.F.R. §1502.16(h). "All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperation agencies . . .."  46 Fed.Reg. 18026, 18031 (Mar. 23, 1981).

The Corps here acknowledged that, regardless of its position limiting its authority and review under the CWA to just the fill associated with the initial clearing, grubbing, and grading, it must analyze mitigation measures from operation of the Mine itself: "the NEPA scope of analysis includes the entire surface footprint of the proposed mine, tailings and

waste rock, roads, utilities, and other infrastructure.  In addition, because of the involvement of the USFS, the scope of the NEPA document includes construction, operations, reclamation, and closure of the proposed mine (see p. 1 of the Final EIS)."  Exh. 12 (ROD, p. 12).

Further, as detailed above, due especially to the fact that the WOTUS at the site run throughout the mine pit and waste/tailings areas, the Corps was required under NEPA to review the impacts from the whole project.  *See* Ninth Circuit decisions in Save Our Sonoran, and White Tanks, *supra* I.B., both enjoining the entire project based on the agency's failure to comply with NEPA.

Yet the 2013 FEIS did not analyze mitigation for the loss of water flows and wildlife habitat in Empire Gulch, due to the Forest Service's legal position that it had no authority to analyze or impose such measures.  "Due to the Forest Service's jurisdictional limitation that mitigation measures can be required only on NFS [National Forest Service] surface resources, no mitigation measures are proposed that would directly offset the impacts predicted to occur along Empire Gulch."  Exh. 5 (FEIS, p. 546).  "The Forest Service authority related to mitigation is limited to protection of surface resources on NFS lands."  Exh. 13 (FEIS, p. 94).  Because neither the 2013 FEIS nor the 2019 EA analyzed any mitigation for these lost flows, the Corps violated NEPA.

Additionally, as determined by EPA in its review of the 2017 HMMP:

> Our review of the HMMP affirms our position that **the mitigation does not comply with the EPA's 404(b)(1) Guidelines and the requirements of the Mitigation Rule.**  The HMMP proposed by Rosemont fails to offset the proposed mine's impacts to aquatic resources in the Cienega Creek watershed.

Fink Dec., Exh. D (2017 EPA letter, at 3) (emphasis added).  EPA's rationale included that Sonoita Creek "lies outside the watershed where the Rosemont Mine project will be

39

constructed," (id. at 4), the 2017 HMMP "contains no quantitative functional assessment of waters at [Sonita Creek Ranch], or the Rosemont Mine impact set," (id. at 5), and "there is no justifiable ecological reason to fill and reconstruct Sonoita Creek at RX Ranch." Id. at 12.

    F.  The Corps Failed to Include an Analysis and Determination of the Amount of the Financial Assurance Covering the Mitigation Plan.

As part of reviewing and approving the mitigation plan, Corps regulations require that Rosemont provide "financial assurance" to cover mitigation costs: "(n) **Financial assurances.** (1) The district engineer shall require sufficient financial assurances to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with applicable performance standards . . .." 33 C.F.R. §332.3(n)(1) (emphasis in original). "The rationale for determining the amount of the required financial assurances must be documented in the administrative record for either the DA permit or the instrument." 33 C.F.R. §332.3(n)(2).

"The final mitigation plan must include the items described in paragraphs (c)(2) through (c)(14) of this section . . ." 33 C.F.R. §332.4(c)(1)(i). Item (c)(13) is "Financial assurances." 33 C.F.R. §332.4(c)(13). The mitigation plan must include: "[a] description of financial assurances that will be provided and how they are sufficient to ensure a high level of confidence that the compensatory mitigation project will be successfully completed, in accordance with its performance standards (*see* §332.3(n))." Id. at §332.4(c)(13); *see also* id. at §332.3(k)(2) ("permit conditions . . . must . . . (iv) Describe any required financial assurances or long-term management provisions for the compensatory mitigation project, unless they are specified in the approved final mitigation plan.").

Furthermore, "the district engineer must assess . . . the costs of the compensatory mitigation project."  40 C.F.R. §230.93(a)(1).  "District engineers must document the analysis used to determine the amount of the financial assurance, and must include this analysis in the administrative records for their permits."  Fink Dec., Exh. H (2005 Corps' Guidance on the Use of Financial Assurances, p. 2).

Despite the requirement that the amount and analysis of the financial assurance to cover the mitigation plan be included in the final permit, neither the 404 Permit nor the ROD contain any cost information or demonstration of financial assurance.  Rather, "Special Condition 5" of the Permit requires Rosemont to submit the financial assurance covering the mitigation only prior to construction, **after** the Permit is issued: "[y]ou shall submit a proposal for the short-term financial assurance prior to initiation of construction activities in waters of the U.S. associated with this permit."  Exh. 12 (ROD, p. 71).

"Special Condition 7" of the Permit, governing mitigation measures at the Sonoita Creek Ranch, does not require the approval or establishment of the financial assurance until at least 12 years after Permit approval:

> Prior to the end of monitoring year 12 of the 15 year-year monitoring period, you shall establish a fully-funded endowment or other long-term financial assurance specifically approved by this office, in writing, for the management of the preserve required in Special Condition 1 in perpetuity.

Exh. 12 (ROD, p. 72).

Rosemont's final mitigation plan, the 2017 HMMP, acknowledged that the required financial assurance analysis and amount will only be submitted **after** the Permit is issued.  "Details of the funding for the mitigation effort will be provided once the permit decision has been made."  Exh. 41 (HMMP, p. 68).

Thus, despite the Corps' acknowledgement, both in the ROD and in its regulations, that the agency must analyze and determine the amount of the mitigation financial assurance which "is necessary to ensure avoidance and minimization of impacts to waters of the U.S. as well as ensure successful compensatory mitigation for the unavoidable losses of waters of the U.S. due to the construction of the proposed action," (Exh 12, ROD, p. 73), the Permit was issued without this critical information.

**II.    The Project Will Result in Immediate and Irreparable Harm to Plaintiffs' Interests in Protecting High Quality Waters, Wildlife, and Related Natural Resources of the Santa Ritas.**

The Corps' 404 Permit, and the resulting USFS approval of the revised MPO, authorizes Rosemont to begin immediate construction.  The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often .. . irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  Amoco Prod. Co. v. Vill. of Gambell, Alaska, 480 U.S. 531, 545 (1987).  This particularly true for the imminent activities at issue here because "once the desert is disturbed, it can never be restored."  Save Our Sonoran, 408 F.3d at 1124, 1126.  Moreover, the "likelihood of irreparable environmental injury without adequate study of the adverse effects and possible mitigation is high."  S. Fork Band Council of W. Shoshone v. Dep't of Interior, 588 F.3d 718, 728 (9th Cir. 2009).

Rosemont intends to move forward with ground-disturbing, mining-related activities as early as summer 2019.  Fink Dec., Exh. B, p. 1.  These initial activities include "a drilling program," which would include drilling at 36 locations, the "pioneering" of "some new roadways," the construction of "new intersections off State Route 83" and at "Rosemont Junction," and the construction of a 20-inch water pipeline

and a high voltage transmission line "from Sahuarita across over the Santa Rita Mountains." Fink Dec., Exh. A (Transcript, p. 11-15).

Subsequently, beginning in "roughly October," (and long before this case will be resolved on the merits), Rosemont intends to "get into more serious land-clearing activities in connection with mine construction." Fink Dec., Exh. A (Transcript, p. 17). This includes "going in and conducting . . . major clearing and grubbing of the area." Id., p. 11. Rosemont also intends to begin major ground-disturbing activities at the Sonoita Creek Ranch mitigation site "sometime in the fall" of 2019. Id., p. 32, 36.

There is no question that these "land-clearing activities" would result in irreparable harm to the environment and SSSR's interests. As explained by Julia Fonseca, Environmental Planning Manager for Pima County, "[c]learing refers to the removal of trees and other aboveground vegetation, while grubbing is the removal of stumps and roots." Fonseca Dec. ¶14 (ECF 43-5). "After clearing and grubbing, Rosemont will remove topsoil and subsoil, which will destroy soil structure and horizonation." Id. "Soil horizons and other structures are the result of soil-forming processes that take thousands to tens of thousands of years," and mine reclamation "cannot replicate the time-dependent soil features that are destroyed by the permitted activities." Id. ¶15. Thus, this harm would be irreparable, again particularly in this desert ecosystem. Save Our Sonoran, 408 F.3d at 1126.

Moreover, this clearing, grubbing, dredging and filling, would irreparably harm wildlife habitat in this area. According to the Mine Plan of Operations, 23,000 cords of merchantable timber would be removed, mostly from the drainages of Barrel Canyon, Wasp Canyon, and a few side drainages. Fonseca Dec. ¶21. "There is no practicable way to restore the plants or animals once destroyed." Id. The grubbing also "causes permanent loss of burrows, dens and other shelter sites critical to native wildlife

43

survival," with the loss of these habitat features "irreparable." Id. ¶22.

SSSR also faces the threat of likely, irreparable harm to endangered species at the Mine site if the project is not enjoined while this case is heard.

> [T]he proposed project will result in degradation of jaguar habitat and disturbance to jaguars. Construction and operations of the mine, including the associated roads, will result in removal, destruction, and degradation of jaguar habitat and jaguar prey habitat and is likely to disturb jaguars, causing changes in, among other things, their habitat use and movement patterns.

Exh. 34 (2016 Biological Opinion, p. 298). These expected impacts to jaguar and jaguar habitat will range from "long-term" (defined as 30 years) to "permanent." Id. at 298-99. FWS also determined that impacts to Chiricahua leopard frogs "are reasonably certain to occur," and "are most likely to be heavily weighted towards the beginning phase of project implementation." Fink Dec., Exh. I (2013 Biological Opinion, p. 214).

> Specifically, *the majority of adverse effects are likely to result from the 18-month initial period of construction* which will include the use of heavy earth-moving equipment to clear vegetation, build roads, construct infrastructure, manipulate area drainage patterns, [and] build power lines and their access roads.

Id., p. 214-15 (emphasis added). These anticipated impacts to federally-listed species, beginning with the initial construction, will significantly impair Plaintiffs' members use and enjoyment of this site. *See e.g*., Serraglio Dec. ¶¶14, 16.

Harm to individual members of an endangered species is considered irreparable. Cascadia Wildlands v. Scott Timber Co., 715 Fed. Appx. 621, 624 (9th Cir.2017) (in evaluating irreparable harm, "the district court correctly required harm to [plaintiffs'] interest in individual members of the . . . species as opposed to harm to the entire species itself."). "Harm to those members is irreparable because '[o]nce a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult.'" Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 886 F.3d 803, 818

44

(9th Cir. 2018), *quoting* FCC v. Rosboro Lumber, 50 F.3d 781, 785 (9th Cir. 1995).

The declarations of SSSR's members further highlight the immediate and irreparable harms that would occur to SSSR's interests unless the Court grants the requested injunction. Serraglio Dec., ¶ 26 (stating that the planned activities for this summer and fall "would immediately and irreparably harm my use and enjoyment of the project area, . . . by impeding access to some areas, ruining scenic vistas and drives, degrading and destroying habitat, and reducing the chances for recovery of a number of protected species"); Hartmann Dec., ¶ 13 (stating that these activities "will absolutely and immediately preclude my uses and enjoyment of these lands and waters"); Featherstone Dec., ¶ 8 ( stating that "Rosemont's proposed operations in the coming months . . . represent a severe and immediate intrusion into the unspoiled resources of the area that I use and value.").

Because Rosemont's planned activities for this fall would impact jurisdictional waters, "the whole of the property falls under the Corps' permitting authority and the court's authority to enjoin development." Save Our Sonoran, 408 F.3d at 1123 (upholding injunction against entire project in challenge to Corps 404 permit).

**III.    The Balance of Hardships and the Public Interest Tip Sharply in Favor of Plaintiffs.**

A.    The Public Interest Weighs Heavily in Favor of a Preliminary Injunction.

The public interest weighs heavily in favor of preserving the *status quo* and preventing irreparable environmental and other harms until this Court has fully reviewed the merits. "The public interest strongly favors preventing environmental harm. Although the public has an economic interest in the mine, there is no reason to believe that the delay in construction activities caused by the court's injunction will reduce

45

significantly any future economic benefit that may result from the mine's operation." Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs, 472 F.3d 1097, 1101 (9th Cir. 2006). The public interest in favor of a preliminary injunction is especially acute when faced with violations of environmental laws. As the Ninth Circuit held in considering a preliminary injunction against a large mining project:

> Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward. Suspending a project until that consideration has occurred thus comports with the public interest.

S. Fork Band Council, 588 F.3d at 728; *see also* Save Our Sonoran, 408 F.3d at 1124. "The preservation of our environment, as required by NEPA . . . is clearly in the public interest." Sierra Club. v. Bosworth, 510 F.3d 1016, 1033 (9th Cir. 2007). Although issuing a preliminary injunction is not automatic, "[c]onsistent with *Amoco Production Company,* we have held that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits of their underlying claim." Alliance for the Wild Rockies, 632 F.3d at 1138.

The public has a strong interest in ensuring that federal agencies comply with laws designed to protect the public waters and lands, and public participation. "The problem here has not been any shortcoming in the laws, but simply a refusal of administrative agencies to comply with them . . . .  This invokes a public interest of the highest order: the interest in having government officials act in accordance with law." Seattle Audubon Soc'y v. Evans, 771 F.Supp. 1081, 1096 (W.D. Wash. 1991).

46

B.       The Interests of the Corps and Rosemont Are Not Sufficient to Override the Interests of Plaintiffs and the Public.

The Corps' interests in this Motion are negligible and do not outweigh the Plaintiffs' and the publics' interest in preventing irreparable environmental harm.  The temporary economic impacts to Rosemont are also not irreparable.

> [T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . . are not enough.

L.A. Mem'l Coliseum Comm. v. NFL, 634 F.2d 1197, 1202 (9th Cir.1980).

As the Ninth Circuit stated in upholding an injunction against a large-scale land development in Arizona, authorized pursuant to a Corps 404 permit:

> The district court determined that the balance of hardships tipped in SOS's favor because, if wrongfully restrained, Lone Mountain "may suffer financial harm," but if an injunction does not issue, unlawful disruption to the desert is likely irreparable.  The district court's analysis is a classic, and quite proper, examination of the relative hardships in an environmental case.

Save Our Sonoran, 408 F.3d at 1125.  Thus, where irreparable environmental harm is likely, "more than pecuniary harm must be demonstrated" in order to avoid a preliminary injunction, even though mining interests may face a "real financial hardship."  N. Alaska Envtl. Ctr. v. Hodel, 803 F.2d 466, 471 (9th Cir. 1986).

**IV.     No More Than a Nominal Bond Is Appropriate in this Case.**

Under F.R.C.P. 65(c), in order to obtain a preliminary injunction, a plaintiff may be required to post a bond in such sum as the court deems proper.  However, the "court has discretion to dispense with the security requirement, or to request a mere nominal security, where requiring security would effectively deny access to judicial review." Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency, 766 F.2d 1319, 1325-26 (9th Cir.

1985) (no bond where plaintiffs were public interest organizations seeking to protect the environment); *see also* <u>Friends of the Earth v. Brinegar</u>, 518 F.2d 322, 323 (9th Cir. 1975) ($1,000 bond); <u>League of Wilderness Defenders v. Zielinski</u>, 187 F. Supp. 2d 1263, 1272 (D. Ore. 2002) (no bond in NEPA case).

Here, SSSR and AMRC are small local nonprofit organizations with little financial resources. Hartmann Dec. ¶15; Featherstone Dec. ¶16. Although the Sierra Club and Center for Biological Diversity are larger nonprofit organizations, for all Plaintiffs, a requirement of a more than nominal bond would represent a real financial hardship and prevent Plaintiffs from vindicating their rights and frustrate judicial review. Isherwood Dec. ¶¶ 8-11; Suckling Dec. ¶¶ 8-11.

Respectfully submitted this 15th day of May, 2019.

<u>/s/Allison N. Melton</u>
Allison N. Melton (CO Bar #45088)
Center for Biological Diversity
128 Cascadilla St./#3024
Crested Butte, CO 81224
Phone: 970-309-2008
Email: amelton@biologicaldiversity.org

Roger Flynn (CO Bar # 21078)
Jeffrey C. Parsons (CO Bar # 30210)
WESTERN MINING ACTION PROJECT
P.O. Box 349, 440 Main St., #2
Lyons, CO 80540
(303) 823-5738; Fax (303) 823-5732
Email: wmap@igc.org

Marc D. Fink (MN Bar # 343407)
Center for Biological Diversity
209 East 7th Street
Duluth, Minnesota 55805
Phone: 218-464-0539

48

Email: mfink@biologicaldiversity.org
*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

In compliance with the Court's Order of May 10, 2019 (ECF 38 in 19-cv-177-TUC-JAS (Lead)), I certify that this Memorandum in Support of Motion for Summary Judgment contains 13,948 words, excluding the cover page, tables, index, and signature block.

## CERTIFICATE OF SERVICE

I, Allison N. Melton, attest that I served the foregoing to all parties in this case, via this court's ECF filing system, this 15th day of May, 2019.

*/s/ Allison N. Melton*
Allison N. Melton

49