Heidi J. McIntosh (CO Bar No. 48230) *(admitted pro hac vice)*
Stuart C. Gillespie (CO Bar No. 42861) *(admitted pro hac vice)*
Caitlin Miller (CO Bar No. 50600) *(admitted pro hac vice)*
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
hmcintosh@earthjustice.org
sgillespie@earthjustice.org
cmiller@earthjustice.org
Phone: (303) 623-9466
Fax: (720) 550-5757

*Attorneys for Plaintiffs Tohono O'odham*
*Nation; Pascua Yaqui Tribe; and Hopi*
*Tribe*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Save the Scenic Santa Ritas, *et al.*, ) | No. 4:19-cv-00177-TUC-JAS [Lead]) |
| Plaintiffs, ) | No. 4:19-cv-00205-TUC-JAS (C) |
| v. ) | |
| ) | Chief Judge: James A. Soto |
| United States Army Corps of Engineers, ) | |
| *et al.*, ) | **TRIBES' MEMORANDUM IN** |
| Defendants, ) | **SUPPORT OF MOTION FOR** |
| and ) | **TEMPORARY RESTRAINING** |
| ) | **ORDER** |
| Rosemont Copper Company, ) | |
| ) | |
| Defendant-Intervenors. ) | |
| ) | |
| ) | |
| Tohono O'odham Nation, *et al.*, ) | No. 4:19-cv-00205-TUC-JAS (C) |
| ) | |
| Plaintiffs, ) | |
| v. ) | |
| ) | |
| United States Army Corps of Engineers, ) | |
| ) | |
| and ) | |
| ) | |
| Peter Helmlinger ) | |
| ) | |
| Defendants. ) | |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 6

I.     The Tribes Will Suffer Irreparable Harm Absent a Temporary Restraining
       Order ........................................................................................................ 7

II.    The Tribes Have Established a Likelihood of Success on the Merits ..................... 9

       A.     The Corps Violated NEPA by Failing to Prepare a Supplemental EIS to
              Evaluate Significant New Information ............................................................ 9

       B.     The Corps Violated NEPA by Failing to Analyze the Copper World
              Expansion as a Connected or Cumulative Action ...................................... 11

              (1)     The Copper World Expansion is a Connected Action That Must Be
                      Analyzed in a Comprehensive SEIS ..................................................... 12

              (2)     The Copper World Expansion is a Cumulative Action That Must Be
                      Analyzed in a Comprehensive SEIS ..................................................... 13

       C.     The Corps Violated the NHPA by Failing to Consult with the Tribes in
              Order to Avoid and Minimize Any Impacts to Cultural Resources ............ 14

       D.     The Court Should Enjoin Any Construction Activities on the Site Pending
              Preparation of a Supplemental EIS and Consultation ................................. 15

III.   The Balance of Harms Weigh Heavily in Favor of a Temporary Restraining
       Order ...................................................................................................... 15

IV.    The Public Interest Weighs Heavily in Favor of a Temporary Restraining
       Order ...................................................................................................... 16

V.     The Court Should Impose No Bond or Only a Nominal Bond ............................ 17

CONCLUSION ................................................................................................ 17

Pursuant to Federal Rule of Civil Procedure 65(b), the Tohono O'odham Nation, Pascua Yaqui Tribe, and Hopi Tribe (collectively, the Tribes) respectfully request a temporary restraining order to prevent the Rosemont Copper Company (Rosemont) from grading the west side of the Santa Rita Mountains and discharging fill material into jurisdictional waters of the United States. Without notifying the Tribes, Rosemont commenced bulldozing the site on or before April 14, 2022. Rosemont's ground-clearing activities are causing severe, immediate, and irreversible harm to tribal cultural resources, waters of the United States, and critical wildlife habitat. The Tribes seek emergency relief to preserve the status quo and prevent any further irreparable harm before the Court can rule on a motion for a preliminary injunction.

## INTRODUCTION

This is the second time Rosemont has attempted to race forward and construct its proposed mine before the Court can rule on the merits of the Tribes' challenge to the Rosemont Clean Water Act Section 404 Permit. In 2019, Rosemont attempted to grade and clear the proposed mine site on the east side of the Santa Rita Mountains, only to be halted by this Court's decision vacating the U.S. Forest Service's approval of the mine. Faced with that ruling, Rosemont has now expanded its proposed mine to include over 3,503 acres on the west side of the Santa Rita Mountains, which it has pitched to investors as the Rosemont Copper World Expansion. That expansion, however, still depends on Rosemont having a valid Section 404 Permit, which the U.S. Army Corps of Engineers (Corps) suspended pending further agency review. Rosemont cannot therefore build its project absent a valid Section 404 Permit.

Despite the fact that the Corps has not reinstated, modified, or revoked the Section 404 Permit, Rosemont abruptly started grading, clearing, and discharging fill material in furtherance of its expanded mining project. Rosemont did not inform the Tribes or the public of these ground-disturbing activities. Nor did the Corps. The Tribes, however, obtained aerial photos on April 14, 2022, depicting bulldozers grading large swaths of the

site, including the extensive networks of ephemeral tributaries.  Rosemont has continued to bulldoze the site even though Corps has not evaluated the significant impacts of the Copper World Expansion, consulted with the Tribes on avoiding impacts to cultural resources, and decided whether (or not) to reissue the suspended Section 404 Permit, which Rosemont plainly needs to construct the project.

A temporary restraining order is essential to halt the bulldozers and prevent any further irreparable harm to cultural and environmental resources.  It is also essential to ensure the Corps comprehensively evaluates the Copper World Expansion and formally consults with the Tribes, as required by the National Environmental Policy Act (NEPA) and National Historic Preservation Act (NHPA).  The Corps had a mandatory obligation to conduct that analysis and consultation *before Rosemont undertook ground-clearing activities*.  The Corps failed to do so, violating the law.

## BACKGROUND

The Santa Rita Mountains is a landscape imbued with cultural significance for the Tribes.  *Pascua Yaqui Tribe v. Helmlinger*, No. 4:19-cv-00205-TUC-JAS, ECF No. 9-6.[1] It is the location of sacred sites, ancestral villages and burials, and a source of plant, animal, and mineral resources critical to maintaining the Tohono O'odham Nation's culture.  *Id.*  In recognition of the area's importance to the Tribes, the Forest Service designated both the east and west sides of the mountains as a Traditional Cultural Property eligible for listing on the National Register of Historic Places.  *Id.*  The Tribes also hold the unique waters that run throughout the mountains as sacred, as they bring special spiritual and ecological importance to the land.  Second (2d) Declaration (Decl.) of Austin Nunez ¶¶ 8-10 (attached as Ex. 1); *see also* ECF No. 42-2 at ¶¶ 4-5, 27.

---

[1] The Tribes provided exhibits for all of the factual allegations in their Complaint, which are docketed in the consolidated case, *Pascua Yaqui Tribe v. Helmlinger*, No. 4:19-cv-00205-TUC-JAS, ECF Nos. 9-1 to 15-5.  The Tribes will reference those documents as "*Pascua Yaqui*, ECF No. __," followed by the page number for the .pdf file.

It is in this sacred place that Rosemont proposed to develop a mile-wide by half-mile deep open pit copper mine on the east side of the mountain.  As part of that mine proposal, Rosemont also needed to construct a utility corridor on the west side of the Santa Rita Mountains to supply water and power to the mine site.  The Corps and Rosemont acknowledged that there were over one-hundred acres of potentially jurisdictional waters of the United States on the mine site, including a dense network of ephemeral streams crossing the utility corridor on the west side.  *See* Decl. of Mark T. Murphy at ¶ 8 (attached as Ex. 2).[2]  Because the Clean Water Act prohibits any unpermitted discharges into these jurisdictional waters, 33 U.S.C. § 1311(a), the company needs a Section 404 Permit from the Corps to construct the Rosemont Mine.  *Pascua Yaqui*, ECF No. 10-6.

Upon obtaining the Section 404 Permit in 2019, Rosemont announced its plans to commence grading, clearing, and grubbing the site.  ECF No. 42-9.  The Tribes and the Conservation Groups filed lawsuits challenging the Section 404 Permit and sought emergency relief to prevent irreparable harm before this Court could rule on the merits.  ECF Nos. 41, 44.  They also simultaneously sought an emergency injunction in their lawsuits challenging the U.S. Forest Service's Record of Decision approving the mine.  The day before Rosemont planned to start bulldozing the site, the Court vacated the Forest Service decision, preventing any construction activities.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 409 F. Supp. 3d 738 (D. Ariz. 2019).[3]  Because there were no longer any exigent circumstances, the Court denied without prejudice the motions for preliminary injunction.  ECF No. 94.  The Court also vacated the U.S. Fish

---

[2] *See also* WestLand Resources, Inc., Preliminary Jurisdictional Determination: Santa Rita Road Waterline for the Rosemont Project, Pima County, Arizona (March 1, 2010) (attached as Ex. 16, with maps at Ex. 17).

[3] Federal Defendants and Rosemont appealed the decision, which is fully briefed and awaiting a decision from the Ninth Circuit.  Appeal Nos. 19-17585, 19-17586.

and Wildlife Service's Biological Opinion for the Rosemont mine.  *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 441 F. Supp. 3d 843, 856 (D. Ariz. 2020).[4]

The Corps promptly suspended Rosemont's Section 404 Permit, pending further agency action to reinstate, modify, or revoke the permit.  ECF No. 98 at 2.  The Corps acknowledged that the permit was based on a faulty environmental impact statement that had been vacated by this Court.  *Id.*  The Corps also sought a stay of this case, promising the Court that Rosemont "is not authorized to discharge fill material into waters of the United States under its suspended permit."  *Id.*; *see also* ECF No. 98-1.  The Tribes and Conservation Groups did not oppose the stay based on the Corps' representations and the understanding that Rosemont could not undertake any activities on the site without a permit due to the extensive network of the waters covering the entire site.  ECF No. 99 at 2.  The Court entered the stay until the Corps took further action.  ECF No. 102.

Even though the permit remains suspended, Rosemont has significantly expanded the proposed Rosemont Mine to encompass at least 3,503 additional acres on the west side of the Santa Rita Mountains, which it has marketed as the Copper World Expansion.[5]  The expanded mine overlaps the same waters of the United States identified in the Section 404 Permit.  Murphy Decl. ¶ 16.  For example, Rosemont plans to construct a waste rock pile/heap leach pad, tailings facility, and processing facility on top of the ephemeral streams identified in the Section 404 permit.  *Id.*[6]  The viability of the Copper World Expansion thus depends upon the Section 404 Permit, which remains suspended.

Despite that clear reality, Rosemont sent a letter to the Pima County Flood Control District outlining its imminent plan to start "clearing, grading, stockpiling, and other

---

[4] Rosemont appealed a portion of the Court's ruling upholding the U.S. Fish and Wildlife Service's designation of critical habitat for the jaguar.  Appeal No. 20-15654.

[5] *See* Letter from Javier Del Rio, Vice President, Hudbay Minerals, Inc., to Pima County Regional Flood Control District, fig.6 (Mar. 10, 2022) (attached as Ex. 3).

[6] *See also* Draft Drawings Rosemont Copper Project (Mar. 2022) (attached as Ex. 4).

earthwork activities" for "Rosemont's future mining and metallurgical operations" at the Copper World Expansion.  Ex. 3 at 1.   According to the figures, the expanded mine would span the entire width of the Santa Rita Mountains from west to east and stretch almost four miles from north to south.  *Id.* at fig.6.  Upon obtaining that letter, the Tribes immediately requested additional details from the company on April 1, 2022, including whether it had a valid Section 404 Permit.  The Tribes received no response.[7]  The Tribes also alerted the Corps to Rosemont's imminent plans to grade the entire site as part of the Copper World Expansion.

The Corps informed Rosemont that the Section 404 Permit "is still a signed permit accepted by Rosemont" and "remains suspended."[8]  The Corps also informed the company that it could not rely on the Approved Jurisdictional Determinations (AJDs) issued in 2021.  *Id.* at 1-2.  Those ADJs were based on a short-lived rule vacated by this Court due to its "fundamental, substantive flaws."  *Pascua Yaqui Tribe v. U.S. Env't Prot. Agency*, 2021 WL 3855977, at *5 (D. Ariz. Aug. 30, 2021); *see also Navajo Nation v. Regan*, 2021 WL 4430466, at *3 (D.N.M. Sept. 27, 2021).  The Corps warned Rosemont that the AJDs do not "accurately delineat[e]" the jurisdictional waters on the site under the current regulatory regime, and that Rosemont would need a valid permit before undertaking any discharge activities.   Ex. 6 at 2.

Faced with the Corps letter, Rosemont admits that it cannot "impact any washes covered by this permit until it is either revoked or reinstated."[9]  Nonetheless, , Rosemont started preemptively clearing and grading for its expanded mining project *before* the Corps conducted any further review or reissued, modified, or revoked the Section 404

---

[7] *See* Email from Stuart C. Gillespie, Senior Attorney, Earthjustice, to Javier del Rio, Vice President, Rosemont Copper Company (Mar. 31, 2022) (attached as Ex. 5).

[8] *See* Letter from Julie A. Balten, Commanding Colonel, U.S. Army, to Matt Bingham, Hudbay Minerals at 2 (Apr. 6, 2022) (attached as Ex. 6).

[9] *See* Letter Letter from Javier Del Rio, Vice President, Hudbay Minerals, Inc., to Colonel Julie A. Balten, U.S. Army (Apr. 11, 2022) (attached as Ex. 18).

Permit.  Rosemont did not notify the Tribes of these ground-disturbing activities.  The Tribes, however, obtained aerial photos on April 14, 2022, showing bulldozers actively grading huge swaths of the site, including the ephemeral streams braided throughout the area.  Decl. of Russ McSpadden (attached as Ex. 7).  The Tribes warned the company to cease these unpermitted activities, which violate the Clean Water Act.[10]  The company has refused to do so, insisting on grading the site before the Corps has conducted any further review of its expanded mining project and without authorization under a Section 404 Permit.[11]

Given the exigent circumstances, the Tribes urged the Corps to immediately direct Rosemont to cease ground-disturbing activities until the Corps had: (1) prepared a Supplemental Environmental Impact Statement (SEIS) comprehensively analyzing the newly-proposed Copper World Expansion, including the cumulative impacts of the expansion when considered together with the original proposal; (2) consulted with the Tribes to avoid and minimize any impacts to cultural resources, and (3) made an informed decision about whether to reinstate, revoke, or modify the Section 404 Permit.[12]  The Corps has not done so.  The Tribes promptly filed this request for a temporary restraining order to halt Rosemont's destruction of the waters, cultural resources, and environment of the unique and sacred Santa Rita Mountains until the Court can rule on a motion for preliminary injunction.

## ARGUMENT

The standards for a temporary restraining order and a preliminary injunction are essentially the same.  *See, e.g.*, *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Washington v.*

---

[10] Tribes' Amended 60-day Notice of Intent to Sue Under Clean Water Act (Apr. 13, 2022) (attached as Ex. 8).

[11] Letter from Javier del Rio, Vice President, Rosemont Copper Company, to Eric Shepp, Pima County Flood Control District (Apr. 12, 2022) (attached as Ex. 9).

[12] Letter from Stuart C. Gillespie, Senior Attorney, Earthjustice, to David Castanon, U.S. Army Corps of Engineers (April 15, 2022) (attached as Ex. 10).

*Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).  To obtain a temporary restraining order, the Tribes must demonstrate: (1) a likelihood of success on the merits; (2) that they are likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities favors an injunction; and (4) an injunction is in the public interest.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  Because the Tribes meet all four prongs of the test, the Court should grant their emergency motion.  Alternatively, they have raised "'serious questions going to the merits'" and that the equitable factors weigh in their favor.  *Id.* at 1134-35.

## I.    The Tribes Will Suffer Irreparable Harm Absent a Temporary Restraining Order.

The Supreme Court has recognized that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  Moreover, courts have consistently recognized that "[d]amage to or destruction of any" cultural or religious sites "easily" meets the irreparable-harm requirement.  *See Quechan Tribe of Fort Yuma Indian Rsrv. v. U.S. Dep't of Interior*, 755 F. Supp. 2d 1104, 1120 (S.D. Cal. 2010); *Colo. River Indian Tribes v. Marsh*, 605 F. Supp. 1425, 1440 (C.D. Cal. 1985) (finding irreparable harm where a development would "threaten the integrity of the cultural and archeological resources").

Here, the Tribes have already suffered, and continue to suffer, irreparable harm due to Rosemont's grading and clearing of the Copper World Expansion site.  On or before April 14, 2022, Rosemont started bulldozing the ephemeral streams braided across the property, discharging fill material into these waters.  *See* Ex. 7 McSpadden Decl. (providing photos); *see also* Ex. 8 at 2-3.  These ephemeral tributaries are of unique importance to the Tribes as they convey storm flows down from the Santa Rita Mountains to the Santa Cruz River that flows across the Tohono O'odham's San Xavier Reservation.  Ex. 1 Nunez 2d Decl. ¶¶ 8-10.  There is no way to reverse the loss of these

critical desert streams.  *See Save our Sonoran, Inc. (SOS) v. Flowers*, 408 F.3d 1113, 1124 (9th Cir. 2005) ("[O]nce the desert is disturbed, it can never be restored.").

The Corps has acknowledged that filling ephemeral streams—as is actively occurring on the site—causes "cascading and cumulative downstream effects . . . resulting in significant, actual environmental harms." *Pascua Yaqui Tribe*, 2021 WL 3855977 at *5 (quoting Decl. of Jaimie A. Pinkham, Assistant Secretary of the Army for Civil Works, ¶¶ 16-17, attached as Ex. 11).  For example, filling ephemeral streams cuts off the critical stormflows that provide the lifeblood of downstream waters, such as the Santa Cruz River.  Ex. 2 Murphy Decl. ¶ 7.  Filling these streams also degrades the xeroriparian habitat used by migrating songbirds, including those travelling to and from Madera Canyon located to the south of the site.  *Pascua Yaqui*, ECF No. 9 at 15-16. Rosemont's operations will also affect jaguar critical habitat spanning these washes and extending up to the ridgeline.  *Pascua Yaqui*, ECF No. 12-5 at 320-21 (identifying jaguar critical habitat on west side).  Rosemont's actions will therefore permanently degrade waters and wildlife habitat, impairing the Tribes' interests.  Ex. 1 Nunez 2d Decl. ¶ 10.

The company is also transforming the west side of the Santa Rita Mountains from a Traditional Cultural Property into an industrial mining complex, causing further irreparable harm to the Tribes.  Rosemont has already graded portions of the landscape, McSpadden Decl. ¶¶ 9-11, 13, 16-17, degrading the integrity of a nearby sacred site and place of worship known as Huerfano Butte, Ex. 1 Nunez 2d Decl. ¶¶ 11-13.  In short order, the company will clear a historic Hohokam habitation site to make way for a waste rock facility, forever wiping this cultural site off the land.  *Id.* ¶ 14.  There is no way to undo these harms to cultural resources and the landscape—they are "severe, irreversible, and irretrievable," as the Forest Service acknowledged in the Environmental Impact Statement.  *Pascua Yaqui*, ECF No. 9-8 at 236.

These irreparable harms are a product of the Corps' failure to analyze the Copper World Expansion, as required by NEPA.  As courts have warned, "[t]he risk implied by a

violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation." *Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989). That admonition rings true here given Rosemont's efforts to raze the site before the Corps analyzes the consequences.  Without an emergency injunction, Rosemont will preemptively bulldoze the entire site, destroying jurisdictional waters and sacred cultural sites in short order.  Courts have expressed grave concerns about the danger inherent in precisely this fact pattern where the "developer will rush to fill the wetlands and commence construction, disrupting the wetlands, mooting the controversy, and rendering any judicial relief impractical if not impossible." *Sierra Club v. U.S. Army Corps of Eng'rs*, 277 F. App'x 170, 174 (3d Cir. 2008) (Rendell, J., concurring).  A restraining order is essential to preserve the status quo, prevent further irreparable harm, and ensure the Corps comprehensively evaluates the project, before it is too late.

## II.     The Tribes Have Established a Likelihood of Success on the Merits.

NEPA "establishes 'action-forcing' procedures that require agencies to take a 'hard look' at environmental consequences" *before* they occur.  *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000).  Likewise, "[s]ection 106 of [the] NHPA is a 'stop, look, and listen' provision that requires each federal agency to consider the effects of its programs" on historical properties, such as traditional cultural sites, and avoid them to the extent possible.  *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 805 (9th Cir. 1999).  Yet, the Corps has abdicated both of these obligations by ignoring the significant adverse impacts of Rosemont's Copper World Expansion.  The Court can and should enjoin any construction activities until the Corps complies with the law.

### A.     The Corps Violated NEPA by Failing to Prepare a Supplemental EIS to Evaluate Significant New Information.

To comply with NEPA, agencies "*shall* prepare supplements" whenever there are: (1) substantial changes in the proposed action that are relevant to environmental concerns; or (2) significant new circumstances or information relevant to environmental

9

concerns and bearing on the proposed action or its impacts.  40 C.F.R. § 1502.9(d)(1) (emphasis added).  The Rosemont Copper World Expansion satisfies both of those criteria, triggering the Corps' mandatory obligation to prepare an SEIS to inform its decision to revoke, reinstate, or modify the Section 404 Permit.

First, the Copper World Expansion represents a substantial—indeed massive— change to the Rosemont Mine project.  When Rosemont obtained the Section 404 Permit for the Rosemont Mine, the proposed project involved the temporary filling of potentially jurisdictional waters on the west side for the utility corridor.  Rosemont has since vastly enlarged what was already a massive project to include the Copper World Expansion. Rosemont now proposes to permanently destroy the waters of the United States in the utility corridor and bury them under a massive waste rock pile, heap leach pad, and processing facility.  Ex. 2 Murphy Decl. ¶¶ 16-17.  Rosemont also proposes to destroy additional reaches of the same jurisdictional waters to construct three tailings facilities and five open-pit mines.  These substantial changes demand supplemental analysis.

Second, the Corps must prepare an SEIS given the significant new information documenting the far-reaching impacts of the Copper World Expansion.  The expanded project would irreparably destroy the ephemeral streams that convey flood flows, nutrients, and chemicals across the site and downstream to the Santa Cruz River.  It would cause severe, irreversible, and irreparable damage to tribal cultural properties by clearing a Hohokam habitation site, degrading an iconic place of worship (Huerfano Bute), and transforming the Santa Rita Mountains—a traditional cultural landscape—into an industrial mine visible from Tucson and the San Xavier Reservation.  Ex. 1 Nunez 2d Decl. ¶¶ 11-15.  Furthermore, the expanded project would destroy vast expanses of natural habitat, adversely impacting songbirds and iconic species, such as the jaguar. These impacts clear the "low standard" that triggers an SEIS.  *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

Despite these significant and irreparable impacts, no federal agency has even begun to analyze the significant impacts of the Copper World Expansion. The Corps' Environmental Assessment did not analyze the significantly expanded impacts of the expanded project. Nor did the U.S. Forest Service analyze these impacts in the 2014 EIS relied upon by the Corps, claiming that the mine was too speculative at that time.[13] Whether or not that was true then, the facts are clear now: Rosemont has not only revealed its plans for the Rosemont Copper World Expansion, but commenced grading, clearing, and earthwork to build that mine. The Corps has an obligation to analyze the significant adverse impacts of those activities *before* they occur. Its failure to do so violates NEPA and prejudices its ability to make an informed decision about whether to reissue, modify, or revoke the Section 404 Permit. *See Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir. 2006) (stating that "ex post facto environmental review cannot cure an initial failure to undertake environmental review").

### B. The Corps Violated NEPA By Failing to Analyze the Copper World Expansion as a Connected or Cumulative Action.

NEPA requires agencies to analyze the proposed action, as well as all "connected" or "cumulative actions," in a single EIS. 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.9(e)(1). These requirements ensure that agencies comprehensively evaluate the impacts of their decisions; it also prevents an agency from "dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact." *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893–94 (9th Cir. 2002). Here, the Corps must analyze the Copper World Expansion as a connected or cumulative action, as well as the cumulative impacts of the project, so that it can make an informed decision about whether to reinstate, modify, or revoke the Section 404 Permit. Its failure to do so violates NEPA.

---

[13] U.S. Forest Serv., Final Environmental Impact Statement for the Rosemont Copper Project Vol. 2 at 140 (2013) (excerpted) (attached as Ex. 12). The 2016 Final Biological Opinion did not analyze the impacts from the Expansion, either.

**(1)     The Copper World Expansion is a Connected Action That Must Be Analyzed in a Comprehensive SEIS.**

The Ninth Circuit has applied an "independent utility" test to determine whether multiple actions are connected so as to require consideration in a single EIS.  *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006). "The crux of the test is whether *each of two projects* would have taken place *with or without the other* and thus had independent utility." *Sierra Club v. Bureau of Land Mgmt.*, 786 F.3d 1219, 1226 (9th Cir.2015) (emphasis in original) (quotation marks omitted).  Here, Rosemont's Section 404 Permit and the Copper World Expansion are connected—indeed inextricably intertwined—actions that must be analyzed in an SEIS.

As an initial matter, the Copper World Expansion cannot proceed absent the Section 404 permit for the Rosemont Mine, demonstrating that the two lack independent utility.  Rosemont must clear and grade the very same ephemeral streams covered by the suspended Section 404 Permit to construct the waste rock pile, leach heap pad, and processing facility for the Copper World Expansion.  Ex. 1 Murphy Decl. ¶¶ 16-17.  The viability of the project thus depends on the Section 404 Permit, which remains suspended.  In addition, the Copper World Expansion depends on the very same utility corridor for the Rosemont mine—that is, the utility corridor covered by the suspended Section 404 Permit.[14]  Because the Copper World Expansion "[c]annot or will not proceed unless other actions are taken previously or simultaneously" under the Section 404 permit, it must be analyzed in a supplemental EIS.  40 C.F.R. § 1501.9(e)(1)(ii).

Furthermore, the Rosemont Mine and Copper World Expansion "[a]re interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1501.9(e)(1)(iii).  As noted, the Copper World Expansion would destroy the same jurisdictional waters covered by the suspended Section 404 Permit. Both operations depend on the same utility corridor, without which Rosemont cannot

---

[14] *See* Rosemont Copper World Reclamation Plan, fig.2 (Aug. 2021) (attached as Ex. 13).

operate its mine.  On top of that, Rosemont has described the "synergies" across the mines, their functional overlap, and efforts to develop "the Copper World deposit in conjunction with the Rosemont deposit."[15]  Copper World is functionally, economically, and physically an interdependent part of the larger Rosemont Mine.  The Corps must prepare an SEIS to consider the significant adverse impacts of the expanded mining project.  Its failure to do so violates NEPA.

**(2)     The Copper World Expansion is a Cumulative Action That Must Be Analyzed in a Comprehensive SEIS.**

NEPA requires agencies to analyze "cumulative actions"—those actions that, when viewed with other proposed actions, have cumulatively significant impacts—in a single NEPA document.  42 U.S.C. § 4332(C).  Cumulatively significant impacts "cannot be avoided by . . . breaking [an action] down into small component parts" or foregoing that analysis entirely.  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998).

Here, the Rosemont Mine and Copper World Expansion will have a cumulatively significant impact on the environment and cultural resources, necessitating a comprehensive supplemental EIS.  The Copper World Expansion overlaps and extends beyond the Utility Corridor, resulting in cumulatively significant impacts on the same ephemeral streams identified in the Section 404 Permit.  Furthermore, the Copper World Expansion will degrade additional cultural resources, including a Hohokam habitation site, Huerfano Butte, and the Santa Rita Mountains traditional cultural landscape.  The Copper World Expansion will also exacerbate harms to critical jaguar habitat caused by the Rosemont Mine.  "A single EIS, therefore, [is] required to address the cumulative effects of the[] proposed [development]."  *Id.* (requiring a single EIS for multiple timber sales that could cumulatively impact the "same watershed").  At the very least, the Corps

---

[15] Press Release, Hudbay Minerals, Inc., Hudbay Announces Initial Mineral Resource Estimate at Copper World (Dec. 15, 2021) (attached as Ex. 14).

13

must consider the impacts of the Copper World Expansion as part of a cumulative impacts analysis for the Section 404 Permit.  *See, e.g.*, *Great Basin Mine Watch* 456 F.3d at 971-74 (holding that even if two mining projects are not "connected actions" under NEPA, the "cumulative impacts" from both projects on the regional environment must be fully considered).

### C.     The Corps Violated the NHPA by Failing to Consult with the Tribes in Order to Avoid and Minimize Any Impacts to Cultural Resources.

The "fundamental purpose of the NHPA is to ensure the preservation of historical resources."  *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 609 (9th Cir. 2010); 54 U.S.C. § 306108.  To that end, agencies must consult with Indian tribes "to identify [their] concerns about historic properties . . . including those of traditional religious and cultural importance, articulate [their] views on the undertaking's effects on such properties, and participate in the resolution of adverse effects."  36 C.F.R. § 800.2(c)(2)(ii)(A).  Where agencies subsequently discover "unanticipated effects on historic properties," they must "consult to resolve" those adverse effects.  *Id.* § 800.13(b).

Here, the Corps had an obligation to consult with the Tribes on the Section 404 Permit to resolve the unanticipated adverse impacts of the newly-proposed Rosemont Copper World Expansion.  The expansion would destroy an ancestral Hohokam village site, degrade Huerfano Butte, and impair the Santa Rita Mountains traditional cultural property, all of which are eligible for listing on the National Register of Historic Places. Ex. 1 Nunez 2d Decl. ¶¶ 11-18.  The Corps must resolve these adverse effects by consulting with the Tribes to "develop and evaluate alternatives or modifications to the undertaking"—the Section 404 Permit—"that could avoid, minimize, or mitigate adverse effects on historic properties."  36 C.F.R. § 800.6(a).  The Corps, however, has failed to consult with the Tribes regarding the adverse impacts of the Copper World Expansion on historical properties, violating the NHPA.

D.     The Court Should Enjoin Any Construction Activities on the Site
       Pending Preparation of a Supplemental EIS and Consultation.

The Ninth Circuit has repeatedly enjoined construction activities to "maintain the status quo" pending NEPA compliance. *Se. Alaska Conservation Council v. U.S. Army Corps of Eng'rs*, 479 F.3d 1148, 1151 (9th Cir. 2007). To that end, it has affirmed the court's authority to enjoin development projects whose "viability is founded on the Corps' issuance of a Section 404 permit" pending compliance with NEPA. *White Tanks Concerned Citizens v. Strock*, 563 F.3d 1033, 1042 (9th Cir. 2009); *SOS*, 408 F.3d at 1124 ("[B]ecause the uplands are inseparable from the washes, the district court was correct to conclude that the Corps' permitting authority, and likewise the court's authority to enjoin development, extended to the entire project.").

Here, the Court should enjoin any ground-clearing activities on the Copper World Expansion site pending the Corps' compliance with NEPA and the NHPA. The Corps identified 149 ephemeral streams, ranging from small channels to wide braided systems, that cross the utility corridor, weave across the proposed Copper World Site, and are potentially jurisdictional waters of the United States. Ex. 2 Murphy Decl. ¶ 8. Due to the braided network of jurisdictional waters, Rosemont unquestionable needs a valid Section 404 Permit to construct the Copper World Expansion, including the tailings facility, waste rock pile, and processing plant. *Id.* ¶ 16. In fact, Rosemont admits that it cannot "impact any washes covered by this permit until it is either revoked or reinstated." Ex. 18. Yet, that has not occurred—the permit remains suspended. Because the project's "viability is founded on the Corps' issuance of a Section 404 permit," the Court has authority to enjoin any activities on the site until the Corps complies with NEPA and the NHPA. *White Tanks*, 563 F.3d at 1042; *SOS*, 408 F.3d at 1124.

III.   The Balance of Harms Weigh Heavily in Favor of a Temporary Restraining
       Order.

To determine whether injunctive relief is appropriate, courts apply a "traditional balance of harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722,

737 (9th Cir. 2001).  In the face of irreparable harm to the environment and cultural resources, courts will withhold or limit injunctive relief only in "unusual circumstances." *Id.* at 737 n.18 (citation omitted); *see also League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014) (holding that if irreparable environmental harm is sufficiently likely, "the balance of harms will usually favor the issuance of an injunction to protect the environment.") (quoting *Amoco*, 480 U.S. at 545).

Here, environmental injury is imminent, while there is no countervailing harm to the Corps.  Rosemont, for its part, has not demonstrated any irreparable harm that would justify the unusual circumstance of withholding emergency relief.  It insists on bulldozing the site given "the amount of planning and commercial commitments" in which it has engaged, Ex. 9 at 1, but those assertions cut the other way.  A temporary restraining order is essential to ensure the requisite planning and analysis by the Corps *before* Rosemont causes irreparable harm.  Any financial harms are "self-inflicted" given the company proceeded in the face of litigation and repeated warnings from the Tribes and Corps. *Sierra Club. v. Trump*, 929 F.3d 670, 706 (9th Cir. 2019).

## IV.    The Public Interest Weighs Heavily in Favor of a Temporary Restraining Order.

The Ninth Circuit recognizes "the public interest in careful consideration of environmental impacts before major federal projects go forward, and . . . [has] held that suspending such projects until that consideration occurs 'comports with the public interest.'"  *All. for the Wild Rockies*, 632 F.3d at 1138 (citation omitted).  Congress recognized when it enacted NEPA that there is a strong public interest in requiring agencies to fully consider the environmental consequences of their decisions. There is also an undeniable "public interest in preserving nature and avoiding irreparable environmental injury."  *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (*en banc*).  The public, moreover, has an overarching interest in its government abiding by

16

the laws and regulations governing it.  *See, e.g.*, *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018).

## V.      The Court Should Impose No Bond or Only a Nominal Bond.

Under Rule 65(c) of the Federal Rules of Civil Procedure, a plaintiff must generally post a bond "in an amount the court considers proper."  However, the "court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *California ex rel. Van de Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended on other grounds* 775 F.2d 998 (9th Cir. 1985).  Courts have consistently waived the bond requirement or imposed a nominal bond where plaintiffs, like the Tribes in this case, seek a restraining order to protect the public interest.  *See id.* (requiring no bond); *Friends of the Earth, Inc. v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975) (requiring only a $1,000 bond).

The Tribes brought this case under NEPA and the NHPA to protect cultural resources, jurisdictional waters, and the environment.  They have no pecuniary interest in the lawsuit, and a requirement of more than a nominal bond would chill the Tribes' right to seek judicial review.  Decl. of Ryan Claw, ECF No. 43-7; Decl. of Raymundo Baltazar, Jr., ECF No. 43-8; Decl. of Wilfred Gaseoma, ECF No. 43-9.  Furthermore, the Tribes have raised serious questions on the merits, which "tips in favor of a minimal bond or no bond at all."  *Van De Kamp*, 766 F.2d at 1326.

## CONCLUSION

For the foregoing reasons, the Tribes respectfully request that the Court grant the motion for a temporary restraining order.

DATED this 19th day of April, 2022,

/s/ Stuart C. Gillespie
Stuart C. Gillespie *(admitted pro hac vice)*
Earthjustice

17

633 17th Street, Suite 1600
Denver, CO 80202
sgillespie@earthjustice.org
Phone: (303) 996-9616 (direct)
Fax: (303) 623-8083

Heidi J. McIntosh (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
hmcintosh@earthjustice.org
Phone: (303) 996-9621 (direct)
Fax: (303) 623-8083

Caitlin Miller (*admitted pro hac vice*)
Earthjustice
633 17th Street, Suite 1600
Denver, CO 80202
cmiller@earthjustice.org
Phone: (303) 996-9613 (direct)
Fax: (303) 623-8083

*Attorneys for Plaintiffs Tohono O'odham Nation;
Pascua Yaqui Tribe; and Hopi Tribe*

## CERTIFICATE OF SERVICE

I hereby certify that on April 19, 2022, I electronically transmitted the foregoing **TRIBES' MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

> _/s/ Stuart C. Gillespie_
> Stuart C. Gillespie