1
2
3
4

FENNEMORE CRAIG, P.C.
Norman D. James (No. 006901)
2394 East Camelback Road, Suite 600
Phoenix, Arizona  85016-2394
Telephone:  (602) 916-5000
Email:  njames@fennemorelaw.com

5
6
7

George O. Krauja (No. 010964)
One South Church Avenue, Suite 1010
Tucson, Arizona  85701-1627
Telephone:  (520) 879-6800
Email:  gkrauja@fennemorelaw.com

8
9
10
11

Mick Rusing (No. 006617)
RUSING LOPEZ & LIZARDI, P.L.L.C.
6363 North Swan Road, Suite 151
Tucson, Arizona  85718
Telephone:  (520) 792-4800
Email:  mrusing@rllaz.com

12

Attorneys for Rosemont Copper Company

13
14

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

15
16

Save the Scenic Santa Ritas, *et al.*,

Plaintiffs,

No. 4:19-cv-00177-TUC-JAS (Lead)
No. 4:19-cv-00205-TUC-JAS (C)

17

v.

18
19

U.S. Army Corps of Engineers, *et al.*,

Defendants,

**ROSEMONT COPPER COMPANY'S**
**RESPONSE TO TRIBES' MOTION**
**FOR TEMPORARY RESTRAINING**
**ORDER (Doc. 108) AND TRIBES'**
**MEMORANDUM IN SUPPORT OF**
**MOTION FOR TEMPORARY**
**RESTRAINING ORDER (Doc. 109)**

20

and

21
22

Rosemont Copper Company,

Intervenor-Defendant.

23
24
25
26
27
28

FENNEMORE CRAIG, P.C.

PHOENIX

# TABLE OF CONTENTS

Page

I.    THE TRIBES ARE NOT ENTITLED TO INJUNCTIVE RELIEF BECAUSE THE COURT LACKS JURISDICTION AS THERE IS NO REVIEWABLE FINAL AGENCY ACTION. ......................................................... 2

II.   COPPER WORLD PROJECT AND THE ROSEMONT PROJECT ARE NOT CONNECTED ACTIONS. ............................................................... 4

III.  ROSEMONT IS NOT REQUIRED TO OBTAIN A SECTION 404 PERMIT FOR ACTIVITIES IN THE UNPERMITTED AREA. .......................... 6

   A.   The Tribes' Allegations Concerning the CWA Are Premature. .................. 6

   B.   Discharge into Ephemeral Washes Does Not Require a 404 Permit Unless the Washes Are "Waters of the United States." ................................ 6

   C.   Washes Are not WOTUS Unless They Have a "Significant Nexus" to a Traditional Navigable Water. ....................................................... 8

   D.   Preliminary Jurisdictional Determinations Do Not Establish a Significant Nexus. ..................................................................... 9

   E.   There Is No Significant Nexus between the Washes and Study Reach B of the Santa Cruz River ............................................................ 10

   F.   Study Reach B Is Not a TNW; for this Independent Reason, the Washes Are Not WOTUS. ............................................................ 13

IV.   ROSEMONT'S ACTIVITIES CAUSE NO IRREPARABLE HARM TO PLAINTIFFS. .................................................................................. 15

V.    HARM TO ROSEMONT COMPELS A BOND. .................................................. 17

VI.   THE COURT SHOULD NOT GRANT AN INJUNCTION WITHOUT AN EVIDENTIARY HEARING. ...................................................................... 19

VII.  CONCLUSION ................................................................................. 19

Rosemont Copper Company ("Rosemont") responds to the Tribes' Motion for Temporary Restraining Order (Doc. 108) and the Tribes' Memorandum in Support of Motion for Temporary Restraining Order (Doc. 109) (collectively, the Tribes' "Motion"). The Tribes' Motion should be denied for several independent reasons described below. First, a court may not enjoin activities over which it has no subject matter jurisdiction. *City of San Diego v. Whitman*, 242 F.3d 1097, 1102 (9th Cir. 2001); *Good v. Arrington*, 517 F. App'x 544, 545 (9th Cir. 2013). Yet, that is precisely what the Tribes impermissibly ask of the Court in this case.

The Tribes are asserting new claims against Defendant U.S. Army Corps of Engineers ("Corps") under the Administrative Procedure Act ("APA") even though there is no final agency action that can be challenged under that statute. Rosemont's Section 404 permit was suspended in 2019, and it remains suspended.[1] Further, the statutes allegedly violated by the Corps, the National Environmental Policy Act ("NEPA") and the National Historic Properties Act ("NHPA"), apply to federal actions. These statutes do not apply to Rosemont and cannot serve as a basis to enjoin Rosemont's private land use activities.

The Tribes actually object to Rosemont's discharge of fill material into desert washes that cross Rosemont's private property near Helvetia, Arizona. But these washes are not subject to federal jurisdiction, and they are not covered by Rosemont's suspended Corps permit. Even if that were not the case, the Tribes' claim would be based on alleged violation of the Clean Water Act ("CWA"), not violations of NEPA and the NHPA. Rather than complying with the 60-day notice requirement imposed by Congress for citizen suits under the CWA, the Tribes have sued the Corps under the APA while seeking an injunction against Rosemont.

Thus, for several independent reasons, the Tribes' requested relief clearly falls outside of the jurisdiction of this Court and the permissible scope of an action under the

---

[1] Highlighting that the current work does not rely on the suspended Section 404 permit, Rosemont is in the process of surrendering the permit. Because the permit is the subject of Plaintiffs' complaints, Rosemont will file a motion to dismiss the case on mootness grounds next week.

1  APA.  The Tribes cannot demonstrate a likelihood of success on the merits, and the balance

2  of the hardships tips sharply toward Rosemont.  Accordingly, the Tribes' Motion must be

3  denied.  *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008); *Alliance for the Wild Rockies v.*

4  *Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011).

5        This response is supported by the declarations of Andre Lauzon (**Exhibit 1**), Brian

6  Lindenlaub (**Exhibit 2**), and Rich Burtell (**Exhibit 3**), as well as additional evidence

7  attached to those declarations and to this response.

8  **I.      THE TRIBES ARE NOT ENTITLED TO INJUNCTIVE RELIEF BECAUSE**

   **THE COURT LACKS JURISDICTION AS THERE IS NO REVIEWABLE**

9  **FINAL AGENCY ACTION.**

10       Plaintiffs' supplemental claims against the Corps for violations of NEPA and the

11 NHPA are reviewed under the APA, 5 U.S.C. § 706.  *See Gros Ventre Tribe v. United*

12 *States*, 469 F.3d 801, 814 (9th Cir. 2006).  "It is axiomatic that Plaintiffs must identify an

13 'agency action' to obtain review under the APA."  *Whitewater Draw Nat. Res. Conservation*

14 *Dist. v. Mayorkas*, 5 F.4th 997, 1010 (9th Cir.), *cert. denied*, 142 S. Ct. 713 (2021) (citation

15 omitted); *see also* 5 U.S.C. § 704.

16       Here, Plaintiffs have not alleged that the Corps took a reviewable final action, as

17 discussed in Rosemont's Joint Response to Plaintiffs' Motion to Lift Stay (Doc. 104) and

18 Motions to File Supplemental Complaints (Docs. 106, 111.)[2]   The Tribes and the

19 Conservation Group Plaintiffs base their claims on the Corps' inaction in permitting

20 Rosemont's activities on its private property near Helvetia (the "Unpermitted Area"[3]).

21 (Doc. 106-1 at 102 ¶ 381, 103–04 ¶¶ 387–88; Doc. 111-2 at 102 ¶ 319.)  Thus, the Court

22 lacks subject matter jurisdiction over Plaintiffs' supplemental APA claims for three reasons.

23       *First*, Plaintiffs have not alleged that the Corps engaged in a final action reviewable

24 _____

25 [2]  Rosemont's response to Plaintiffs' other pending motions is filed separately and

   concurrently herewith, and is incorporated herein by this reference.  For all of the reasons

26 that the requests to lift the stay and file supplemental complaints should be denied, so should

   the Tribes' request for injunctive relief.

27 [3]  A map depicting this private land is attached as Exhibit 1 to the Declaration of Andre

28 Lauzon.  It is referred to as the Unpermitted Area because it is not subject to the Section

   404 permit or any other federal permits.

FENNEMORE CRAIG, P.C.

PHOENIX

2

under the APA.  Agency action is "final" if a minimum of two conditions are met: "[f]irst, the action must mark the consummation of the agency's decision making process . . . it must not be of a merely tentative or interlocutory nature.  And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Gallo Cattle Co. v. U.S. Dep't of Agric.*, 159 F.3d 1194, 1198–99 (9th Cir. 1998) (alterations and ellipsis in original) (citation omitted).

Plaintiffs cannot meet either requirement.  The Corps has taken no action concerning Rosemont's activities in the Unpermitted Area and, thus, there is no action to review. *Mamigonian v. Biggs*, 710 F.3d 936, 942 (9th Cir. 2013).  Plaintiffs have alleged no action that "mark[s] the consummation of the [Corps'] decision making process."  *See Gallo Cattle Co.*, 159 F.3d at 1198–99.  And Plaintiffs have not alleged that the Corps has taken any action that "impose[s] new legal requirements or alter[s] the legal regime to which" any party is subject such that there is no reviewable final action.  *See Whitewater*, 5 F.4th at 1010.  Indeed, because the Tribes have conceded that the "Corps has not reissued, modified, or revoked the suspended 404 permit," (Doc. 106-1 at 89 ¶ 319), it is impossible that the Corps engaged in any action that imposes "new legal requirements or alter[ed] the legal regime to which [any party] is subject."  *See Whitewater*, 5 F.4th at 1010.

*Second*, to the extent Plaintiffs' NEPA and NHPA claims are based on the Corps' inaction pursuant to § 706(1) of the APA, they fail because Plaintiffs have not established that the Corps had a discrete and non-discretionary duty to take any action here.  *Norton v. SUWA*, 542 U.S. 55, 64 (2004) ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." (emphasis in original)).  Because the Corps has not taken any action as to Rosemont's activities in the Unpermitted Area or as to Rosemont's Section 404 permit—which remains suspended—the agency has no obligation to take any action under NEPA or the NHPA. *San Carlos Apache Tribe v. United States*, 417 F.3d 1091, 1092–94 & n.6 (9th Cir. 2005) (stating the NHPA applies where there is a federal "undertaking"); *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074-75 (9th Cir. 1996) (explaining that NEPA did not apply where

there was no federal action, let alone the required "major federal action"). Thus, the Corps was under no duty to take any discrete action under either the NHPA or NEPA, and the Court lacks jurisdiction over Plaintiffs' supplemental APA claims.

*Third*, Plaintiffs supplemental APA claims conflict with the CWA's citizen suit provisions. The CWA provides that citizens can sue to enforce the CWA, provided certain jurisdictional requirements are met. 33 U.S.C. § 1365. Because Congress has created a specific mechanism for citizens to enforce the CWA, it is presumed that Congress sought to bar other claims seeking to do the same. *See Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 14 (1981). Section 1365's provisions reflect a careful congressional balancing designed to resolve disputes without litigation. *See Ctr. For Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 800 (9th Cir. 2009).

Plaintiffs' supplemental claims short-circuit that careful balancing. CWA citizen suits cannot be brought to compel agency action to enforce the CWA. *See Whitman*, 242 F.3d at 1102. Permitting Plaintiffs' disguised CWA claims to go forward as APA claims would allow Plaintiffs to avoid the CWA's jurisdictional requirements, creating irreconcilable tension with the CWA's citizen suit provisions.

In sum, the Court has no subject matter jurisdiction over Plaintiffs' supplemental APA claims because the Corps has engaged in no reviewable final action, and there is no discrete agency action that the Corps was required to take. The Corps' permit is suspended and, as noted above, Rosemont is in the process of surrendering the permit. Plaintiffs' claims are futile and cannot serve as the basis for injunctive relief.

## II.   COPPER WORLD PROJECT AND THE ROSEMONT PROJECT ARE NOT CONNECTED ACTIONS.

Plaintiffs also argue that the Copper World Project and the Rosemont Project are connected actions. (*See* Doc. 106-1 at 81–84, ¶¶ 291–302.) Indeed, throughout their motion papers, they have renamed the Copper World Project as the "Copper World Expansion Project" to improperly suggest the two projects are interrelated. Plaintiffs are mistaken; the projects are separate and have independent utility.

The Ninth Circuit applies an "independent utility" test to determine whether multiple actions are considered connected actions. "The crux of the test is whether 'each of two projects would have taken place with or without the other and thus had independent utility.'" *Sierra Club v. BLM*, 786 F.3d 1219, 1226 (9th Cir. 2015) (citation omitted). Under this test, "when one of the projects might reasonably have been completed without the existence of the other, *the two projects have independent utility* and are not 'connected' for NEPA's purposes." *Id.* (citation omitted).

In *Sierra Club*, for example, environmental groups contended that the BLM's decision to grant a right-of-way over federal land for a wind energy project being constructed on private land required the BLM to consider the effects of the wind project under NEPA and the Endangered Species Act. *See id.* at 1222. The court rejected those arguments notwithstanding the projects' obvious synergies because the access road had independent utility and neither project depended on the other project. *Id.* at 1225–27; *see also Concerned Citizens & Retired Miners Coal. v. U.S. Forest Serv.*, 279 F. Supp. 3d 898, 910–13 (D. Ariz. 2017) (concluding that exploration project and future construction and operation of copper mine had independent utility and were not connected actions).

Here, the Copper World Project and the Rosemont Project are independent projects that have utility separate and apart from each other. Lauzon Decl. ¶¶ 18–22. Neither project depends on the other project, and each project could take place without the other project. *Id.* ¶ 18. Indeed, the Rosemont Project was proceeding on its own until it was halted by legal challenges to key federal permits. *Id.* ¶¶ 12–14. Now Copper World, a strictly private project, is proceeding independently without regard to the Rosemont Project's status. *Id.* ¶¶ 18–22. As recognized in *Sierra Club*, that there are synergies between the projects does not mean they are connected actions if they stand on their own. Thus, these projects are not connected actions and do not have to be analyzed together. And because there is no federal action associated with the Copper World Project, NEPA and the NHPA are not triggered,

as explained above.[4]

## III.   ROSEMONT IS NOT REQUIRED TO OBTAIN A SECTION 404 PERMIT FOR ACTIVITIES IN THE UNPERMITTED AREA.

### A.   The Tribes' Allegations Concerning the CWA Are Premature.

On April 4, 2022, the Tribes sent Rosemont a 60-day notice of intent to file a citizen suit against Rosemont.  *See* 33 U.S.C. § 1365.  In their notice, attached as **Exhibit 4**, the Tribes asserted the following:

> The proposed mine site [*i.e.,* the Unpermitted Area] contains a dense network of ephemeral streams that qualify as jurisdictional waters of the United States protected by the Clean Water Act.  Yet, [Rosemont] has or imminently plans to clear and grade the site, including the discharge of dredge and fill material into [WOTUS] without a Clean Water Act section 404 permit, 33 U.S.C. § 1344.

**Ex. 4 at 1.**  As explained above, however, this cannot be brought under the APA.  Instead, it is governed by the CWA citizen suit provision, 33 U.S.C. § 1365, the terms of which must be satisfied before a suit may be filed.  This requirement is jurisdictional.  *Ctr. for Biological Diversity*, 566 F.3d at 800.  When a party fails to comply with the 60-day notice, "the district court must dismiss the action as barred by the terms of the statute."  *Id.* (citation omitted).

Rather than awaiting expiration of the CWA's 60-day notice period, the Tribes have attempted to shoehorn their untimely CWA citizen suit into this action, which involves (a) a different mining project and (b) a 404 permit that is inapplicable to the Unpermitted Area or the activities therein.  The Court should reject this transparent effort to evade Congress's clear intent as embodied in the 60-day notice requirement.

### B.   Discharge into Ephemeral Washes Does Not Require a 404 Permit Unless the Washes Are "Waters of the United States."

"Under the CWA, any discharge of dredged or fill materials into the waters of the

---

[4] If, in the future, the Forest Service's Final EIS is reinstated, and Rosemont elected to proceed with the Rosemont Project, then the Forest Service would likely need to prepare a supplement to the EIS to address new information, including the Copper World Project. But supplementation would not be required because the Rosemont Project and the Copper World Projects are connected actions, but because the information would be relevant to the agency's approval of a new plan of operations for the Rosemont Project.  But, as explained, there is no action presently pending that would trigger such review.

United States ['WOTUS'] is forbidden unless authorized by a permit issued by the Corps of Engineers pursuant to Section 404 of the CWA, which is codified at 33 U.S.C. § 1344." *Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs*, 543 F.3d 586, 589 (9th Cir. 2008) (cleaned up), *abrogated on other grounds by U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016).

A Section 404 permit is <u>not</u> required for discharges of fill into ephemeral washes unless those washes are WOTUS. *Id.* at 594 ("If [Fairbanks'] property contains [WOTUS], then the CWA requires Fairbanks to obtain a Section 404 discharge permit; *if its property does not contain those waters, then the CWA does not require Fairbanks to acquire that permit*." (emphasis added)). Accordingly, unless the Tribes prove that the washes are WOTUS, they cannot establish that Rosemont has any obligations under the CWA.

The Tribes request that this Court enter an "order to prevent [Rosemont] from grading the west side of the Santa Rita Mountains and discharging fill material into jurisdictional [WOTUS]." (Doc. 109 at 3.) All of the washes in the Unpermitted Area are ephemeral, meaning they are dry except in direct response to precipitation events. Lindenlaub Decl. ¶¶ 11–16. There are no intermittent (seasonal flow) or perennial (year-round flow) waters in the Unpermitted Area, nor are there any wetlands. *Id.* ¶ 11. Accordingly, there is no surface flow in the Unpermitted Area, except for short durations in direct response to rainfall. *Id.* ¶¶ 11–16.

The Tribes repeatedly assert that the ephemeral washes in the Unpermitted Area are WOTUS (*e.g.*, Doc. 109 at 3, 5–6, 12–13), but they fail to offer adequate support for these assertions. The documentation included as exhibits to their Memorandum do <u>not</u> establish that these washes are WOTUS, *see* Section III.D., *infra*, and the Tribes fall woefully short of their burden of proof for obtaining a preliminary injunction.

In contrast, Rosemont's evidence submitted herewith persuasively demonstrates that there are no WOTUS in the Unpermitted Area. *See* Section III.E., *infra*. Accordingly, there is no legal basis for the Tribes' attack on Rosemont's activities on its own private land.

**C.     Washes Are not WOTUS Unless They Have a "Significant Nexus" to a Traditional Navigable Water.**

As the Tribes recognize, for a wash to qualify as a WOTUS for purposes of the CWA and Section 404 permitting, it must have a "significant nexus" to a traditionally navigable water ("TNW").  ***See* Ex. 4 at 5.**[5]   This is the test described by Justice Kennedy in his concurring opinion in *Rapanos v. United States,* 547 U.S. 715, 779–80 (2006).[6]  Justice Kennedy's opinion is the controlling statement of law on this subject. *See, e.g., Sackett v. U.S. Env't Prot. Agency*, 8 F.4th 1075, 1088–91 (9th Cir. 2021) ("[O]ur circuit's law is that Justice Kennedy's understanding of 'significant nexus' provides the governing standard for determining when wetlands are regulable under the CWA.").  To constitute a WOTUS, a waterbody must "significantly affect the chemical, physical, and biological integrity of" a TNW.  *Rapanos*, 547 U.S. at 780.  Otherwise, there is no significant nexus.  *Id.*  "Absent a significant nexus, jurisdiction under the [CWA] is lacking."  *Id.* at 767.

Following *Rapanos*, EPA and the Corps jointly issued a guidance document, widely referred to as the "*Rapanos* Guidance,"[7] that describes the agencies' application of the significant nexus test.  The *Rapanos* Guidance provides that, "the agencies will consider the flow characteristics and functions of only the tributary itself in determining whether such tributary has a significant effect on the chemical, physical and biological integrity of downstream TNWs." **Ex. 5 at 8.**  "Principal considerations … include the volume, duration, and frequency of the flow of water in the tributary and the proximity of the tributary to a [TNW]." **Ex. 5 at 8.**  Consideration is also given to "relevant contextual factors that directly

---

[5] The Tribes assert that the washes have a significant nexus to a reach of the Santa Cruz River referred to as "Study Reach B," which is depicted in Figure 3 to the F Block Report attached as Exhibit 1 to the Lindenlaub Declaration.  As described below, there is no significant nexus to Study Reach B; Study Reach B is not a TNW; and there is therefore no CWA jurisdiction over the washes.

[6] Unless otherwise specified, all citations to *Rapanos* refer to Justice Kennedy's concurring opinion.

[7] *See Clean Water Act Jurisdiction Following the U.S. Supreme Court's Decision in Rapanos v. United States & Carabell v. United States* (issued June 6, 2007, amended December 2, 2008), attached as **Exhibit 5**.

influence the hydrology of tributaries," including the "size of the tributary watershed, average annual rainfall, average annual winter snow pack, slope, and channel dimensions." **Ex. 5 at 11.**

"[T]he agencies will evaluate whether the tributary … [is] likely to have an effect that is more than speculative or insubstantial on the chemical, physical, and biological integrity of a [TNW]." **Ex. 5 at 11.** "*As the distance from the tributary to the navigable water increases, it will become increasingly important to document whether the tributary … [has] a significant nexus rather than speculative or insubstantial nexus with a [TNW].*" **Ex. 5 at 11** (emphasis added).

Finally, the agencies explain that "**small washes** *characterized by low volume, infrequent, or short duration flow*[] **are generally not [WOTUS] because** they are not tributaries and **they do not have a significant nexus to downstream waters.**" **Ex. 5 at 11–12** (emphasis added).

> **D.   Preliminary Jurisdictional Determinations Do Not Establish a Significant Nexus.**

The only evidence the Tribes offer in support of their assertion that the washes in the Unpermitted Area are WOTUS is a "preliminary jurisdictional determination" ("preliminary JD") concerning the Santa Rita Road utility corridor, an area in which Rosemont is conducting no activities  (Doc. 109-17; Doc. 109 at 5 n.2; *see also* Doc. 109-3 at 3, 8 ¶¶ 8, 16 (relying on the preliminary JD)).[8]

The Tribes' reliance on the preliminary JD is misplaced.  "[P]reliminary JDs … are 'advisory in nature' and simply indicate that 'there may be [WOTUS]' on a parcel of property . . . ."  *Hawkes Co.*, 578 U.S. at 597 (quoting 33 C.F.R. § 331.2).  "Preliminary JDs are usually issued at the request of landowners wishing to voluntarily waive or set aside questions regarding CWA[ ] jurisdiction over their property, such as where jurisdiction is clear or is otherwise not worth contesting."  *Nat'l Ass'n of Home Builders v. EPA* ("*Home*

---

[8] The Tribes' Memorandum is otherwise supported only by statements supporting the unremarkable proposition that these washes have flow when it rains.  (Doc. 109-16 at 1.)

*Builders II*"), 786 F.3d 34, 37 (9th Cir. 2015) (cleaned up). Preliminary JDs offer "a shortcut into the permitting process"—"a preliminary JD does not make an official designation of jurisdictional waters," but "an applicant willing to accept a preliminary JD may move directly to permitting." *Id.*

A party that wishes to contest CWA jurisdiction must obtain an approved jurisdictional determination ("approved JD" or "AJD"). *Id.* In contrast to a preliminary JD, an AJD involves a determination by the Corps "stating the presence or absence of [WOTUS]." 33 C.F.R. § 331.2. An AJD is a final, appealable agency action, whereas "[p]reliminary JDs are advisory in nature and may not be appealed." *Id.*

Critically, preliminary JDs do <u>not</u> involve a significant nexus evaluation. This is reflected in the preliminary JD for the Santa Rita Road utility corridor, which includes no significant nexus analysis whatsoever; indeed, the phrase "significant nexus" is entirely absent from the preliminary JD. (*See generally* Doc. 109-17). To the contrary, the preliminary JD expressly clarifies that it does <u>not</u> reflect a determination whether any of the washes crossing the Santa Rita Road waterline are jurisdictional WOTUS:

> [T]he permit applicant … is hereby advised of his or her option to request and obtain an approved jurisdictional determination (JD) for that site. Nevertheless, the permit applicant or other person who requested this preliminary JD has declined to exercise the option to obtain an approved JD in this instance and at this time…. [Instead,] **the permit applicant has elected to seek a permit authorization based on a preliminary JD, which does <u>not</u> make an official determination of jurisdictional waters** . . . .

(109-17 at 47 of 64) (emphasis added).[9]

### E.   There Is No Significant Nexus between the Washes and Study Reach B of the Santa Cruz River.

In 2021, as part of its planning for Copper World, Rosemont performed significant studies of the washes in the Unpermitted Area to evaluate whether a Section 404 permit is

---

[9]   The Tribes acknowledge, at least tacitly, that the PJD that does not establish that the washes are jurisdictional WOTUS. (*See* Doc. 109 at 3 n.2 (characterizing the washes as "**potentially** jurisdictional [WOTUS]" (emphasis added)); *see also* Doc. 109-3 at 3, 8 ¶¶ 8, 16 (same).)

1   needed for Copper World.  Rosemont engaged WestLand Resources, Inc. ("WestLand") to

2   perform WOTUS evaluations of private land in the Unpermitted Area (known as "F Block"

3   and "Helvetia Block," respectively, as depicted in the map as Exhibit 1 to the Lauzon

4   Declaration).  WestLand's "F Block Report" and "Helvetia Block Report" are attached as

5   Exhibit 1 and Exhibit 2 to the Lindenlaub Declaration.

6          Rosemont then conducted two additional studies concerning (1) the transport of

7   limestone silt downstream ("Transport Report") and (2) the physical, chemical, and

8   biological connection, if any, between the washes and Study Reach B of the Santa Cruz

9   River ("Connectivity Report").  The Transport Report and the Connectivity Report are

10  attached as Exhibit 2 and Exhibit 3 to the Lauzon Declaration.

11         The results across these four reports are consistent, and they are conclusive: the

12  washes in the Unpermitted Area do not have a significant nexus to Study Reach B.  The

13  washes therefore are not WOTUS, and the Tribes' CWA allegations are groundless.

14         WestLand's F Block Report notes that the ephemeral washes "lie approximately 36

15  river miles from Study Reach B."  Lindenlaub Decl., Ex. 1 at 5.  Notably, "[v]irtually all

16  intervening surface water features along this flow path are ephemeral."  *Id.*  WestLand

17  observed that research of ephemeral stream systems with similar climactic characteristics

18  indicates ephemeral flow from F Block would likely be entirely lost before reaching Study

19  Reach B.  *Id.* at 6.  "With regard to potential biological nexus factors," WestLand observed

20  that F Block's "drainages are all ephemeral and do not support aquatic species."  *Id.* at 7.

21  "As such, these features do not provide aquatic habitat that supports biota of Study Reach

22  B . . . ."  *Id.* (internal quotations omitted).  Similarly, "there is no demonstrable biological

23  nexus" to "the Santa Cruz River that is more than speculative or insubstantial."  *Id.*  Based

24  on these factors, WestLand concluded that "none of the drainages … possess a significant

25  nexus with Study Reach B of the Santa Cruz River."  *Id.* at 8.

26         WestLand's Helvetia Block Report contains similar findings, which is unsurprising

27  given the proximity of Helvetia Block to F Block.  Lindenlaub Decl., Ex. 2.  The washes

28  crossing Helvetia Block are even more distant that those on F Block.  *Id.* at 7.  WestLand

concluded, "[b]ased on hydrologic studies" concerning an analogous ephemeral drainage that flows in the Helvetia Block "ephemeral washes would be lost to infiltration well before reaching Study Reach B." *Id.* WestLand found that "there is no indication that sediment or other analytes that occur in [Helvetia Block's] drainages have any effect on the chemical integrity of Study Reach B, nor do these drainages have any meaningful biological or ecological relationship to [Study Reach B] given their small size, ephemeral condition, distance upstream, and other factors." *Id.*

Rosemont's Transport Report evaluated the extent to which washes in the area transport silt and other constituents downstream. Lauzon Decl., Ex. 1.2 at 1. Neighboring the Unpermitted Area is the Imerys Mine, a marble-limestone quarry. *Id.* at 1–2. The Imerys Marble Quarry is directly adjacent to the Unpermitted Area, and these locations share the same ephemeral washes. *Id.* at 1. Additionally, "the unique characteristics and purity of the Imerys quarry limestone silt serves as an ideal visual marker for tracing transport due to storm flow events over the quarry's 50-year history." *Id.* at 2. These factors make the quarry an ideal study area for assessment of the potential for downstream transport from the Unpermitted Area. *Id.* at 1–2. "The results of this study indicate no evidence of limestone past 8 miles downstream of the ephemeral washes," supporting the conclusion that "sediment fugitives from [Copper World] will not have the ability to be transported by the washes to the Santa Cruz River." *Id.* at 2.

The Connectivity Report evaluated the potential for runoff flowing in the Unpermitted Area's washes to flow to Study Reach B. Lauzon Decl., Ex. 1.3 at 1. The assessment included an array of studies concerning the physical connections, chemical connections, and biological connections between the Unpermitted Area and Study Reach B. *Id.* "All measurable chemical tracers within stormwater and sediment samples indicate that the water originating at site and the chemicals carried through the water travels no further than 17.4 miles" and "there is not a physical or chemical connection to the Santa Cruz River." *Id.* at 32. Nor is there a connection to Study Reach B, which is an additional 16.5 miles downstream. *Id.*; *see also id.* at 2. "The lack of continuous vegetation, poor

biotic integrity, low contribution of organic matter, and phytoextraction of chemicals within plants traveling no further than 4.0 miles from the Helvetia site demonstrate that there is no biological connection to the Santa Cruz River or Study Reach B . . . ." *Id.* at 32.

The conclusions summarized above are consistent with recent AJDs issued by the Corps for other projects in the Santa Cruz River Valley upstream of Study Reach B. *See, e.g.*, Lindenlaub Decl., Ex. 1. at 4–5. Employing a significant nexus analysis, the Corps issued AJDs determining that ephemeral washes associated with the ASARCO Mission Mine and the Sierrita Open Pit Copper Mine have "no significant nexus" to Study Reach B. *Id.* at 4. These findings were "based at least partially upon the distance to Study Reach B (25 to greater than 30 river miles) and the intervening deep, sandy, alluvial bed with limited stands of xeroriparian vegetation along the Santa Cruz River." *Id.* Notably, "the surface water features within [the Unpermitted Area] are of similar to greater distance from Study Reach B of the Santa Cruz River and share the same flow path almost entirely, including the same intervening deep, sandy, alluvial bed in the Santa Cruz River." *Id.*; *see also* Lindenlaub Decl., Ex. 2. at 4. This is depicted in Figure 3 to the F Block Report and Figure 3 to the Helvetia Block Report.

To be clear: *none of the exhibits attached to the Tribes' Motion actually includes a significant nexus evaluation*. Every significant nexus evaluation that has been conducted demonstrates that there is no significant nexus between the washes on the Unpermitted Area and Study Reach B. This means that the washes are not WOTUS, and there is no CWA jurisdiction. Accordingly, there is no likelihood of success on the merits, and the Tribe's request to enjoin activity on Rosemont's private land must be denied.

### F. Study Reach B Is Not a TNW; for this Independent Reason, the Washes Are Not WOTUS.

"After the Supreme Court decided *Rapanos* and the agencies issued their *Rapanos* Guidance, EPA and the Corps made the traditional navigable waters determination ('TNW Determination')" concerning Study Reach B of the Santa Cruz River." *Home Builders II*, 786 F.3d at 37–38. The TNW Determination for Study Reach B was "a preliminary, internal

determination," *id.* at 35, and efforts to judicially challenge the TNW Determination have twice been deemed premature. *Id.* at 42–43; *Nat'l Ass'n of Home Builders v. EPA.* ("*Home Builders I*"), 667 F.3d 6, 16 (D.C. Cir. 2011). The TNW Determination will be ripe for a landowner's challenge when the Corps issues an approved JD asserting that washes are WOTUS based on a significant nexus to Study Reach B. *Home Builders II*, 786 F.3d at 38.

Assuming there were a significant nexus between the washes on the Unpermitted Area and Study Reach B—which there is not—the washes nevertheless are not WOTUS. That is because Study Reach B is not a TNW. The agencies' TNW Determination for Study Reach B relies on the faulty conclusion that the reach is "navigable-in-fact." Burtell Decl. at 129, Att. D at 6. This conclusion is legally and factually erroneous.

A "navigable-in-fact" waterway is one that is "used, or susceptible of being used, in [its] ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 77 U.S. 557, 563 (1870). United States Supreme Court precedent makes clear that navigability is to be assessed by reference to the waterway's "*natural* and *ordinary condition*," not based on an unnatural condition resulting from human-induced increases or reductions in streamflow. *United States v. Holt State Bank*, 270 U.S. 49, 56 (1926) (emphasis added); *The Montello*, 87 U.S. 430, 441–42 (1874) (explaining navigability must be evaluated based on a river's "natural state").

In applying the federal test for navigability, the Arizona Court of Appeals has explained the meaning of "ordinary and natural condition" in assessing a river's navigability. *State ex rel. Winkleman v. ANSAC* ("*Winkleman*"), 224 Ariz. 230, 236 ¶ 5, 239 ¶ 19, 241 ¶ 28 (App. 2010). A river must be assessed "in its ***ordinary*** (i.e., usual, absent major flooding or drought) ***and natural*** (i.e., without man-made dams, canals, or other diversions) ***condition***." *Id.* (emphasis added).

Study Reach B begins at a wastewater treatment plant in northwestern Tucson, Arizona. Burtell Decl. ¶ 6. It is fitting that the start of this reach is an anthropogenic landmark; not coincidentally, the baseflow of this reach is sewage effluent, not natural

streamflow.  *Id.*  Historically, and in its "natural condition," this reach is discontinuous with insufficient flow to support commercial navigation.  *Id.* ¶ 16.  The effluent discharge that has created artificial flows in Study Reach B are not the "ordinary" or "natural" condition of the river, and therefore cannot be used to support a finding of navigability.  *Id.* ¶¶ 19, 26. The effects of this artificial effluent discharge in the reach is so significant that the Arizona Department of Environmental Quality ("ADEQ") has classified Study Reach B as an "effluent-dependent water" for water quality and related purposes.  A.A.C. Title 18, Ch. 11, Article 1, Appendix B (surface waters and designated uses); *see also* R18-11-113 (process for designating effluent dependent waters); Burtell Decl. ¶¶ 19, 26.

In issuing its TNW Determination for Study Reach B, the agencies relied on river conditions that are unnatural, while failing to recognize that Study Reach B has no history of commercial navigation.  Burtell Decl. ¶¶ 16–28.  The TNW Determination is therefore directly at odds with the jurisprudence concerning *The Daniel Ball* test for navigability. The "preliminary, internal" determination is not the product of an APA rulemaking and has never been subjected to scrutiny by the courts.  It will likely be invalidated if the Corps eventually bases a WOTUS determination on a significant nexus to Study Reach B.

The Arizona Navigable Streams Adjudication Commission has determined that no Arizona river other than the Colorado River is navigable under *The Daniel Ball* test.  *See id.* ¶¶ 3, 12, 26.  Accordingly, the nearest downstream TNW to the Unpermitted Area is approximately 353 river miles downstream of Copper World.  Lindenlaub Decl., Ex. 1.1 at 2–8.  There is no possibility that the washes on the Unpermitted Area have a significant nexus to a TNW at such a tremendous distance.  *Id.*

For this independent reason, the washes are not WOTUS, CWA jurisdiction does not exist, and the Tribes' request for injunctive relief must be denied.

## IV.   ROSEMONT'S ACTIVITIES CAUSE NO IRREPARABLE HARM TO PLAINTIFFS.

Plaintiffs boldly assert they will suffer irreparable harm.  Plaintiffs, however, ignore that Rosemont's grading and clearing activities are exclusively on Rosemont's privately

owned land.  Lauzon Decl. ¶¶ 7–11, 22, 29.  Plaintiffs also ignore that, as discussed above, Rosemont's activities do not require a 404 Permit, or any other federal permit.

Plaintiffs' assertions amount to vague speculation of future harm.  "Speculative injury does not constitute irreparable injury . . . ." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).  The facts paint a much different picture.  Rosemont has implemented a program to survey and identify prehistoric sites on its private property, and avoid or, if avoidance is not possible, to appropriately treat these sites to mitigate adverse impacts, following consultation with interested Tribes.  This program is similar to what is required for federal undertakings under the National Historic Preservation Act, and is being overseen by a third-party consultant with substantial experience in developing and implementing historic property treatment plans.  *Rosemont has* <u>*not*</u> *disturbed any prehistoric sites on its private land, and would consult with the tribes per its protocols prior to doing so*.  Lauzon Decl. ¶ 29.  There is no risk of immediate irreparable harm.  In addition, Rosemont, with no obligation to do so, has implemented a program to survey for and identify sensitive species of plants found on Rosemont's private land prior to work involving ground-clearing activities.  Under this program, which is supervised by trained biologists, areas where activities that involve ground clearing will be surveyed to identify sensitive plant species.  These plants are carefully removed and transplanted in other locations where no ground-disturbing activities are expected to take place. All employees oriented for the site undergo a worker environmental awareness program to recognize protected plants and animals stressing the importance of preservation and avoidance in line with State and Federal Law.  Lauzon Decl. ¶ 30.

The ephemeral washes on Rosemont's private land involved in the Copper World earth moving have no significant nexus to any TNW.  Therefore, as explained, they are not WOTUS.  And, even if there was a nexus, Study Reach B is not a TNW.  Plaintiffs may not like what Rosemont has done and will do on its land.  But, there is no federal jurisdiction over the privately owned washes on Rosemont's private property.  Plaintiffs fail to assert any colorable claim on which the Court could validly enjoin Rosemont's activities.

"The authority to enjoin development extends only so far as the Corps' permitting authority." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1122 (9th Cir. 2005).  There is no basis on which this Court may enjoin Rosemont's current activities, which are outside the Corps' permitting authority.  "An overbroad injunction is an abuse of discretion" because injunctive relief "must be tailored to remedy the specific harm alleged." *Lamb-Weston, Inc. v. McCain Foods, Ltd.,* 941 F.2d 970, 974 (9th Cir. 1991).  Here, even if the Court grants the motions to file supplemental complaints, there are no specific allegations supporting a broad injunction blocking all of Rosemont's private land use activities.

Plaintiffs do not assert specific facts showing specific imminent injury, because there is none.  *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) ("An injunction will not issue if the person or entity seeking injunctive relief shows a mere 'possibility of some remote future injury,' or a 'conjectural or hypothetical' injury." (citations omitted)); *Amylin Pharms., Inc. v. Eli Lilly & Co.*, 456 F. App'x 676, 679 (9th Cir. 2011) ("To support injunctive relief, harm must not only be irreparable, it must be imminent; establishing a threat of irreparable harm in the indefinite future is not enough.").  Plaintiffs fail the irreparable harm requirement for an injunction.

## V.    HARM TO ROSEMONT COMPELS A BOND.

Based on the facts and law, the Court should deny the injunction request.  If, however, the Court could issue an injunction, then "[t]he court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  Although the Ninth Circuit has interpreted Rule 65(c)'s bond requirement to be discretionary, "there is a rebuttable presumption that [the] wrongfully enjoined party is entitled to have the bond executed and recover provable damages up to the amount of the bond." *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1336 (9th Cir. 1994). The Tribes bear the burden of showing that a bond would impose an undue hardship. *See Save Our Sonoran,* 408 F.3d at 1126.

The Tribes urge the Court to waive the bond requirement, alleging this case involves a public interest.  The Ninth Circuit has not adopted a bright-line rule disposing of bonds in public interest cases, and instead applies a fact-specific inquiry.  *See id.*  Relevant to the inquiry is "the potential financial ramifications of issuing a preliminary injunction." *Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 733 (9th Cir. 1999). "[T]he district court may dispense with the filing of a bond when it concludes there is *no realistic likelihood* of harm to the defendant from enjoining [its] conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (emphasis added).  That is not the situation here.  The harm to Rosemont is certain.  The Copper World project has been underway since 2020, and demobilization costs will exceed $ 3,000,000.  Lauzon Decl. ¶¶ 10, 31-32.  The longer the delay, the greater the harm to Rosemont.  *Id.*  The work Plaintiffs' want to block is entirely on private property.  An injunction should be conditioned on a bond of at least $ 3,000,000.  *Id.*[10]

When, as here, a defendant has demonstrated it will be harmed if a preliminary injunction is entered, this Court has required that the requested bond be posted.  *See, e.g.*, *Optimistic Invs. LLC v. Kangaroo Mfg. Inc.*, No. CV-21-00212-PHX-MTL, 2022 WL 1203873, at *10 (D. Ariz. Apr. 22, 2022) (granting defendants' requested bond because there is a "chance that Defendants will prevail").  Moreover, "waivers [of the bond requirement] are rare, especially in cases involving commercial activity," such as this activity on Rosemont's private land.  *SinglePoint Direct Solar LLC v. Curiel*, No. CV-21-01076-PHX-JAT, 2021 WL 3472744, at *9 (D. Ariz. Aug. 6, 2021) ("We have never excused a District Court from requiring a bond where an injunction prevents commercial, money-making activities." (citing *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 426 (3d Cir. 2010))).

The Tribes' failure to demonstrate their inability to post a bond, coupled with

---

[10] The Court can take judicial notice the Tribes' extensive cash generating businesses enable them to post bond. The Tohono O'odham Nation owns four casinos, *Desert Diamond West Valley, Desert Diamond Tucson, Desert Diamond Sahuarita* and *Desert Diamond Why. See* http://www.azindiangaming.ord/member-tribes/tribal-land-casinos/.  The Pascua Yaqui Tribe owns two casinos, *Casino of the Sun* and *Casino del Sol Resort. Id.*

Rosemont's likelihood of success on the merits and certainty of suffering substantial financial harm if an injunction is wrongfully granted, warrants requiring that the Tribes post bond in the amount of $3,000,000 before an injunction is entered.

## VI.     THE COURT SHOULD NOT GRANT AN INJUNCTION WITHOUT AN EVIDENTIARY HEARING.

On this record, the Court should deny the Plaintiffs' Motions to Lift Stay, Motions to Supplement, and Motion for Temporary Restraining Order as a matter of law.   Put bluntly, the Court does not have jurisdiction to do what Plaintiffs ask.   If, however, the Court does not deny the motions outright, the Court should order an evidentiary hearing.

At best, Plaintiffs' injunction request relies on speculative assertions of facts that Rosemont disputes.   Rosemont recognizes the Ninth Circuit, unlike most circuits, does not require an evidentiary hearing before granting an injunction.   *Kenneally v. Lungren*, 967 F.2d 329, 334–35 (9th Cir. 1992).   Even so, a court may order hearings in applications for preliminary injunctions where the facts are "sharply disputed," proceeding on the papers "alone might be inappropriate." *Int'l Molders & Allied Workers' Loc. Union No. 161 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986) (citation omitted).   Rosemont is developing its privately owned land.    Fundamental fairness, the broad relief requested, and the circumstances of this case compel allowing Rosemont to cross-examine Plaintiffs' witnesses, and present its own witnesses, on disputed questions of fact.

If the Court orders an evidentiary hearing, Rosemont proposes the parties exchange witness disclosures within two court days after such an Order.

## VII.   CONCLUSION

For the foregoing reasons, this Court should deny the Tribes' request to enjoin Rosemont's activities on its private land, which is not subject to any Section 404 permit.

1

RESPECTFULLY SUBMITTED this 29th day of April, 2022.

2

FENNEMORE CRAIG, P.C.

3

4

 s/ Norman D. James
Norman D. James

5

George O. Krauja

6

Mick Rusing

7

RUSING LOPEZ & LIZARDI, P.L.L.C.

8

Attorneys for Rosemont Copper Company

21179645.2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENNEMORE CRAIG, P.C.

PHOENIX